**Nos. 22-2003(L), 22-2004, 22-2005, 22-2006,
22-2007, 22-2008, 22-2009, 22-2010, 22-2011**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————

In re: LTL Management LLC

———————————

On Appeal from the United States Bankruptcy Court
for the District of New Jersey

———————————

**BRIEF FOR ANDREW R. VARA, UNITED STATES TRUSTEE,
AS AMICUS CURIAE IN SUPPORT OF APPELLANTS
AND SUPPORTING REVERSAL**

———————————

*Of Counsel:*

RAMONA D. ELLIOTT
*Deputy Director and General Counsel*

P. MATTHEW SUTKO
*Associate General Counsel*

SUMI SAKATA
JOHN P. SHEAHAN
*Trial Attorneys*
*U.S. Department of Justice*
*Executive Office for United States Trustees*
*441 G Street NW, Suite 6150*
*Washington, DC 20530*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

PHILIP R. SELLINGER
*United States Attorney*

MARK B. STERN
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# TABLE OF CONTENTS

**Page**

INTEREST OF THE UNITED STATES TRUSTEE ...................................................1

INTRODUCTION AND SUMMARY ............................................................2

STATEMENT OF THE ISSUE........................................................................4

STATEMENT OF THE CASE .......................................................................4

    A.    Statutory Background ..................................................................4

    B.    Factual and Procedural Background .............................................8

ARGUMENT ............................................................................................ 12

    A.    LTL's Petition Does Not Serve a Valid Bankruptcy Purpose .................13

    B.    The Pre-Petition Corporate Restructuring Underscores the Extent to Which LTL's Petition Was Not Filed in Good Faith............................17

    C.    The Bankruptcy Court's Contrary Conclusion Is Unpersuasive ..............22

CONCLUSION ......................................................................................... 26

COMBINED CERTIFICATIONS

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                     **Page(s)**

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999) ............................................................................................13

*Czyzewski v. Jevic Holding Corp.*,
137 S. Ct. 973 (2017) ................................................................................ 17, 19

*15375 Mem'l Corp. v. Bepco, L.P., In re*,
589 F.3d 605 (3d Cir. 2009) ........................................................12-13, 14, 16, 22

*Integrated Telecom Express, Inc., In re*,
384 F.3d 108 (3d Cir. 2004) ......................................3, 4, 7, 8, 12, 13, 14, 15, 17, 22, 23

*LTL Mgmt. LLC, In re*,
No. 21-30589, 2021 WL 5343945 (Bankr. W.D.N.C. Nov. 16, 2021) ................ 11, 14

*Merit Mgmt. Grp. v. FTI Consulting, Inc.*,
138 S. Ct. 883 (2018) ........................................................................................21

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ........................................................................................4-5

*Railway Labor Execs.' Ass'n v. Gibbons*,
455 U.S. 457 (1982) ..........................................................................................5

*SGL Carbon Corp., In re*,
200 F.3d 154 (3d Cir. 1999) ..................................................3, 7, 8, 13, 15, 20

*Telegroup, Inc., In re*,
281 F.3d 133 (3d Cir. 2002) ............................................................................18

*Tennessee Student Assistance Corp. v. Hood*,
541 U.S. 440 (2004) ........................................................................................18

*Wright v. Union Cent. Life Ins. Co.*,
304 U.S. 502 (1938) ..........................................................................................4

**Statutes:**

11 U.S.C. § 307 ................................................................................1

11 U.S.C. § 362 ................................................................................8

11 U.S.C. § 524(e) ..........................................................................16

11 U.S.C. § 524(g) ..........................................................................19

11 U.S.C. § 548 ..............................................................................21

11 U.S.C. § 701 *et seq.* .....................................................................6

11 U.S.C. § 1101 *et seq.* ...................................................................6

11 U.S.C. § 1112(b) ............................................................ 1, 3, 4, 7, 12

11 U.S.C. § 1112(b)(2) .....................................................................25

11 U.S.C. § 1129(a)(7) .......................................................................7

11 U.S.C. § 1129(b)(1) .......................................................................7

11 U.S.C. § 1208(c)-(d) ......................................................................7

11 U.S.C. § 1307(c)-(d) ......................................................................7

28 U.S.C. § 158(d)(2) ......................................................................12

28 U.S.C. §§ 581-589a .......................................................................1

28 U.S.C. § 586(a)(8) ........................................................................1

28 U.S.C. § 1407 ............................................................................23

**Rule:**

Fed. R. App. P. 29(a) .........................................................................1

**Legislative Materials:**

H.R. Rep. No. 95-595 (1977)...............................................................................................1

H.R. Rep. No. 103-835 (1994)............................................................................................5

## INTEREST OF THE UNITED STATES TRUSTEE

The United States Trustee files this brief under Federal Rule of Appellate Procedure 29(a).

The Attorney General appoints United States Trustees to supervise the administration of bankruptcy cases and trustees. 28 U.S.C. §§ 581-589a. They "serve as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena." H.R. Rep. No. 95-595, at 88 (1977). To this end, Congress has provided that "[t]he United States trustee may raise and may appear and be heard on any issue in any case or proceeding." 11 U.S.C. § 307. 28 U.S.C. § 586(a)(8) specifically authorizes United States Trustees to seek the conversion and dismissal of chapter 11 cases under 11 U.S.C. § 1112(b).

In this case, a solvent company facing substantial tort liability used what is referred to as a "divisional merger" to insulate its valuable ongoing business assets in one successor company while saddling a different successor company with that tort liability. That latter company then immediately filed for chapter 11 bankruptcy relief, sought to enjoin the ongoing tort litigation against not only the debtor but also its parent company and other nondebtor affiliates, and stated a goal to eliminate the civil liability of those affiliates through releases in the debtor's bankruptcy plan. The misuse of the bankruptcy system is an issue of substantial importance to the United States Trustee, who often files motions for conversion or dismissal under § 1112(b).

## INTRODUCTION AND SUMMARY

Johnson & Johnson (J&J) and its related entities sold a talc-based baby powder product for decades; there are now approximately 38,000 pending tort claims contending that the product caused ovarian cancer or mesothelioma. Last year, Johnson & Johnson Consumer Inc. (Old JJCI), the corporate subsidiary that had held all of the assets and liabilities relating to the baby powder product for decades, underwent a transaction under Texas corporate law known as a "divisional merger." Through that transaction, Old JJCI was divided into two companies. One of the companies was a new subsidiary—also called Johnson & Johnson Consumer Inc. (New JJCI)—that was assigned almost all of Old JJCI's non-talc assets and liabilities. That corporation is currently worth approximately $61 billion. The other company was LTL Management LLC (LTL), which was assigned all of Old JJCI's talc-related liabilities and very few assets.

During its brief existence, LTL has had no substantial ongoing business operations, no employees other than those seconded from other J&J affiliates, and no reason for existing other than to file for bankruptcy. And indeed, two days after its creation, LTL did exactly that, filing a voluntary petition for chapter 11 bankruptcy relief. The stated purpose of this corporate restructuring and subsequent bankruptcy filing was to enable the J&J corporate enterprise to resolve all of its talc-related tort liabilities in a single bankruptcy proceeding—with the stated aim of confirming a plan of reorganization that would create a trust for talc claimants' benefit and would

preclude them from pursuing their claims against not only LTL but also J&J and other nondebtor corporate affiliates that have not filed for bankruptcy.

LTL's bankruptcy filing was not in good faith and should be dismissed for cause under 11 U.S.C. § 1112(b). As this Court has explained, chapter 11 petitioners receive considerable benefits at the expense of creditors, including "the automatic stay, the exclusive right to propose a reorganization plan, [and] the discharge of debts." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 129 (3d Cir. 2004) (quotation omitted). Congress has determined that those benefits are appropriate in circumstances where bankruptcy relief will benefit creditors as a group, such as where a "financially troubled petitioner[] seek[s] a chance to remain in business," *id.* (quotation omitted), or where the prospect of near term insolvency threatens a race to the courthouse pitting creditors against each other or a "fire sale" harming all creditors, *id.* at 121 (quotation omitted). At the same time, those benefits mean that bankruptcy "presents an inviting safe harbor for" solvent companies that face large potential tort liability, "creat[ing] the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings." *In re SGL Carbon Corp.*, 200 F.3d 154, 169 (3d Cir. 1999).

To guard against such abuse, a bankruptcy court must dismiss a chapter 11 petition "unless it is filed in good faith," *SGL Carbon*, 200 F.3d at 162, a standard that focuses generally on "(1) whether the petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going concern or maximizing the value of the debtor's estate, and (2)

whether the petition is filed merely to obtain a tactical litigation advantage," *Integrated Telecom*, 384 F.3d at 119-20.

In this case, LTL's petition fails the good faith test in all respects. Because LTL has no substantial ongoing business operations, its petition cannot preserve any going concern. Because LTL is not facing any substantial prospect of short-term financial distress, the petition cannot maximize the value of its estate. And because LTL's petition was self-evidently filed in large part as an attempt to extend the benefits of bankruptcy to nondebtor corporate affiliates, it cannot further a valid bankruptcy purpose. That conclusion is confirmed by the pre-petition corporate restructuring that was undertaken for the purpose of enabling the company to misuse the Code by making its bankruptcy filing a weapon against tort claimants rather than a good-faith means of reorganization.

## STATEMENT OF THE ISSUE

The issue presented is whether LTL's chapter 11 petition should be dismissed for cause under 11 U.S.C. § 1112(b) as not having been filed in good faith.

## STATEMENT OF THE CASE

### A.    Statutory Background

1. Bankruptcy is the "subject of the relations between a[] . . . debtor[] and his creditors, extending to his and their relief." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1938) (quotation omitted). To standardize an "expansive (and sometimes unruly) area of law," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639,

649 (2012), Congress enacted the Bankruptcy Code under the Bankruptcy Clause of the U.S. Constitution, which vests Congress with power to "adjust[] . . . a failing debtor's obligations," *Railway Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (quotation omitted).

In enacting the Code, Congress was particularly concerned with "protect[ing] creditors in general," seeking to prevent "an insolvent debtor from selectively paying off the claims of certain favored creditors at the expense of others" and to temper the "inevitable temptation among creditors to compete fiercely over the debtor's limited funds." H.R. Rep. No. 103-835, at 33 (1994). Congress thus designed a bankruptcy system "to enforce a distribution of the debtor's assets in an orderly manner in which the claims of all creditors are considered fairly, in accordance with established principles rather than on the basis of the inside influence or economic leverage of a particular creditor." *Id.* In addition, Congress intended the bankruptcy system to "provide honest debtors who have fallen on hard times the opportunity for a fresh start." *Id.* at 32.

To achieve both of those objectives, the Code implements a comprehensive scheme that establishes a highly reticulated mechanism for the equitable adjustment of the debtor-creditor relationship. In particular, Congress has designed a basic bankruptcy *quid pro quo* that imposes a host of duties—including requiring debtors to comply with extensive disclosure and reporting obligations, generally requiring them to devote the value of all but certain statutorily exempt assets to the estate, and

5

specifying how the estate's assets must be distributed to creditors—that debtors must satisfy to receive relief.

2. In general, a company may file a bankruptcy petition under either chapter 7 or chapter 11 of the Code. In a chapter 7 bankruptcy, the company's pre-petition assets are liquidated and distributed to creditors according to specific rules of priority established in the Code. 11 U.S.C. § 701 *et seq.* A chapter 7 bankruptcy is typically undertaken in circumstances where the debtor's business cannot be rehabilitated.

By contrast, a chapter 11 bankruptcy typically results in a "plan" that specifies how each class of creditors' claims will be treated in exchange for a discharge of debts to the extent provided by the Code. *See* 11 U.S.C. § 1101 *et seq.* A chapter 11 plan can either provide for the reorganization and ongoing operation of the debtor's business or a liquidation and distribution to creditors in accordance with the Code's priority scheme. At a high level, chapter 11 reflects Congress's recognition that a debtor may suffer from temporary financial distress but may nevertheless be able to preserve its business as a going concern if it can resolve that distress. The successful implementation of a plan under chapter 11 and preservation of the debtor's business will often benefit creditors, because a company will usually be worth more as a going concern than as a bare set of assets.

3. A debtor's right to adjust its debts through chapter 11 is, however, subject to several important limitations. To ensure that creditors are not prejudiced by a debtor's choice to file under chapter 11 rather than chapter 7, Congress has provided that a

plan may generally be confirmed only if each creditor receives at least as much as it would receive in a chapter 7 liquidation or consents to less favorable treatment. *See* 11 U.S.C. § 1129(a)(7), (b)(1).

Congress has also instituted mechanisms to protect creditors at the outset of a chapter 11 case. As particularly relevant here, Congress has provided that, generally speaking, "on request of a party in interest, and after notice and a hearing, the court shall convert a case under [chapter 11] to a case under chapter 7 or dismiss a case under [chapter 11], whichever is in the best interests of creditors and the estate, for cause." 11 U.S.C. § 1112(b). Under this provision, a "Chapter 11 petition is subject to dismissal for 'cause' . . . unless it is filed in good faith." *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999). Notably, § 1112(b) speaks in mandatory language, providing that the bankruptcy court "shall" convert or dismiss the case upon a finding of cause, in contrast to other provisions of the Code that provide a discretionary authority to convert or dismiss. *See* 11 U.S.C. §§ 1208(c)-(d), 1307(c)-(d).

"At its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy . . . ." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004). As is explained above, the underlying purposes of the bankruptcy system are to ensure that creditors are treated fairly and that they receive maximum value on their claims; at the same time, the bankruptcy system necessarily imposes costs on creditors by, for example, preventing

7

them from continuing to pursue their claims outside of bankruptcy during the

bankruptcy case. *See* 11 U.S.C. § 362. The good-faith standard thus "furthers the

balancing process between the interests of debtors and creditors which characterizes

so many provisions of the bankruptcy laws and is necessary to legitimize the delay and

costs imposed upon parties to a bankruptcy." *SGL Carbon*, 200 F.3d at 161 (quotation

omitted). The determination whether a petition was filed in good faith focuses on "(1)

whether the petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going

concern or maximizing the value of the debtor's estate, and (2) whether the petition is

filed merely to obtain a tactical litigation advantage." *Integrated Telecom*, 384 F.3d at

119-20.

### B.     Factual and Procedural Background

1. Johnson & Johnson (J&J) is a New Jersey company, first incorporated in

1887, that is a "profitable global supplier of health[ and] consumer products and

pharmaceuticals." J.A. 2, 47. In 1894, J&J began selling a talc-based baby powder

product; through a series of corporate transactions beginning in the 1970s, the assets

and liabilities related to that product were assigned to Johnson & Johnson Consumer

Inc. (Old JJCI), a subsidiary of J&J, which continued to sell the product until 2020

(when its sale was discontinued in the United States and Canada). J.A. 2-4.

In recent years, J&J and Old JJCI have faced a large, and escalating, number of

lawsuits claiming that their talc-based baby powder contained asbestos and fibrous

talc; that certain applications of talc powder can increase the risk of, or cause, ovarian

cancer; and that exposure to asbestos-containing talcum powder can cause mesothelioma. J.A. 3. These lawsuits together threatened J&J and Old JJCI with significant liability: one case involving 22 plaintiffs recently resulted in a $2.25 billion final judgment assessed against J&J and Old JJCI, and there are approximately 38,000 claims currently pending. J.A. 4; *see also* Decl. of John K. Kim ¶ 39, J.A. 458.

Nevertheless, J&J and Old JJCI have repeatedly suggested, even following the $2.25 billion verdict, that the talc-related litigation has not created a significant risk of near-term insolvency for either company. For example, J&J has indicated that, in a worst-case scenario, total talc-related liabilities may reach $7 to $7.5 billion—but J&J had liquidity of over $41 billion last year. *See* J.A. 3427, 4670, 4766-67, 4782. And in its 2020 10-K filing, J&J publicly reported that it "anticipates that operating cash flows, the ability to raise funds from external sources, borrowing capacity from existing committed credit facilities and access to the commercial paper markets will continue to provide sufficient resources to fund operating needs, including the talc litigation." Trial Ex. 398, at 30, Form 10-K for the Fiscal Year Ended January 3, 2021, Johnson & Johnson.

2. On October 12, 2021, Old JJCI underwent a "labyrinthine" set of corporate transactions that gave rise to this bankruptcy case. J.A. 4-5. Of particular importance, Old JJCI engaged in a "divisional merger" under Texas corporate law, through which Old JJCI ceased to exist and its assets and liabilities were divided between two new

9

companies—LTL Management LLC (LTL) and a new Johnson & Johnson Consumer Inc. (New JJCI)—that were formed in its place. *See* J.A. 5.

Through that merger, LTL received all of Old JJCI's talc-related assets and liabilities, along with approximately $6 million in cash and a royalty revenue stream estimated to generate approximately $50 million annually. *See* Kim Decl. ¶¶ 24-26, J.A. 453-54. In addition, LTL received rights under a Funding Agreement that generally obligates New JJCI and J&J to fund, up to the greater value of New JJCI or Old JJCI (and to the extent that LTL's royalty stream or other assets are insufficient), various LTL costs and expenses and—in the event of an LTL chapter 11 bankruptcy—any trust for the benefit of existing and future claimants created under a reorganization plan confirmed by a final, nonappealable order of the bankruptcy court. *See* Kim Decl. ¶ 27, J.A. 454; J.A. 5-6. All other assets and liabilities of Old JJCI were allocated to New JJCI, which is valued at approximately $61 billion. Kim Decl. ¶ 25, J.A. 453; J.A. 35. Shortly after its creation, LTL relocated from Texas to North Carolina and "entered into a secondment agreement pursuant to which J&J Services has agreed to second to [LTL] certain of its employees . . . on a full-time basis to manage [LTL's] business." Kim Decl. ¶¶ 16, 29, J.A. 448, 455.

Two days after the divisional merger, LTL filed a voluntary petition for chapter 11 relief in the Western District of North Carolina. The stated purpose of the corporate restructuring and subsequent bankruptcy filing was "to enable [LTL] to globally resolve talc-related claims through a chapter 11 reorganization without

subjecting the entire Old JJCI enterprise to a bankruptcy proceeding." Kim Decl.

¶ 21, J.A. 450. Although only LTL filed for bankruptcy, it has explained that its "goal

in this case is to negotiate, obtain approval of and ultimately consummate a plan of

reorganization that would, among other things, . . . provide for the issuance of an

injunction that will permanently protect" not just LTL but also "its affiliates and

certain other parties from further talc-related claims." Kim Decl. ¶ 59, J.A. 463-64.

3. After the petition was filed in North Carolina, it was transferred to the

District of New Jersey, which is where J&J is headquartered and where LTL's

employees—all of whom are seconded from other corporate affiliates—work. *See In re*

*LTL Mgmt. LLC*, No. 21-30589, 2021 WL 5343945, at *1 (Bankr. W.D.N.C. Nov. 16,

2021). Following the transfer, multiple groups representing talc claimants moved to

dismiss LTL's bankruptcy petition for cause under § 1112(b) as not having been filed

in good faith.

The bankruptcy court held a five-day trial on the motions to dismiss (and a

related motion for a preliminary injunction). *See* J.A. 7-8. It then denied the motions.

First, the court concluded that LTL's petition was "supported by a valid

reorganizational purpose" because "the chapter 11 filing serves to maximize the

property available to satisfy creditors." J.A. 14-32 (quotation omitted). Second, the

court concluded that LTL was in significant financial distress, finding that it "had

contingent liabilities in the billions of dollars and likely would be expending annually

sums ranging $100-200 million" were it forced to defend against the talc claims. And

11

although the Funding Agreement obligates J&J and New JJCI to cover LTL's expenses up to approximately $61 billion, the court stated that actually requiring J&J and New JJCI to meet that obligation "would have a horrific impact on these companies." J.A. 33-41. Third, the court concluded that the chapter 11 filing was not undertaken only to secure a tactical litigation advantage but was instead undertaken—following a legal divisional merger under state corporate law—to allow for the more efficient and equitable resolution of claims through an LTL-specific bankruptcy rather than through a JJCI bankruptcy or through tort litigation. J.A. 41-52.

A number of movants filed notices of appeal, and the bankruptcy court certified its decision for direct review in this Court under 28 U.S.C. § 158(d)(2). *See* J.A. 135-39. This Court then granted, over debtor's opposition, the claimants' petitions for permission to appeal. *See* Order, *In re LTL Mgmt. LLC*, No. 22-8015 (3d Cir. May 11, 2022), ECF No. 12-1. These consolidated appeals followed.

## ARGUMENT

A petition under chapter 11 is "subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith, and the burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004). Although the bankruptcy court's underlying factual findings are subject to review for clear error, the determination of whether the "facts of a case support the conclusion of good faith" is "subject to plenary review because it is, essentially, a conclusion of law." *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d

12

605, 616 (3d Cir. 2009). In this case, the totality of the facts and circumstances demonstrate that LTL's petition was not filed in good faith.

## A.    LTL's Petition Does Not Serve a Valid Bankruptcy Purpose

A bankruptcy court must dismiss a chapter 11 petition "unless it is filed in good faith." *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999). In applying that standard, a court considers "(1) whether the petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *Integrated Telecom*, 384 F.3d at 119-20.

LTL's petition fails the good faith test in every respect. Because LTL was created for the sole purpose of filing for bankruptcy, it has no substantial ongoing business operations that might be protected by a bankruptcy filing. Similarly, because LTL faces no substantial prospect of short-term insolvency, the petition cannot maximize the value of its estate. And because LTL's petition was filed in principal part to extend the benefits of bankruptcy to nondebtor corporate affiliates, it does not further a valid bankruptcy purpose.

A central purpose of chapter 11 is to allow a distressed business to "preserv[e] going concerns" while navigating financial hardship. *Integrated Telecom*, 384 F.3d at 119 (quoting *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)). As an entity created as a vehicle to file for bankruptcy, LTL has no substantial going concerns to preserve. Other than various items linked to Old JJCI's

13

talc-related assets and liabilities, LTL's only assets are an equity interest in a single

royalty revenue stream and rights under the Funding Agreement. *See* Kim Decl. ¶ 26,

J.A. 453-54. Its only employees are employees of other J&J affiliates that have been

seconded to LTL. *See In re LTL Mgmt. LLC*, No. 21-30589, 2021 WL 5343945, at *1

(Bankr. W.D.N.C. Nov. 16, 2021). Because LTL has "no going concerns to

preserve—no employees, offices, or business other than the handling of litigation,"

*Bepco*, 589 F.3d at 619—the petition cannot substantially further the fundamental

reorganization purpose of chapter 11.

In some cases, even where there is no substantial need to preserve going

concerns, a chapter 11 petition may still serve a valid bankruptcy purpose to the

extent that it enables the debtor the "maximiz[e] the value of [its] estate" for the

benefit of creditors. *Integrated Telecom*, 384 F.3d at 119-20. As this Court has explained,

"[a]t its most basic level, the Bankruptcy Code maximizes value by alleviating the

problem of financial distress." *Id.* at 121. In short, in the absence of the successful

preservation of the debtor's business, the Code ensures at least an "orderly liquidation

[that] is likely to produce more value—or to avoid more loss—than [a] piecemeal

liquidation" and avoids the problem "that the system of individual creditor remedies

may be bad for the creditors as a group when there are not enough assets to go

around." *Id.* at 120-21 (quotations and emphasis omitted).

Achieving these benefits, however, requires that a debtor be facing the prospect

of financial distress: without such distress, there is no prospect of a fire-sale

14

liquidation or of pitting creditors against each other to fight over a limited pot. As a result, invoking this purpose of the Code to demonstrate "good faith necessarily requires some degree of financial distress on the part of a debtor." *Integrated Telecom*, 384 F.3d at 121. Thus, courts "have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11." *SGL Carbon*, 200 F.3d at 166.

LTL does not face any immediate financial distress. Under the Funding Agreement, the company has access to up to approximately $61 billion to fund ongoing litigation costs and tort judgments. As explained above, J&J and Old JJCI repeatedly suggested that the total expected cost of the talc-related tort litigation was far lower than that number, and, in any event, there certainly was no impending danger of LTL being unable to fulfill its obligations.

Finally, the avowed purpose of LTL's bankruptcy filing is not to protect creditors but to protect corporate affiliates that are not themselves in bankruptcy. As LTL itself explained, the corporate restructuring and bankruptcy petition were implemented "to enable [LTL] to globally resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding," and LTL's "goal in this case is to . . . consummate a plan of reorganization that would[] . . . provide for the issuance of an injunction that will permanently protect [LTL], its affiliates and certain other parties from further talc-related claims." Kim Decl. ¶¶ 21, 59, J.A. 450, 463-64. But the purpose of the Code is

to provide a mechanism for the adjustment of the debtor-creditor relationship, not to permit nondebtors—who do not themselves shoulder the obligations of bankruptcy—to benefit from the Code's protections. *Cf.* 11 U.S.C. § 524(e) (providing that a discharge in bankruptcy generally "does not affect the liability of any" nondebtor for that debt). LTL's filing—designed primarily (if not exclusively) to benefit nondebtor corporate affiliates—does not serve a valid bankruptcy purpose. *See Bepco*, 589 F.3d at 624-25.

The absence of good faith is underscored by the absence of evidence that LTL made an independent decision to seek bankruptcy protection, much less to do so for any purpose other than to protect corporate affiliates. LTL's first-day filings suggest— consistent with the two-day gap between LTL's creation and its bankruptcy petition— that the decision to have LTL file for bankruptcy was made by J&J or Old JJCI before LTL's creation. *See* Kim Decl. ¶ 21, J.A. 450. And LTL itself is controlled entirely by employees seconded from other J&J affiliates, who may not be fully beholden to LTL's interests. This Court has recognized bad faith in similar circumstances, where the debtor was directed by a representative who "was primarily concerned with protecting [nondebtor affiliates], not the Debtors." *Bepco*, 589 F.3d at 624 (emphasis omitted); *see also id.* at 624-25 (explaining that it weighed in favor of bad faith that "the Debtors' decision to file for bankruptcy was not their own; [a corporate affiliate] was ultimately in control of whether the Debtors filed").

16

**B.     The Pre-Petition Corporate Restructuring Underscores the Extent to Which LTL's Petition Was Not Filed in Good Faith**

The pre-petition corporate restructuring underscores the absence of good faith. Through that restructuring, Old JJCI spun off its talc-related liabilities into a separate entity with minimal assets other than its rights under the Funding Agreement. That entity then filed a chapter 11 petition to benefit not only the debtor but also its nondebtor corporate affiliates. Those corporate maneuvers have resulted in a bankruptcy that "circumvent[s] the Code's procedural safeguards," *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 986 (2017), and undermines the "Code's careful balancing of interests," *Integrated Telecom*, 384 F.3d at 119, which provides additional cause to dismiss the petition.

The corporate restructuring and subsequent bankruptcy petition undermine the basic *quid pro quo* contemplated by the Code. To benefit from bankruptcy, a debtor is required to shoulder a host of obligations. A chapter 11 debtor must make extensive disclosures of its creditors, assets and liabilities, income and expenditures, and the nature of its financial affairs. It must then, under the supervision of the bankruptcy court, agree to, and obtain confirmation of, a plan of reorganization that meets a variety of substantive requirements to ensure that the plan is feasible, treats all of the creditors' claims equitably, and generally leaves each class of creditors no worse off than it would be if the debtor were liquidated. Furthermore, the equity owners of the debtor generally cannot retain their interest or receive a distribution on account of

17

their ownership until all creditors have been paid in full. *In re Telegroup, Inc.*, 281 F.3d 133, 139 (3d Cir. 2002). Only if a debtor can successfully consummate such a plan does it receive a discharge of its debts that "releases [the] debtor from personal liability with respect to any discharged debt by voiding any past or future judgments on the debt." *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004).

In this case, because only LTL has filed a bankruptcy petition, only LTL has agreed to take on the obligations and duties that the Code requires. Neither New JJCI nor J&J has made the extensive financial disclosures required for a debtor, and neither has submitted itself to the supervision of the bankruptcy court to obtain relief under a feasible and equitable plan of reorganization. At the same time, because of the corporate restructuring that left LTL with few assets other than its rights under the Funding Agreement (which themselves have no liquidation value), LTL can meet creditor demands only to the extent that those demands are covered by that agreement. As reflected in LTL's first-day filings, the corporate enterprise's apparent strategy is to have J&J and New JJCI fund a settlement trust for talc claimants as part of an LTL plan of reorganization and, in exchange, to seek an injunction from the bankruptcy court preventing claimants from continuing to pursue those claims against nondebtors J&J and New JJCI. And LTL has already sought automatic stay relief not only for its own benefit but also for the benefit of its corporate affiliates.

In short, through the corporate restructuring and subsequent bankruptcy filing, J&J and New JJCI seek to garner the fundamental benefits of bankruptcy—a stay that

prevents talc claimants from pursuing litigation in the forum of their choice and the ability to reach a single, overarching resolution of all the talc-related tort claims (even over some claimants' potential objections)—without themselves shouldering its attendant obligations, undermining the framework established by the Code.[1]

In addition, through its eve-of-bankruptcy transactions, J&J essentially chose which subset of its assets would be exposed to the bankruptcy case and which subset of its creditors would be forced to deal with the delay and uncertainty of the bankruptcy process. That undermines the Code's priority scheme, "which ordinarily determines the order in which the bankruptcy court will distribute assets of the estate" and which provides that equity holders "receive nothing until all previously listed creditors have been paid in full." *Jevic*, 137 S. Ct. at 979. That scheme "constitutes a basic underpinning of business bankruptcy law" and "has long been considered fundamental to the Bankruptcy Code's operation." *Id.* at 983-84.

Carving out that single class of tort creditors also provides additional evidence that LTL's petition was "filed merely for tactical advantage" in ongoing litigation.

---

[1] Only one provision of the Code, 11 U.S.C. § 524(g), contemplates permitting a bankruptcy court to extinguish third-party claims against a nondebtor. That provision permits bankruptcy courts to enjoin third parties from pursuing certain asbestos-related claims against a limited set of non-debtors where several stringent requirements are satisfied. *See id.* Here, although it is possible that some of the talc claimants' tort claims might be subject to that provision, LTL has not yet demonstrated that most or all of the claims would be or that it will comply with the stringent requirements articulated in that provision. And in any event, the possibility that LTL's nondebtor affiliates could permissibly obtain some relief under § 524(g) does not cure the many bad-faith aspects of LTL's filing.

*SGL Carbon*, 200 F.3d at 165. In *SGL Carbon*, for example, the debtor filed for bankruptcy after it was named as a defendant in a large antitrust suit, apparently because it believed that bankruptcy would provide a preferable venue for resolving the antitrust claims. In evaluating a motion to dismiss the petition, this Court examined the proposed reorganization plan, which provided for all creditors to "be paid in full in cash" except antitrust judgment creditors—who would be "required to accept limited-time credits to purchase SGL Carbon's products." *Id.* at 167. This Court explained that the "plan's differing treatment of creditors suggests SGL Carbon's petition was not filed to reorganize the company but rather to put pressure on antitrust plaintiffs to accept the company's settlement terms." *Id.*

Although J&J and its affiliates have pursued different tactics in this case, the fundamental result is the same. J&J and New JJCI continue to satisfy their obligations to all of the enterprise's creditors outside of bankruptcy, with the single exception of the talc-related tort claimants. Those creditors, and those creditors alone, have now had their claims subjected to the burdens of bankruptcy. Thus, through the corporate restructuring, the J&J affiliates have essentially managed to achieve what SGL Carbon sought: they have put pressure on talc claimants—and no other creditors—to take a bankruptcy-induced discount on their claims.

Finally, the corporate restructuring and immediate bankruptcy filing are, at the least, in substantial tension with the Code's fraudulent transfer provisions. Under those provisions, a trustee is given the power to avoid any transfer of assets from or

obligations to the debtor if the transfer was made within two years of the petition

filing date and various actual or constructive fraud conditions are satisfied (including

if the transfer was made "with actual intent to hinder, delay, or defraud any entity to

which the debtor was or became" indebted or if the debtor "received less than a

reasonably equivalent value in exchange" and "became insolvent as a result"). 11

U.S.C. § 548. This avoidance power "help[s] implement the core principles of

bankruptcy" by allowing the trustee to "set aside transfers that unfairly or improperly

deplete assets" of the estate to the detriment of creditors. *Merit Mgmt. Grp. v. FTI

Consulting, Inc.*, 138 S. Ct. 883, 888 (2018) (alterations and quotation omitted).

If Old JJCI had simply transferred nearly all of its assets to a different J&J

affiliate and then filed a bankruptcy petition two days later in an attempt to resolve its

talc-based liabilities, that transfer almost certainly would have been avoidable in a

fraudulent transfer action and the transferred assets would have been available to

creditors. Although the question of whether J&J or other affiliates will ultimately be

liable for a fraudulent transfer remains unresolved in this case, the divisional merger

technique employed here appears designed to, at the least, hinder these fundamental

creditor protections. The resulting bankruptcy petition does not constitute a good

faith filing.

### C.     The Bankruptcy Court's Contrary Conclusion Is Unpersuasive

The bankruptcy court failed to come to grips with the fundamental concerns raised by the petition.

First, the bankruptcy court stated that "the chapter 11 filing serves to maximize the property available to satisfy creditors," on the ground that the bankruptcy system produces more efficient and equitable outcomes than tort litigation. J.A. 14-32; *see* J.A. 18-19 ("[T]his Court holds a strong conviction that the bankruptcy court is the optimal venue for redressing the harms of both present and future talc claimants in this case . . . .").

This Court has made clear, however, that bankruptcy is not intended as a general vehicle for efficient resolution of mass tort claims but is instead designed to address the specific circumstance of a potentially insolvent debtor. Thus, a good-faith petition must do more than attempt to leverage the perceived efficiencies of bankruptcy over other litigation; it "must seek to create or preserve some value that would otherwise be lost—not merely distributed to a different stakeholder—outside of bankruptcy." *Integrated Telecom*, 384 F.3d at 129. Because there was no apparent risk of LTL (or, before LTL's formation, Old JJCI or J&J) becoming insolvent or unable to satisfy tort judgments in the foreseeable future, the bankruptcy process does not preserve value by avoiding a race to judgment or intracreditor fighting over a limited pot. *See Bepco*, 589 F.3d at 620 (explaining that "the centralization of claims and the

22

consolidation of litigations into a single forum" is not a sufficient good-faith basis for a petition because the distribution problem "bankruptcy is designed to handle" is the problem where "the system of individual creditor remedies harms the creditors as a group and there are not enough assets to go around").

This Court has emphasized that, "[r]ather than pursuing a valid bankruptcy purpose," a bare desire to resolve tort claims more efficiently than is possible in the tort system "suggest[s] that [the debtor] filed for Chapter 11 in part to gain a litigation advantage over [plaintiffs], a use of Chapter 11 that [was] emphatically rejected in *SGL Carbon*." *Integrated Telecom*, 384 F.3d at 125. Insofar as LTL is simply attempting to leverage bankruptcy to resolve the pending tort claims, that purpose further confirms that the petition is no more than an attempt "to distribute value directly from a creditor to a company's shareholders"—a paradigmatic example of a bad-faith filing. *Id.* at 129.

The bankruptcy court's reasoning is also at odds with Congress's judgment regarding the appropriate mechanisms for resolving mass claims. Congress has not determined to impose the bankruptcy system on all mass tort claimants, even when there is no prospect of a defendant's near-term insolvency. Instead, Congress has created other mechanisms to facilitate the efficient and equitable mass resolution of claims, including federal multidistrict litigation procedures, *see* 28 U.S.C. § 1407. Indeed, at the time of LTL's bankruptcy petition, approximately 90% of the pending ovarian cancer claims were proceeding in a multidistrict litigation. *See* Kim Decl. ¶ 42,

J.A. 459. Regardless of any "strong conviction" that Congress's judgment about which mechanisms are appropriate in which circumstances is wrong, a desire to circumvent that judgment cannot constitute the good faith required to support a bankruptcy petition.

Second, the bankruptcy court concluded that LTL was in financial distress, finding that it "had contingent liabilities in the billions of dollars and likely would be expending annually sums ranging $100-200 million" were it forced to defend against the talc claims. J.A. 33-41. But that conclusion fails to account for LTL's rights under the Funding Agreement, which would enable LTL to receive at least approximately $61 billion in funding to cover both litigation and judgment-related costs from J&J and New JJCI. Nowhere did the bankruptcy court suggest that LTL's talc-related costs would likely approach or exceed $61 billion, much less that they might do so in the near term.

Indeed, the court recognized the significance of the Funding Agreement, but it declared that requiring J&J and New JJCI to meet their full obligations under the agreement "would have a horrific impact on these companies." J.A. 35. It stated that the "Court is at a loss to understand, why—merely because [LTL] contractually has the right to exhaust its funding options—[LTL] is not to be regarded as being in" distress. *Id.* The court's statement highlights its assumption that the LTL bankruptcy case is the appropriate way to globally resolve all claims against its affiliates, who are

not themselves in bankruptcy. But as explained, such a goal is not a valid bankruptcy purpose supporting a good-faith petition.

Finally, the bankruptcy court briefly suggested that even if LTL's petition were filed in bad faith, it would refuse to dismiss the case under 11 U.S.C. § 1112(b)(2), which creates a narrow exception to the section's mandatory dismissal command. J.A. 13 n.8. That provision states that a court should not convert or dismiss a case under § 1112(b) if "unusual circumstances establish[] that converting or dismissing the case is not in the best interests of creditors and the estate" and if, among other requirements, the "grounds for converting or dismissing the case include an act or omission of the debtor" for which there is a "reasonable justification" and which "will be cured within a reasonable period of time." 11 U.S.C. § 1112(b)(2).

The suggestion that § 1112(b)(2) might preclude dismissal in this case is without merit. At the least, LTL could not meet the requirements of § 1112(b)(2) because there could never be a reasonable justification for filing a petition in bad faith, nor could such a bad-faith filing ever be cured.

25

# CONCLUSION

For the foregoing reasons, the order of the bankruptcy court should be reversed.

Respectfully submitted,

*Of Counsel:*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

RAMONA D. ELLIOTT
  *Deputy Director and General Counsel*

PHILIP R. SELLINGER
  *United States Attorney*

P. MATTHEW SUTKO
  *Associate General Counsel*

MARK B. STERN

SUMI SAKATA
JOHN P. SHEAHAN
  *Trial Attorneys*
  *U.S. Department of Justice*
  *Executive Office for United States Trustees*
  *441 G Street NW, Suite 6150*
  *Washington, DC 20530*

  *s/ Sean R. Janda*
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

June 2022

## COMBINED CERTIFICATIONS

1.      Government counsel are not required to be members of the bar of this Court.

2.      This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,489 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

3.      The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

4.      This document was scanned for viruses using Symantec Endpoint Protection, Version 14.3 and no virus was detected.


                                                            *s/ Sean R. Janda*
                                                            Sean R. Janda

ADDENDUM

# TABLE OF CONTENTS

11 U.S.C. § 1112 ............................................................................................................A1

**11 U.S.C. § 1112**

**§ 1112. Conversion or dismissal**

(a) The debtor may convert a case under this chapter to a case under chapter 7 of this title unless—

(1) the debtor is not a debtor in possession;

(2) the case originally was commenced as an involuntary case under this chapter; or

(3) the case was converted to a case under this chapter other than on the debtor's request.

(b)(1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

(2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—

(A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—

(i) for which there exists a reasonable justification for the act or omission; and

(ii) that will be cured within a reasonable period of time fixed by the court.

(3) The court shall commence the hearing on a motion under this subsection not later than 30 days after filing of the motion, and shall decide the motion not later than 15 days after commencement of such hearing, unless the movant expressly consents to a continuance for a specific period of time or compelling circumstances prevent the court from meeting the time limits established by this paragraph.

(4) For purposes of this subsection, the term "cause" includes—

(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B) gross mismanagement of the estate;

(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;

(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;

(E) failure to comply with an order of the court;

(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

(c) The court may not convert a case under this chapter to a case under chapter 7 of this title if the debtor is a farmer or a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion.

(d) The court may convert a case under this chapter to a case under chapter 12 or 13 of this title only if—

(1) the debtor requests such conversion;

(2) the debtor has not been discharged under section 1141(d) of this title; and

(3) if the debtor requests conversion to chapter 12 of this title, such conversion is equitable.

(e) Except as provided in subsections (c) and (f), the court, on request of the United States trustee, may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate if the debtor in a voluntary case fails to file, within fifteen days after the filing of the petition commencing such case or such additional time as the court may allow, the information required by paragraph (1) of section 521(a), including a list containing the names and addresses of the holders of the twenty largest unsecured claims (or of all unsecured claims if there are fewer than twenty unsecured claims), and the approximate dollar amounts of each of such claims.

(f) Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter.