# United States Court of Appeals

*for the*

# Third Circuit

Case Nos. 22-2003, 22-2004,
22-2005, 22-2006, 22-2007,
22-2008, 22-2009, 22-2010, 22-2011

In re: LTL MANAGEMENT, LLC,

*Debtor.*

OFFICIAL COMMITTEE OF TALC CLAIMANTS, *et al.*,

*Petitioners-Appellants,*

– v. –

LTL MANAGEMENT, LLC,

*Debtor-Appellee.*

DIRECT APPEAL FROM THE UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF NEW JERSEY IN CH. 11
NO. 21-30589 AND ADV. PRO. NO. 21-03032

## BRIEF FOR *AMICI CURIAE* LAW PROFESSORS IN SUPPORT OF APPELLANTS

SEAN E. O'DONNELL
STEPHEN B. SELBST (*pro hac vice* pending)
STEVEN B. SMITH (*pro hac vice* pending)
RACHEL H. GINZBURG (*pro hac vice* pending)
HERRICK, FEINSTEIN LLP
Two Park Avenue
New York, New York 10016
(212) 592-1400

*Attorneys for the Law Professors*

# TABLE OF CONTENTS

Page

INTEREST OF AMICI CURIAE ................................................................ 1

SUMMARY OF ARGUMENT ................................................................... 1

ARGUMENT .............................................................................................. 2

    I.     J&J's Attempt to Limit the Rights of Creditors Undermines the Statutory Scheme of Chapter 11. ....................................................................... 2

    II.    Despite J&J's Assertions, This Is Not a Normal Mass Torts Bankruptcy ... 7

    III.   The Texas Two-Step Will Undermine Public Confidence in the Bankruptcy System. ............................................................................. 11

CONCLUSION ......................................................................................... 14

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re A.H. Robins Co., Inc.*,
  88 B.R. 742 (E.D. Va. 1988) ..................................................................10

*In re A.H. Robins Co., Inc.*,
  880 F.2d 695 (4th Cir. 1989) ................................................................10

*In re Abbotts Dairies of Pennsylvania, Inc.*,
  788 F.2d 143 (3d Cir. 1986) ...................................................................3

*In re City of Detroit, Michigan*,
  Case No. 13-53846 (Bankr. E.D. Mich. 2013)......................................11

*In re Dow Corning Corp.*,
  86 F.3d 482 (6th Cir. 1996) ..................................................................10

*In re Duratech Indus.*,
  241 B.R. 283 (E.D.N.Y. 1999) .................................................................3

*In re General Motors Corp*,
  Case No. 09-50026 (Bankr. S.D.N.Y. 2009)..........................................11

*In re Johns-Manville Corp.*,
  32 B.R. 728 (S.D.N.Y. 1983) ...................................................................9

*In re PG&E Corporation and Pacific Gas and Electric Co.*,
  Case No. 19-30088 (Bankr. N.D. Cal. 2019) .........................................11

*In re Reliant Energy Channelview LP*,
  594 F.3d 200 (3d Cir. 2010) ....................................................................3

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988) ....................................................................8

*Matter of Celotex Corp.*,
  128 B.R. 478 (Bankr. M.D. Fl. 1991) ......................................................9

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*,
  330 F.3d 548 (3d Cir. 2003) ....................................................................3

**Statutes**

11 U.S.C. § 1129 ...................................................................................4

11 U.S.C. § 363(b)(1)..........................................................................3, 4

11 U.S.C. § 363(m) ..............................................................................3

11 U.S.C. § 521(a)(1)............................................................................3

**Other Authorities**

Khristopher J. Brooks, *Johnson & Johnson talc powder spinoff files for bankruptcy*, CBS News (Oct. 15, 2021) ................................................12

Jared A. Ellias, *[Texas Two-Step and the Future of Mass Tort Bankruptcy Series] Upending the Traditional Chapter 11 Bargain*, Harvard Law School Bankruptcy Roundtable (June 21, 2022) ...........................6

Michael A. Francus, *Texas Two-Stepping Out of Bankruptcy* (Jan. 30, 2022)..........................................................8

Chris Isidore, *GM bankruptcy: End of an era*, CNN Money (June 2, 2009) ...............................................................11

Melissa B. Jacoby & Edward J. Janger, *Ice Cube Bonds: Allocating the Price of Process in Chapter 11 Bankruptcy*, 123 Yale L. J. 4 (2014) ................................6

Melissa B. Jacoby, *Shocking Business Bankruptcy Law*, 131 Yale L.J. Forum 409 (2021). ..........................................................5

Jesus Jiménez, *Johnson & Johnson Subsidiary Seeks Bankruptcy Protection to Handle Talc Product Claims*, N.Y. Times (Oct. 14, 2021)...................13

Dietrich Knauth and Tom Hals, *Judge greenlights J&J strategy to resolve talc lawsuits in bankruptcy court*, Reuters (Feb. 25, 2022) ........................13

Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-Threatening Mass Tort Liability*, 148 U. Pa. L. Rev. 2045 (2000)............................9

David Skeel, *The populist backlash in Chapter 11*,
  The Brookings Institution (Jan. 12, 2022).............................................................14

## INTEREST OF AMICI CURIAE[1]

The amici curiae, whose names and affiliations are set forth in the attached Appendix A, are seven professors of law who have expertise bearing directly on the purposes of the Bankruptcy Code (the "Law Professors"). The Law Professors regularly teach courses in bankruptcy law and principles, and have authored numerous articles, textbooks, and treatises on bankruptcy law. The Law Professors have an interest in the orderly development of bankruptcy law and practice and in preventing abuses of the bankruptcy system, including through the robust and thoughtful appellate review of difficult questions posed by complex cases.

## SUMMARY OF ARGUMENT

The Law Professors have no economic interest at stake, but share a concern about the effect of the Texas Two-Step[2] on the bankruptcy system. The Law Professors believe that Judge Kaplan erred in his decision below for three reasons. First, Judge Kaplan erred in allowing J&J to use complicated maneuvering to sever

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no counsel or party, other than counsel to the Law Professors, made a monetary contribution to fund the preparation or submission of this brief. The institutional affiliations of the Law Professors are listed for identification only.

[2] Capitalized terms not defined herein shall have the terms ascribed to them in the Brief for Appellant Official Committee of Talc Claimants [ECF No. 46]. In the interest of avoiding repetition, this amicus brief assumes familiarity with the basic facts of the Debtor's ("LTL Management") bankruptcy filing.

the burdens and oversight that bankruptcy law requires of a Chapter 11 debtor from the benefits that Chapter 11 provides to distressed companies. If Judge Kaplan's decision is allowed to stand, it will provide a roadmap for large, rich debtors to deal with liability issues using bankruptcy tools without providing creditors with the full protections they are entitled to. Second, the Law Professors believe Judge Kaplan erred in viewing this as a run-of-the-mill mass torts bankruptcy instead of an extraordinary effort by a sophisticated company to evade bankruptcy court supervision. Third, the Law Professors worry that Judge Kaplan's decision will undermine public confidence in the bankruptcy system by allowing a large, rich company to take advantage of the bankruptcy system on terms far better than those available to smaller and less sophisticated debtors, let alone consumer debtors.

## ARGUMENT

### I.    J&J's Attempt to Limit the Rights of Creditors Undermines the Statutory Scheme of Chapter 11.

In designing the bankruptcy system, Congress created a system that offers benefits to debtors – but at the cost of accepting provisions that protect creditors by providing oversight and obligations. The benefits include the tremendous powers that Congress gave to Chapter 11 debtors as well as the protections of bankruptcy law, such as the automatic stay. For mass tort debtors, the powers of the bankruptcy court to estimate claims and provide discharge are often especially important.

2

These powers are qualified by provisions of bankruptcy law that protect creditors, such as, among other things:

- Fiduciary duties that obligate companies to maximize value for the benefit of creditors;[3]

- Court and creditor supervision of corporate assets, including both reporting requirements and an obligation to submit to examination and to provide disclosure;[4]

- Court and creditor supervision of asset sales and disposition;[5]

---

[3] "[D]ebtors-in-possession have a fiduciary duty to maximize the value of the estate . . . ." *In re Reliant Energy Channelview LP*, 594 F.3d 200, 210 (3d Cir. 2010) (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003)).

[4] *See, e.g.*, 11 U.S.C. § 521(a)(1) ("[T]he debtor shall . . . file . . . a list of creditors; and . . . unless the court orders otherwise . . . (i) a schedule of assets and liabilities; (ii) a schedule of current income and current expenditures; (iii) a statement of the debtor's financial affairs . . . ."); *In re Duratech Indus.*, 241 B.R. 283, 290 (E.D.N.Y. 1999) ("Examinations under Rule 2004 are allowed for the purpose of discovering assets and unearthing frauds and have been compared to a fishing expedition.") (citation and quotation marks omitted).

[5] *See* 11 U.S.C. § 363(b)(1). The Code further provides that "reversal or modification on appeal of an authorization under subsection (b) . . . of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . . unless such authorization and such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m); *see also In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) ("Courts applying section 363(m) . . . have . . . turned to traditional equitable principles, holding that [good faith] encompasses one who purchases in 'good faith' and for 'value.'") (citations omitted).

- Extensive oversight of management's business decisions, such as submitting actions outside of the ordinary course of business for judicial approval in a public court hearing;[6] and

- The need to satisfy the high standards of Bankruptcy Code section 1129, which protects creditors, before a final order confirming a plan of reorganization can be approved.[7]

Importantly, the extra protection that Congress provided to creditors is not meant to be punishment for filing for Chapter 11 – they are tools that ensure creditors have a say in maximizing the estate's value. Congress created guardrails that allow a federal judge and creditors to have a say in how assets are used and maintained, which help to protect against waste and fraud. Congress imposed a bargain on companies that seek to make use of the bankruptcy system, in which debtors trade enhanced powers to address financial distress in exchange for giving creditors monitoring rights and control over corporate assets that go far beyond what exists outside of bankruptcy. That is the bargain that Congress created to allow large companies to reorganize in Chapter 11.

Through the Texas Two-Step, J&J has found a way to "carve up" the bankruptcy bargain, taking advantage of the legal rights that favor their litigation strategy without providing creditors the enhanced rights that Congress provides in

---

[6] *See* 11 U.S.C. § 363(b)(1) ("The trustee, ***after notice and a hearing***, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . .") (emphasis added).

[7] *See* 11 U.S.C. § 1129.

4

Chapter 11.[8]  For example, J&J currently benefits from a bankruptcy court order shielding not only LTL but also various J&J subsidiaries from litigation.[9] J&J will be able to dispose of the talc-litigation claims through the bankruptcy process, which must offer significant advantages to them – otherwise they would not have concocted this scheme.

However, J&J has not provided creditors with their customary bankruptcy rights. The J&J enterprise is operating free of any judicial supervision, with no obligation to seek court approval of major business decisions or to provide a level of public reporting that goes far beyond what the SEC requires of public companies.

Simply put: This is not the system that Congress designed.  If Congress wants to decouple the rights that the Bankruptcy Code provides to creditors from what it gives to debtors, it has the power to create a new chapter of the Bankruptcy Code that would do so. As Congress has not done so, J&J should not be allowed to use

---

[8] Melissa Jacoby refers to this as "bankruptcy a la carte." *See* Melissa B. Jacoby, *Shocking Business Bankruptcy Law*, 131 Yale L.J. Forum 409, 411 (2021).

[9] *See* A196 (Preliminary Injunction Order, ¶ 2) ("The Defendants are prohibited and enjoined . . . from commencing or continuing to prosecute any Enjoined Talc Claim against any of the Protected Parties, on any theory of liability . . . ."); A195 (Preliminary Injunction Order, n. 3) ("The Protected Parties are listed in Appendix B to the Complaint"); *see also* A3830-34 (Preliminary Injunction Complaint, Appendix B, listing various J&J subsidiaries).

Texas state law to amend a federal statute and create a completely different bankruptcy system than the one implemented through the Bankruptcy Act of 1978.

Importantly, a key benefit of the Texas Two-Step for J&J is that it re-calibrates the bargaining power that Chapter 11 normally provides to creditors. In addition to their statutory rights to inspect assets, creditors benefit from their valuable control rights over the debtor's assets and the pressure that the "fishbowl of bankruptcy" puts on debtors to exit bankruptcy, which is pressure that helps creditors obtain favorable settlements. As one of the Law Professors has written elsewhere, "[t]he burden of court oversight . . . gives creditors bargaining power, as companies seek to exit bankruptcy quickly to escape the expense and distraction of a bankruptcy proceeding."[10] By severing Old JJCI's assets from its liabilities, J&J has manufactured a court process where the debtor has a significant advantage relative to the bargaining environment J&J would have otherwise enjoyed.

Crucially, the funding agreement between New JJCI and LTL Management is no substitute for real court supervision and creditor oversight. J&J asserts that the Old JJCI assets are equally available to pay talc victims as they would be outside

---

[10] Jared A. Ellias, *[Texas Two-Step and the Future of Mass Tort Bankruptcy Series] Upending the Traditional Chapter 11 Bargain*, Harvard Law School Bankruptcy Roundtable (June 21, 2022), http://blogs.harvard.edu/bankruptcyroundtable/tag/jared-a-ellias/ (citing Melissa B. Jacoby & Edward J. Janger, *Ice Cube Bonds: Allocating the Price of Process in Chapter 11 Bankruptcy*, 123 Yale L. J. 4 (2014)).

bankruptcy.[11] This is so, J&J claims, because of the funding agreement: LTL Management has the power under the funding agreement to compel New JJCI to pay consideration equal to the value of New JJCI as needed to satisfy the talc victims.[12] But this is not the same as allowing creditors to supervise the assets during the bankruptcy case and creditors have no assurance that the value of New JJCI's assets will be maximized.

## II.    Despite J&J's Assertions, This Is Not a Normal Mass Torts Bankruptcy.

For a company facing financial distress arising from mass tort liabilities, Chapter 11 can be a meaningful opportunity for troubled debtors to resolve tort claims and for victims to get justice. When the bankruptcy court's jurisdiction is properly invoked, Chapter 11 is an appropriate way to address mass tort cases, while respecting the rights of debtors and creditors. Since Johns-Manville first used the bankruptcy court system to resolve its asbestos liabilities, there has been a long line

---

[11] *See* A450 (John K. Kim First Day Declaration, ¶ 21) ("A key objective of this restructuring was to make certain that the Debtor has the same, if not greater, ability to fund the costs of defending and resolving present and future talc-related claims as Old JJCI did prior to the restructuring. This was achieved through the establishment of a funding agreement between the Debtor, on the one hand, and J&J and New JJCI (on a joint and several basis) on the other . . . .").

[12] *See* A454 (John K. Kim First Day Declaration, ¶ 27) ("[T]he Funding Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding for a trust . . . .").

of mass tort cases allowing for that use of Chapter 11.[13] But in those cases, the entirety of each debtor's assets was subject to bankruptcy court jurisdiction. J&J's strategy is unique because unlike other mass tort debtors, who submitted all their assets and liabilities before the Court, J&J created LTL solely to offload certain liabilities and to submit select assets before the Court while shielding other valuable assets from the oversight of the Court and creditors. LTL is only facing financial trouble because it was manufactured to do so.

J&J's strategy is "the latest addition to a panoply of aggressive techniques debtors have developed to gain the upper hand against creditors."[14] Rather than providing an orderly process and distribution of assets to its creditors, J&J "decide[d] what price tag it wishe[d] to put on the tort claims and aim[ed] to foist that dollar value upon the tort claimants."[15] This is not what Chapter 11 is for. Companies should not be allowed to manufacture financially unhealthy subsidiaries to cherry-pick which assets creditors get access to.

---

[13] *See Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) (affirming district court order affirming bankruptcy court's confirmation order).

[14] *See* Michael A. Francus, *Texas Two-Stepping Out of Bankruptcy* (Jan. 30, 2022) at 1, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4021502.

[15] *See id*. at 13.

While Congress did not contemplate the "unique problems caused by mass tort liability" when the Bankruptcy Code was enacted in 1978, many companies faced with mass tort liability that "threaten[ed] the viability of the enterprise" have sought protections under the federal bankruptcy laws.[16]

> Johns-Manville Corp., Celotex Corp., . . . and at least a dozen other asbestos manufacturers deluged with thousands of personal injury claims; A.H. Robins Co. facing potentially devastating Dalkon Shield personal injury claims; Dow Corning Corp. under an onslaught of breast implant litigation; and other companies . . . have sought protection under Chapter 11 of the Bankruptcy Code within the past twenty years.[17]

But in prior mass tort cases, the companies facing liability were the ones who filed for bankruptcy, rather than brand new companies that the tortfeasors manufactured to hold their liabilities and file for bankruptcy.[18]

---

[16] Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-Threatening Mass Tort Liability*, 148 U. Pa. L. Rev. 2045, 2045-46 (2000).

[17] *Id*. at 2046 (citations omitted).

[18] *See In re Johns-Manville Corp.*, 32 B.R. 728, 730 (S.D.N.Y. 1983) ("On August 26, 1982, the Johns-Manville Corporation and affiliated corporations ('Appellees') filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. Prior to the filing, Appellees had been sued in a number of lawsuits throughout the country for injuries resulting from exposure to asbestos fibers or asbestos products that were mined, manufactured, or sold by Appellees."); *Matter of Celotex Corp.*, 128 B.R. 478, 479 (Bankr. M.D. Fl. 1991) ("The Celotex Corporation and Carey Canada Inc. (collectively referred to as 'Debtor') filed a voluntary petition for relief under Chapter 11 . . . At the time the petition was filed, over 141,000 asbestos-related bodily injury lawsuits were pending against Debtor."); *In re A.H. Robins Co., Inc.*, 88 B.R. 742, 743 (E.D. Va. 1988) ("By the time of filing of the instant proceedings,

Here, the policy balance of debtor and creditor rights is upended because J&J is taking advantage of all of the Bankruptcy Code's advantages without any of the oversight over the vast majority of its assets. Sanctioning J&J's strategy would set a dangerous precedent allowing debtors to skirt the Bankruptcy Code's requirements. Indeed, approving this strategy paves the way for future tortfeasors to undergo divisional mergers and file for bankruptcy, regardless of whether the original entity was insolvent. Moreover, non-mass tort debtors could also take advantage of this strategy, separating all of their liabilities from their assets, and deciding which assets the creditors will have access to. And Judge Kaplan's statement that "for most companies, the complexity, necessary capital structure, and financial commitments required to lawfully implement a corporate restructuring as done in this case, will limit the utility of the 'Texas Two-Step'" only means that the wealthiest companies with the greatest means would be able to take advantage of this method, while companies that are less fortunate will be subjected to court oversight, deepening any perceived inequity between large and small companies in Chapter 11.[19]

---

Robins was faced with almost 6,000 lawsuits and claims arising from the Dalkon Shield . . . ."), *aff'd*, 880 F.2d 695 (4th Cir. 1989); *In re Dow Corning Corp.*, 86 F.3d 482, 485 (6th Cir. 1996) ("Until it ceased their manufacture in 1992, Dow Corning was the predominant producer of silicone gel breast implants, accounting for nearly 50% of the entire market.").

[19] *See* A52 (Opinion Denying Motions to Dismiss).

### III.   The Texas Two-Step Will Undermine Public Confidence in the Bankruptcy System.

One of the key accomplishments of the Bankruptcy Act of 1978 is that it yielded a flexible system that has proven capable of providing useful bargains to a wide range of problems.  Importantly, bankruptcy law's resolution of those problems – whether it was General Motors' overly large dealership network,[20] the Pacific Gas & Electric Company's billions of dollars of damage to property all over California[21] or the City of Detroit's overly generous pension benefits[22] – has been widely, although perhaps not exclusively, received as legitimate by the public at large.

J&J is clearly one of the world's leading corporations and one of the most famous American companies.  However, the public's ability to understand this bankruptcy case is very different from the now familiar story of a corporate titan restructuring in Chapter 11.  For an example of how this will matter to the public, consider how CNN covered the GM bankruptcy in 2009: "General Motors filed for bankruptcy protection early Monday . . . ."[23]

---

[20] *See In re General Motors Corp*, Case No. 09-50026 (Bankr. S.D.N.Y. 2009).

[21] *See In re PG&E Corporation and Pacific Gas and Electric Co.*, Case No. 19-30088 (Bankr. N.D. Cal. 2019).

[22] *See In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich. 2013).

[23] Chris Isidore, *GM bankruptcy: End of an era*, CNN Money (June 2, 2009), https://money.cnn.com/2009/06/01/news/companies/gm_bankruptcy/.

Now compare this to the convoluted news coverage of the LTL Management

bankruptcy, which is utterly incomprehensible to the average American:

CBS News:

> A bankruptcy move from Johnson & Johnson could stall
> any talcum powder settlements for the thousands of
> families that have sued the company for billions of dollars
> in damages in recent years.

> Officials with Johnson & Johnson said they have created
> a new subsidiary called LTL Management. Johnson &
> Johnson said it then moved $2 billion in baby powder
> lawsuit settlement money to LTL, then submitted LTL for
> bankruptcy. LTL Management filed for bankruptcy
> protection in North Carolina on Thursday and listed its
> liabilities between $1 billion and $10 billion.

> Johnson & Johnson itself has not filed for bankruptcy and
> neither has any of its other subsidiaries like Aveeno and
> Neutrogena.[24]

Reuters:

> Feb 25 (Reuters) - Johnson & Johnson (JNJ.N) can use the
> bankruptcy system to resolve multibillion-dollar litigation
> claiming its talc products cause cancer, a U.S. judge ruled
> on Friday, signing off on a legal maneuver that enables the
> company to avoid fighting more than 38,000 individual
> lawsuits.

> J&J used a strategy known as the "Texas two-step," which
> allows companies to split valuable assets from liabilities
> through a so-called divisive merger. In October, J&J,

---

[24] Khristopher J. Brooks, *Johnson & Johnson talc powder spinoff files for
bankruptcy*, CBS News (Oct. 15, 2021), https://www.cbsnews.com/news/johnson-
johnson-talc-powder-cancer-lawsuits-bankruptcy-ltl-management/.

which maintains its talc products are safe, put the claims into a newly created entity called LTL Management LLC, which filed for bankruptcy days later.[25]

The New York Times:

> Johnson & Johnson announced on Thursday that a subsidiary that it recently created to manage claims that assert that its talc-based products caused cancer had filed for bankruptcy protection.
> The company said in a statement that it hoped its filing for Chapter 11 protection would help resolve current and future claims "in a manner that is equitable to all parties." J.&J. said that it would provide money for the subsidiary for whatever amounts the bankruptcy court decided were owed, and that it would create a $2 billion trust for that reason. Certain royalty revenue streams have been allocated for the subsidiary to pay for any future costs, it added.[26]

Transparency and legitimacy are important policy goals of any bankruptcy regime. Here, J&J has managed to turn what was once a straightforward aspect of the Chapter 11 bankruptcy system into multiple paragraphs of explanation.

If the bankruptcy court's ruling is affirmed by this Court, the Law Professors share a concern that this filing, and the many future contortions of the Bankruptcy

---

[25] Dietrich Knauth and Tom Hals, *Judge greenlights J&J strategy to resolve talc lawsuits in bankruptcy court*, Reuters (Feb. 25, 2022), https://www.reuters.com/legal/transactional/judge-allows-johnson-johnson-talc-unit-remain-bankruptcy-court-2022-02-25/.

[26] Jesus Jiménez, *Johnson & Johnson Subsidiary Seeks Bankruptcy Protection to Handle Talc Product Claims*, N.Y. Times (Oct. 14, 2021), https://www.nytimes.com/2021/10/14/business/johnson-johnson-bankruptcy-talc-claims.html.

Code that will come after it, will undermine public confidence in the fairness and integrity of the bankruptcy system.[27]  It will also undermine the perception of fairness of any bankruptcy outcome on the part of the talc victims, whose interests are the key feature of this bankruptcy case.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should reverse the MTD Order and find that LTL's bankruptcy filing should be dismissed as a bad faith filing.

Dated: July 7, 2022
     New York, New York

**HERRICK, FEINSTEIN LLP**
*By: /s / Sean E. O'Donnell*
Sean E. O'Donnell
Stephen B. Selbst (*pro hac vice* pending)
Steven B. Smith (*pro hac vice* pending)
Rachel H. Ginzburg (*pro hac vice* pending)
Two Park Avenue
New York, New York
Tel: (212) 592-1400
Fax: (212) 592-1500
sodonnell@herrick.com
sselbst@herrick.com
ssmith@herrick.com
rginzburg@herrick.com

*Attorneys for the Law Professors*

---

[27] *See* David Skeel, *The populist backlash in Chapter 11*, The Brookings Institution (Jan. 12, 2022), https://www.brookings.edu/research/the-populist-backlash-in-chapter-11/ ("There is a growing populist perception that Chapter 11 . . . has become deeply unfair. It benefits insiders—the "haves"—at the expense of outsiders—the "have nots.").

# APPENDIX A

Kenneth Ayotte
Robert L. Bridges Professor of Law
U.C. Berkeley School of Law

Susan Block-Lieb
Professor of Law; Cooper Family Chair in Urban Legal Issues
Fordham University School of Law

Diane Lourdes Dick
Professor of Law
University of Iowa, College of Law

Jared Ellias
Professor of Law
Harvard Law School

Bruce A. Markell
Professor of Bankruptcy Law and Practice
Northwestern Pritzker School of Law

Robert K. Rasmussen
J. Thomas McCarthy Trustee Chair in Law and Political Science
University of Southern California Gould School of Law

Yesha Yadav
Associate Dean and Robert Belton Director of Diversity, Equity and Community;
Professor of Law
Vanderbilt University Law School

## **CERTIFICATE OF BAR MEMBERSHIP**

Pursuant to Third Circuit Local Rule 28.3(d), I certify that I am a member of

the Bar of this Court.

July 7, 2022                                    */s/ Sean E. O'Donnell*
                                               Sean E. O'Donnell

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 3,604 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

This brief complies with the electronic filing requirements of Third Circuit Local Rule 31.1(c) because the text of the electronic brief is identical to the text in the paper copies, and a virus detection program has been run on this file and no virus was detected. The virus detection program utilized was Microsoft Defender for Endpoint, Antivirus Version 1.369.880.0.

July 7, 2022                    */s/ Sean E. O'Donnell*
                               Sean E. O'Donnell

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I certify that today, July 7, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Third Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will served by the appellate CM/ECF system.

July 7, 2022                                  */s/ Sean E. O'Donnell*
                                                  Sean E. O'Donnell