**Nos. 22-2003, 22-2004, 22-2005, 22-2006, 22-2007,
22-2008, 22-2009, 22-2010, 22-2011 (Consolidated)**

# United States Court of Appeals for the Third Circuit

IN RE LTL MANAGEMENT, LLC,

*Debtor.*

OFFICIAL COMMITTEE OF TALC CLAIMANTS, *et al.*,

*Petitioner-Appellants,*

v.

LTL MANAGEMENT, LLC,

*Debtor-Appellee.*

Direct Appeal from the United States Bankruptcy Court for the District of New
Jersey in Ch. 11 No. 21-30589 and Adv. Pro. No. 21-03032

**BRIEF OF *AMICUS CURIAE* PUBLIC JUSTICE
IN SUPPORT OF APPELLANTS**

Glenn E. Chappell
Hassan A. Zavareei
Allison W. Parr
TYCKO & ZAVAREEI LLP
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Tel: (202) 973-0900
Fax: (202) 973-0950

*Counsel for Amicus Curiae
Public Justice*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1.1, Amicus Curiae Public Justice makes the following disclosures:

1.     For non-governmental corporate parties, please list all parent corporations:

N/A. Public Justice has no parent corporation.

2.     For non-governmental corporate parties, please list all publicly held corporations that hold 10% or more of the party's stock:

N/A. Public Justice is a non-profit corporation and does not issue stock.

3.     If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

N/A. Public Justice knows of no such party.

4.    In all bankruptcy appeals, counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debt, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and 3) any entity not named in the caption which is an active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ................................................................. 1

INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................... 4

I.      The extraordinary protections of the bankruptcy laws function
        properly only when invoked by honest debtors in legitimate
        financial distress. ......................................................................... 4

II.     J&J's divisive merger strategy artificially walls off assets from talc
        claimants, denies them the right to enforce their own right to
        recover, and subverts the constitutional system in place to redress
        their harms. ............................................................................... 10

III.    The stakes in this case are real, and the human costs are high. ............... 13

IV.     If allowed to stand, J&J's attempted abuse of the bankruptcy laws
        will set a dangerous precedent. ................................................... 18

CONCLUSION .......................................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Blanche Moure-Cabrera v. Johnson & Johnson*,
  No. 19-000727-CA, 2020 WL 5891514 (Miami-Dade County, Fla.
  Cir. Ct. Feb. 27, 2020) .................................................................................... 14

*Cabibi v. Johnson & Johnson*,
  No. BC665257, 2019 WL 6698308 (Los Angeles County Super Ct., Cal.
  June 15, 2017) .................................................................................................. 14

*Crudge v. Johnson & Johnson*,
  BC685901, 2019 WL 6050996 (Los Angeles County Super. Ct., Cal.
  Oct. 11, 2019) .................................................................................................. 14

*Furness v. Lilienfield*,
  35 B.R. 1006 (D. Md. 1983) ........................................................................ 6, 7

*Grogan v. Garner*,
  498 U.S. 279 (1991) ............................................................................................. 9

*In re Certified HR Servs. Co.*,
  No. 05-22912-BKC-RBR, 2009 WL 2913244 (Bankr. S.D. Fla. Mar. 4, 2009) .......... 2

*In re Frigitemp Cor.*,
  8 B.R. 284 (Bankr. S.D.N.Y. 1981) .................................................................... 5

*In re LTL Mgmt., LLC*,
  637 B.R. 396 (Bankr. D.N.J. 2022) .....................................................11, 12, 13

*In re Modiri*,
  474 B.R. 511 (Bankr. E.D. Mich. 2012) ............................................................ 7

*In re Philadelphia Newspapers, LLC*,
  599 F.3d 298 (3d Cir. 2010) ............................................................................... 5

*In re Seatco, Inc.*,
  257 B.R. 469 (Bankr. N.D. Tex. 2001) ............................................................. 8

*In re SGL Carbon Corp.*,
  200 F.3d 154 (3d Cir. 1999) ........................................................................... 6, 9

*In re Timbers of Inwood Forest Assocs., Ltd.*,
  808 F.2d 363 (5th Cir. 1987) ............................................................................. 6

*In re: Aéropostale, Inc.*,
  555 B.R. 369 (Bankr. S.D.N.Y. 2016) ............................................................... 6

*Ingham v. Johnson & Johnson,*
  608 S.W.3d 663 (Mo. Ct. App. 2020) ...............................................14, 15, 17

*Johnson v. Johnson & Johnson,*
  2018-CP-40-01781, 2019 WL 2524856 (Ct. Com. Pl. S.C. May 21, 2019) ............... 14

*Johnson v. Johnson & Johnson,*
  No. 20STCV17335, 2021 WL 6134712 (Los Angeles County Super. Ct., Cal. Oct. 12, 2021) ........................................................................................................ 14

*Kleiner v. Johnson & Johnson Consumer Inc.,*
  No. 2:21-cv-03366 (Ct. Com. Pl., Phila. Cty., Sept. 24, 2021).................................. 14

*Leavitt v. Johnson & Johnson,*
  RG-17-882401, 2019 WL 1761030 (Alameda County Superior Ct., Cal. Mar. 13, 2019) ..................................................................................................... 14

*Maritime Elec. Co., Inc. v. United Jersey Bank,*
  959 F.2d 1194 (3d Cir. 1991) ...................................................................................... 5

*Matter of Cont'l Airlines,*
  981 F.2d 1450 (5th Cir. 1993) ..................................................................................... 6

*Olson v. Brenntag N. Am., Inc.,*
  132 N.Y.S.3d 741 (N.Y. Sup. Ct. 2020)..............................................................15, 16, 17

*Pepper v. Litton,*
  308 U.S. 295 (1939).................................................................................................... 7

*Prudencio v. Johnson & Johnson,*
  JVR No. 2109160022, 2021 WL 4268327 (Alameda County Super. Ct., Cal. Aug. 26, 2021) ....................................................................................................... 16

*United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,*
  484 U.S. 365 (1988)............................................................................................... 6, 13

## Statutes

11 U.S.C. § 362.......................................................................................................... 4

11 U.S.C. § 502...................................................................................................... 5, 18

11 U.S.C. §§ 105.................................................................................................... 5, 19

11 U.S.C. §§ 524(g) .................................................................................................... 5

**Other Authorities**

*Johnson & Johnson ordered to pay $120 million damages in New York baby powder case*,
    38 No. 22 Westlaw J. Toxic Torts 04, at 1 (2020)........................................................ 16

Katherine M. Anand, Note: *Demanding Due Process: The Constitutionality of the S 524
    Channeling Injunction and Trust Mechanisms That Effectively Discharge Asbestos Claims in
    Chapter 11 Reorganization*, 80 Notre Dame L. Rev. 1187, 1222 (2005) ......................... 8

Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* 10 (1986) ........................... 9

## INTEREST OF AMICUS CURIAE[1]

Public Justice is a national public interest law firm dedicated to pursuing justice for victims of corporate and government wrongdoing. Through involvement in precedent-setting and socially significant litigation, Public Justice seeks to ensure that courthouse doors remain open to all injured plaintiffs with meritorious claims.

Consonant with its organizational mission, Public Justice has a strong interest in litigation that implicates access to the civil justice system. Few cases raise this issue more starkly and acutely than this proceeding.[2]

## INTRODUCTION

American bankruptcy law is premised on a fundamental compromise. When a debtor's financial condition prevents it from paying its debts and threatens its continued operation, it is entitled to turn to the Bankruptcy Court for a lifeline. In that circumstance, it is a foregone conclusion that many creditors will never recover from the debtor the full amounts to which they are entitled under their contracts, loan agreements, or civil judgments. But, in exchange for a discharge of some of their entitlements to give the debtor a fresh start, creditors depend on the bankruptcy process to ensure they are treated as fairly as possible under the circumstances and that they can

---

[1] No party's counsel authored this brief in whole or in part or contributed money intended to fund the preparation or submission of this brief. Further, no person other than Public Justice and its counsel contributed money intended to fund preparation or submission of this brief.

[2] All parties have consented to the filing of this brief.

recover as much as equity allows.

This compromise is built on the assumption of *legitimate* financial distress. Bankruptcy courts are "courts of equity, operating under the consideration that equitable principles govern the exercise of bankruptcy jurisdiction." *E.g.*, *In re Certified HR Servs. Co.*, No. 05-22912-BKC-RBR, 2009 WL 2913244, at *2 (Bankr. S.D. Fla. Mar. 4, 2009). The bankruptcy laws thus have unique features that are all geared to effectuate an equitable result in that special situation, including the automatic stay, special injunctive relief to limit claims against affiliates of the debtor, the claims estimation process, and channeling injunctions. But those features can delay, limit, or even eliminate creditors' rights to adjudicate their claims before a jury and recover the full compensation for their losses that the law allows. Thus, when the debtor's financial distress is illusory, these features of bankruptcy only produce inequities. When that happens, bankruptcy becomes a tool for injustice.

Such is the case in this proceeding. Johnson & Johnson ("J&J"), one of the nation's largest and most prosperous corporations, exploited a quirk in Texas corporation law known as the "Texas Two Step," in which it split itself into two corporate entities, for the sole purpose of managing the liabilities it has or may incur to claimants in thousands of cases across the country who allege that J&J's asbestos-contaminated talc products caused them to develop rare and often terminal cancers. It put the vast majority of its assets into one of the entities and its talc-related liabilities into the other. The liability-laden entity, LTL Management—short for Legacy Talc

Litigation—immediately filed a petition for Chapter 11 bankruptcy. J&J is now using the new entity, LTL Management, to shield its abundant assets from the talc claimants and evade the burdens of bankruptcy. At the same time, J&J seeks to wield the unique features of the bankruptcy process to hinder, delay, and limit talc victims' ability to pursue their claims in civil actions—their only vehicle to seek redress for the deadly harms that they believe J&J inflicted on them (harms for which multiple juries have found J&J responsible).

In the decision below, the Bankruptcy Court relied on a funding agreement between J&J and LTL and reasoned that the bankruptcy system was the optimal, most efficient venue for the resolution of mass tort claims. But the funding agreement limits talc claimants' ability to recover up to the value of J&J's assets at the time of the divisive merger—an artificial constraint that serves only J&J. It also makes claimants' recovery dependent on J&J and LTL's compliance with the funding agreement, an agreement that claimants have no standing to enforce, and which is made between two closely aligned companies who share the same goal of limiting claimants' recovery.

More importantly, the Bankruptcy Court's focus on efficiency overlooks the manifest inequities of resolving talc victims' claims through the bankruptcy system. Efficiency is not the sole or even primary aim of the American civil justice system, which is founded on principles of individual due process and the right to trial by jury. Efficient resolution of claims is not a basis for abandoning that tradition. Congress and the People already chose the civil justice system as the best vehicle for resolving

litigation against companies not facing impending financial doom. The Bankruptcy Code is not a super-statute that authorizes bankruptcy courts to weigh these competing interests in a vacuum.

Finally, greenlighting J&J's abuse of the bankruptcy system will set a precedent that others will surely follow to avoid their obligations to those harmed by their unlawful conduct. Corporate debtors could use the same tactics to delay or frustrate recovery by tort victims, consumers, competitors, contractors, clients, shareholders, regulators, or others seeking to pursue valid claims before a jury. Like J&J, they could do so not because they lack the money to pay, but simply because they wish to avoid the civil justice system that applies to everyone else. And each time an entity successfully manipulates the federal bankruptcy scheme in the way that J&J has here, courthouse doors will close for victims who depend on the American civil justice system to protect their legal rights.

## ARGUMENT

**I.      The extraordinary protections of the bankruptcy laws function properly only when invoked by honest debtors in legitimate financial distress.**

To further the bankruptcy laws' twin aims of giving financially distressed debtors a fresh start and ensuring fair and equal treatment of creditors, Congress has vested the bankruptcy courts with unique, powerful tools. These include the automatic stay pursuant to 11 U.S.C. § 362, the availability of a special injunction to halt litigation against affiliates of the debtor and other third parties, the availability of a "channeling

injunction" under 11 U.S.C. §§ 105(a) or 524(g) that funnels all claims against an entity to a single trust or prohibits claims against any entity other than the trust, and estimation of the value of claims pursuant to 11 U.S.C. § 502(c). Used properly, these mechanisms can provide a centralized, efficient way to facilitate a debtor's reorganization and preserve as much of the estate as possible for creditors.

Among the most powerful of these tools, the automatic stay is designed to protect the debtor's estate from "the chaos and the wasteful depletion resulting from multifold, uncoordinated and possibly conflicting litigation." *In re Frigitemp Cor.*, 8 B.R. 284, 289 (Bankr. S.D.N.Y. 1981). It does so by giving petitioners "a breathing spell from creditors" so that they may "attempt a repayment or reorganization plan or simply be relieved of the financial pressures" that drove the bankruptcy. *Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991). The automatic stay also protects creditors' interests and seeks to maximize their recovery by keeping the debtor's estate "from being eaten away by creditors' lawsuits and seizures of property before the trustee has had a chance to marshal the estate's assets and distribute them equally among the creditors." *Id.*

Other features are meant to further the same purposes. By directing litigation to a specially designated trust and thereby isolating the reorganizing debtor from claims that could further drain its depleted assets, the channeling injunction serves the policy of "facilitating the reorganization and rehabilitation of the debtor as an economically viable entity." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 303 (3d Cir. 2010). The

claims-estimation process is designed to achieve finality so that reorganization may be accomplished, while also ensuring "a fair distribution to creditors." *Matter of Cont'l Airlines*, 981 F.2d 1450, 1461 (5th Cir. 1993). And more generally, the Bankruptcy Courts have "broad equitable powers . . . to achieve fairness and justice in the reorganization process." *In re: Aéropostale, Inc.*, 555 B.R. 369, 396-97 (Bankr. S.D.N.Y. 2016) (cleaned up).

These extraordinary tools are only justified in one special situation—*bona fide* financial distress. As this Court cautioned, "Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liabilities." *See In re SGL Carbon Corp.*, 200 F.3d 154, 166 (3d Cir. 1999) (internal quotation marks omitted) (quoting *Furness v. Lilienfield*, 35 B.R. 1006, 1009 (D. Md. 1983)). When an enterprise is economically strained to the brink of dissolution, Congress has concluded that giving it a fresh start to allow it to continue operating is in the best interests of everyone involved, including creditors—even if some of the entity's debts must be discharged.[3]

---

[3] *See SGL Carbon*, 200 F.3d at 165-66 ("When *financially troubled* petitioners seek a chance to remain in business, the exercise of [Chapter 11's] powers is justified. But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code.") (emphasis added); *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 373 (5th Cir. 1987) ("A principal goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the Chapter 11 debtor by preserving going-concern values and thereby enhancing the amounts recovered by all creditors."), *aff'd sub nom. United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988).

There, a fresh start is in the best interests of everyone because a legitimately financially distressed debtor could not meet all its obligations even if its creditors turned to the courts to enforce their entitlements. *See, e.g.*, *In re Modiri*, 474 B.R. 511, 514 (Bankr. E.D. Mich. 2012) (observing that "the purpose of bankruptcy is to grant relief to those debtors who cannot pay their debts" and that "it would be unfair to a debtor's creditors to grant bankruptcy relief if the debtor can repay those creditors"). In such circumstances, the powerful features of the bankruptcy system are designed to produce the most equitable result still achievable. *See Pepper v. Litton*, 308 U.S. 295, 307-08 (1939) ("[I]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate.").

But these features come at a cost: they can delay, limit, or even foreclose creditors' access to, and ability to recover under, the laws of the American civil justice system. For example:

- The automatic stay prevents litigation creditors from seeking relief through the judicial system for as long as it remains in effect. *See Furness v. Lilienfield*, 35 B.R. at 1009 (warning of the risk of defendants using the automatic stay as "a last-minute escape chute out of pending civil litigation").

- Third-party injunctions do the same but extend even more broadly to limit litigation creditors' rights to recover from the debtor's affiliates. *In re Seatco, Inc.*,

257 B.R. 469, 473 (Bankr. N.D. Tex. 2001) (observing and citing cases in which bankruptcy courts "approved plans containing broad third party releases and permanent injunctions to enforce those releases").

• The channeling injunction mechanism restricts plaintiffs to claims against the assets in the trust, which can cripple their right to recovery if the trust is underfunded.[4]

• Estimation of claims can limit the amount a litigation creditor may recover because confirmation of the reorganization plan—and the consequent funding of the new entity and the creditors' potential recovery—depends necessarily on this truncated, non-jury proceeding. If the value of creditors' claims is underestimated, the reorganized entity may not be sufficiently funded to cover the full amount of damages assessed by juries in litigation. This is especially problematic in asbestos cases, where the number and value of many claims—particularly future claims—is uncertain.[5]

---

[4] *See* Katherine M. Anand, Note: *Demanding Due Process: The Constitutionality of the S 524 Channeling Injunction and Trust Mechanisms That Effectively Discharge Asbestos Claims in Chapter 11 Reorganization*, 80 Notre Dame L. Rev. 1187, 1222 (2005) (recounting that future claimants against a reorganized asbestos defendant were ultimately awarded a fraction of their damages due to a channeling injunction "because the Trust was so grossly under-funded").

[5] *See id.* at 1194 ("[I]n the context of asbestos, an accurate estimation of the liability of a given debtor is impossible given the temporal and geographic dispersion of the victims, as well as the uncertainty as to which injuries, if any, manifest.").

Thus, the tradeoff between the powerful tools of the bankruptcy process and the impact those tools have on access to civil justice is significant and only justified in the special circumstance of financial hardship that would prevent creditor recovery through the normal judicial channels.[6]

There is no such tradeoff when, as here, a financially secure debtor with ample assets to meet its obligations *manufactures* insolvency. J&J is thriving. For 2021, the company recently reported 13.6% growth in sales to $93.8 billion, including sales of $24.8 billion in the fourth quarter alone.[7] It holds at least $31 billion in assets and has a market cap of more than $450 billion. D.E. 632-1 ¶ 6. This Fortune 50 company[8] is not an "honest but unfortunate debtor," *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991), and its use of the Texas Two Step and subsequent Chapter 11 proceedings is just an attempt to preemptively cap its liability. In this situation, the broad equitable features of the bankruptcy process *prevent* fair treatment of creditors rather than ensure it because these features frustrate creditors' access to civil justice without a countervailing benefit. *See SGL Carbon*, 200 F.3d at 166 ("[I]f [a] Chapter 11 plan does not have a rehabilitative

---

[6] *See* Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* 10 (1986) ("The basic problem that bankruptcy law is designed to handle, both as a normative matter and as a positive matter, is that the system of individual creditor remedies may be bad for the creditors as a group when there are not enough assets to go around.").

[7] *See Johnson & Johnson Reports Q4 Full-Year 2021 Results*, Johnson & Johnson (Jan. 25, 2022), https://johnsonandjohnson.gcs-web.com/news-releases/news-release-details/johnson-johnson-reports-q4-and-full-year-2021-results.

[8] *Johnson & Johnson*, Fortune, https://fortune.com/company/johnson-johnson/fortune500/ (last visited Feb. 2, 2022).

purpose, the statutory provisions designed to accomplish the reorganizational objectives become destructive of the legitimate rights and interests of creditors.") (internal quotation marks omitted). These harms are devastating because the civil justice system is a lifeline for victims seeking recourse for devastating and unforeseeable harms.

## II.    J&J's divisive merger strategy artificially walls off assets from talc claimants, denies them the right to enforce their own right to recover, and subverts the constitutional system in place to redress their harms.

In the proceedings below, the Bankruptcy Court identified two aspects of J&J's divisive merger strategy that, in its view, weighed in favor of allowing the bankruptcy process to proceed: the funding agreement put in place between J&J and LTL and the efficiency benefits of the bankruptcy system. But the Bankruptcy Court's analysis downplayed or overlooked the grave costs on the other side of the ledger.

First, the Bankruptcy Court placed great stock in the funding agreement put in place between J&J and LTL. But that agreement disadvantages claimants and denies them the right to enforce LTL's obligations to them—a right the civil justice system provides them. The funding agreement obligates J&J to fund LTL up to the value of Old JJCI *as of the date that J&J performed the divisive merger*. D.E. 632-1 ¶ 23. This limitation artificially caps the assets available to claimants to those held by J&J at a past point in time (and the value of which is uncertain) while, in the present, J&J grows its profits, market share, and resulting assets every day. *Id.* A plaintiff's right to recover would not be limited in this way in the civil justice system. Nor should it: cabining claimants' recovery to the assets available at one snapshot in time benefits only J&J.

The larger picture is also crucial. The funding agreement is between J&J and LTL, two allied and previously unified corporations; it denies claimants' agency in the enforcement of their own right to recover their damages. Talc claimants are not parties to the funding agreement and have no right to enforce it, even though it purports to ensure their protection. As the Talc Claimants explained below, if J&J were to refuse to make payments under the agreement or delay those payments, claimants would have to rely on LTL to enforce the agreement against its former parent company, from which its executives and assets came. *Id.* If LTL were to delay enforcement of the funding agreement, claimants would be at LTL's mercy. And even if J&J and LTL were to scrupulously honor the funding agreement, the precedent set by this maneuvering would enable future bad actors to exploit the same mechanism to deny relief to meritorious claimants in the future. In the civil justice system, claimants have agency in the process because they hold judgments and have the right to enforce them in court.

Second, J&J and the Bankruptcy Court touted the purported efficiency benefits of the bankruptcy system. *See, e.g.*, *In re LTL Mgmt., LLC*, 637 B.R. 396, 415 (Bankr. D.N.J. 2022) (characterizing a trust as "a far simpler and streamlined process" than the civil justice system); *id.* at 416 (claiming that "the bankruptcy system . . . will provide all claimants . . . with an efficient means through which to equitably resolve their claims") (internal quotation marks omitted). These claimed advantages are inaccurately portrayed or overstated—the civil justice system is working as intended for talc claimants *and* J&J in thousands of cases. *See infra* Part III. Even if these arguments were

correct, their proponents overlook a fundamental problem: the People already balanced the various policy factors, including efficiency concerns, by enacting the Seventh Amendment. The Bankruptcy Code is not a super-statute, and the Bankruptcy Court is not a super-legislature, with the power to reorganize the American civil justice system in pursuit of claimed efficiency improvements. A fundamental assumption of the democratically chosen judicial system is that the bankruptcy process's powerful tools are only justified in the narrow context of balancing the equities when companies face impending financial disaster. J&J's attempted use of the bankruptcy process disrespects those limits.

On this last point, J&J argued below, and the Bankruptcy Court appears to have accepted, that J&J is the type of financially distressed debtor for which the bankruptcy system was designed because its potential talc liabilities could lead to future insolvency. D.E. 956 at 21-22; *In re LTL Mgmt., LLC*, 637 B.R. at 419. These worries are far from being realized any time soon, if ever—the Talc Claimants detailed J&J's massive profits, assets, and credit rating, D.E. 632-1 ¶ 6—but in any event, it overlooks J&J's subversive use of the divisive merger. If J&J believes that its current and future talc liabilities truly threaten its solvency or existence as a going concern, then a process exists for resolving those concerns: a standard bankruptcy proceeding involving J&J *without* a divisive merger that walls off its assets from its liabilities.

Such a proceeding would provide transparency to creditors and test J&J's assertions regarding its ability to pay. But J&J seeks to use the Texas Two Step to avoid

this transparency, taking advantage of the bankruptcy system's benefits without subjecting itself to its burdens. The Bankruptcy Court acknowledged that by utilizing the divisive merger statute, J&J avoided "important burdens of bankruptcy" including "full transparency of all assets, liabilities and financial conduct through scheduling and reporting," "accountability for all assets and expenditures," and "judicial oversight over all non-ordinary course of business conduct." *In re LTL Mgmt., LLC*, 637 B.R. at 425. But the Bankruptcy Court nevertheless permitted this procedural gamesmanship. Accepting this tactic as a legitimate reorganizational purpose would spurn the key principle that "[t]he creditor-protection provisions of the Bankruptcy Code … can be made meaningful only by bankruptcy judges who are equally sensitive to the need for creditor protection as to the need for protecting the debtor's right to reorganize." *Timbers of Inwood*, 808 F.2d at 373.

The funding agreement is a self-serving arrangement that caps claimants' potential recovery and makes them bystanders in the fight to redress their own injuries. And any efficiency gains of resolving their claims through the bankruptcy process would be realized at the expense of their right to access the civil justice system. These purported benefits pale in comparison to the costs.

## III.   The stakes in this case are real, and the human costs are high.

The human impacts of these talc cases illustrate the stakes. Talc cases have been

13

tried across the country. In some cases, J&J prevailed.[9] In others, after lengthy trials, juries found that J&J's products caused cancer and inflicted severe harm on consumers who trusted their safety.[10] For those plaintiffs who proved their cases, their verdicts provided justice in situations where time was of the essence. For those who did not, J&J avoided liability. In other words, the civil justice system worked as intended.

In *Ingham v. Johnson & Johnson*, 22 plaintiffs alleged that their frequent use of J&J's talc products caused them to develop ovarian cancer. 608 S.W.3d 663, 678 (Mo. Ct. App. 2020), *cert denied*, 141 S. Ct. 2716 (2021). Unfortunately, this cancer is often diagnosed only after it has spread.[11] These plaintiffs "underwent chemotherapy, hysterectomies, and countless other surgeries" that "caused them to experience

---

[9] *See, e.g.*, *Kleiner v. Johnson & Johnson Consumer Inc.*, No. 2:21-cv-03366 (Ct. Com. Pl., Phila. Cty., Sept. 24, 2021); *Crudge v. Johnson & Johnson*, BC685901, 2019 WL 6050996 (Los Angeles County Super. Ct., Cal. Oct. 11, 2019); *Johnson v. Johnson & Johnson*, 2018-CP-40-01781, 2019 WL 2524856 (Ct. Com. Pl. S.C. May 21, 2019).

[10] *See, e.g.*, *Johnson v. Johnson & Johnson*, No. 20STCV17335, 2021 WL 6134712 (Los Angeles County Super. Ct., Cal. Oct. 12, 2021) ($27,458,000 jury award for plaintiff); *Blanche Moure-Cabrera v. Johnson & Johnson*, No. 19-000727-CA, 2020 WL 5891514 (Miami-Dade County, Fla. Cir. Ct. Feb. 27, 2020) ($9 million jury award for plaintiff); *Leavitt v. Johnson & Johnson*, RG-17-882401, 2019 WL 1761030 (Alameda County Superior Ct., Cal. Mar. 13, 2019) ($28,291,000 jury award for plaintiff); *Cabibi v. Johnson & Johnson*, No. BC665257, 2019 WL 6698308 (Los Angeles County Super Ct., Cal. June 15, 2017) ($40,137,769 jury award for plaintiff; court reduced award to $27,215,404 in accordance with apportionment of liability).

[11] Chyke A. Doubeni et al., *Diagnosis and Management of Ovarian Cancer*, 93 Am Fam. Physician 937, 937 (2016), https://www.aafp.org/afp/2016/0601/afp20160601p937.pdf (describing ovarian cancer as "the most lethal gynecologic cancer," and indicating that "[l]ess than one-half of patients survive for more than five years after diagnosis" and "[m]ore than 75% of affected women are diagnosed at an advanced stage because early-stage disease is usually asymptomatic and symptoms of late-stage disease are nonspecific").

symptoms such as hair loss, sleeplessness, mouth sores, loss of appetite, seizures, nausea, neuropathy, and other infections." *Ingham*, 608 S.W.3d at 678. After a trial that lasted more than six weeks, the jury found J&J liable and awarded $25 million in compensatory damages to each plaintiff, plus punitive damages. *Id.* at 680. The Missouri Court of Appeals affirmed the jury's factual findings in full and entered a judgment of $2.2 billion in damages. *Id.* at 724. The court reduced the jury's original award of damages only because it held that the trial court lacked jurisdiction over a subset of claims by non-resident plaintiffs. *Id.* Five plaintiffs died during the litigation. *See id.* at 721 n.26.

Donna Olson testified that she used J&J's Baby Powder or Shower to Shower products daily for nearly six decades. *Olson v. Brenntag N. Am., Inc.*, 132 N.Y.S.3d 741 (N.Y. Sup. Ct.), *judgment entered sub nom.*, *In re New York City Asbestos Litig.* (N.Y. Sup. Ct. 2020). A physician serving as an expert witness testified that Ms. Olson's daily use of these products led to inhalation of "between 2,500 and 25,000 asbestos fibers per application," which would have resulted in inhalation of "millions of [asbestos] fibers over her lifetime." *Id.* She developed pleural mesothelioma, *id.*, a rare cancer with a five-year survival rate of just 7-18%.[12] After a sixteen-week trial, the jury found that J&J's products caused her illness and found J&J liable, awarded her and her husband $25

---

[12] *Survival Rates for Mesothelioma*, Am. Cancer Society (Jan. 21, 2021), https://www.cancer.org/cancer/malignant-mesothelioma/detection-diagnosis-staging/survival-statistics.html.

million in compensatory damages, and assessed $300 million in punitive damages as well. *Olson*, 132 N.Y.S.3d at 741. The trial court reduced the compensatory and punitive damages awards to $15 million and $105 million, respectively, but affirmed the jury's finding of liability. *Id.* This verdict provided at least some justice for Ms. Olson, whose cancer, according to her attorney, is "at an advanced stage." *Johnson & Johnson ordered to pay $120 million damages in New York baby powder case*, 38 No. 22 Westlaw J. Toxic Torts 04, at 1 (2020) (internal quotation marks omitted).

At only 34 years old, Christina Prudencio developed malignant mesothelioma, a terminal cancer, after daily use of talcum powder until age sixteen and subsequent exposure through use of the substance on her siblings.[13] In August 2021, after a two-month trial, a California jury awarded her $26,572,967 in compensatory damages, and the trial court subsequently reduced those damages by less than one percent. *Prudencio v. Johnson & Johnson*, JVR No. 2109160022, 2021 WL 4268327 (Alameda County Super. Ct., Cal. Aug. 26, 2021). The jury's verdict provided redress for Ms. Prudencio before it was too late. By her mid-thirties, she had already "suffered through surgery, hemorrhage, and other medical issues," and, as her lawyer told the jury, her cancer will take her life "as her chemotherapy stops working."[14]

---

[13] Cara Salvatore, *California Jury Awards $26.5M In Talc Mesothelioma Trial*, Law360 (Aug. 23, 2021), https://www.law360.com/articles/1413774/california-jury-awards-26-5m-in-talc-mesothelioma-trial.

[14] Cara Salvatore, *J&J's Talc Indifference Led To Woman's Cancer, Jury Hears*, Law360 (Aug. 16, 2021), https://www.law360.com/articles/1412269/j-j-s-talc-indifference-led-to-woman-s-cancer-jury-hears (describing Ms. Prudencio's lawyer's comments).

The process these plaintiffs followed to seek compensation for their harms is the cornerstone of the American civil justice system. They and J&J put their evidence before juries, and the juries decided their cases in accordance with due process of law. J&J had ample opportunity to defend the claims, and it had and has the full opportunity to seek appellate review of these judgments.

Thousands of other consumers with cancer are equally entitled to seek redress through the civil judicial system. To date, plaintiffs have brought roughly 38,000 ovarian cancer-related claims against J&J and Johnson & Johnson Consumer Inc. *See* D.E. 3 at 51. More cases will surely follow. After more than a century of profiting from its talc products, J&J only discontinued them in 2020 (and continues to market them outside the United States and Canada).[15] Moreover, the "lengthy latency period between exposure to asbestos and onset of mesothelioma" is "undisputed." *Olson*, 132 N.Y.S.3d at 741; *see also Ingham*, 608 S.W.3d at 723 ("[O]varian cancer can take many years to develop after exposure to an asbestos-containing product . . . .") (citing plaintiffs' evidence). As the death of the five plaintiffs during the *Ingham* litigation illustrate, time is of the essence if many of these seriously ill claimants are to have their day in court, and many will go uncompensated if their cases are delayed during bankruptcy proceedings.

J&J is attempting to manipulate the bankruptcy process to deny its talc victims

---

[15] *See Johnson & Johnson Consumer Health Announces Discontinuation of Talc-based Johnson's Baby Powder in U.S. and Canada*, Johnson & Johnson (May 19, 2020).

access to justice, using the unique features of the bankruptcy system to delay, limit, and outright deny recovery to victims, including victims who already succeeded at trial. *See* D.E. 632-1 ¶¶ 3, 7, 23-27, 38-39. At the same time, J&J is evading the usual burdens that befall a debtor in bankruptcy. If J&J's tactics are permitted, bankruptcy will become a tool to shut the courthouse doors to victims of corporate wrongdoing and to shield wrongdoers from liability.

## IV.    If allowed to stand, J&J's attempted abuse of the bankruptcy laws will set a dangerous precedent.

If allowed to stand, J&J's bankruptcy ploy will set a precedent that will have far-reaching consequences. There is nothing stopping any financially healthy company from manipulating the divisive-merger mechanism to gain access to, and use, *the* bankruptcy system's extraordinary tools to frustrate civil justice.

For instance, imagine a large civic or religious organization that turns a blind eye to sexual abuse of children within its ranks. As survivors begin to come forward, the organization could use a divisive merger to form a special purpose entity under Texas law, place its sexual abuse-related liabilities into the new entity, underfund the special purpose entity, keep all the organization's assets in the other, newly formed primary entity, and have the special purpose entity immediately declare bankruptcy. The organization could then use the automatic stay and the Bankruptcy Court's broad injunctive relief authority to hinder or delay existing claims, use the estimation process in 11 U.S.C. § 502(c) to get the claims valued for purpose of plan approval (and without

18

a jury trial), and then get a reorganization plan approved that includes a victims' trust which takes into account only the new entity's limited financial resources as opposed to the organization's vast assets.

In addition, the organization could obtain a channeling injunction against all future sexual abuse claimants under Section 105(a) of the Bankruptcy Code, thus limiting the victims' recovery against the assets in the underfunded trust. But because many sexual abuse survivors do not come forward until years later,[16] the extent of the conduct within the organization does not come to light until many years after the plan is approved. And because the estimation process undervalued the number and worth of future claims, the reorganized entity ends up underfunded, and the claimants' right to seek the full extent of damages available under the law is crippled by the organization's manipulation of the bankruptcy process and the plan approval.

Meanwhile, the culpable organization—which had ample assets to pay all claims and was never in any true financial distress—goes about its business while the victims are left to absorb the costs of the organization's wrongdoing. The organization has manipulated the bankruptcy laws into a vehicle to make *it* the judge, jury, and claims administrator.

---

[16] *See, e.g.*, Bri Lee, Jonathan Crowe, & Rachael Burgin, *Delays in reporting alleged rapes are common — even years later. This isn't a barrier to justice*, The Conversation (Mar. 1, 2021), https://theconversation.com/delays-in-reporting-alleged-rapes-are-common-even-years-later-this-isnt-a-barrier-to-justice-156201 (discussing the "many legitimate reasons why survivors of sexual violence may not immediately report to police" or come forward).

Other examples abound in the personal injury context. For example, a large (and financially thriving) pharmaceutical company could use the same tactics employed by J&J here to hinder, delay, or limit its liability to communities harmed by opioid use even when juries across the country repeatedly find it culpable in the addiction epidemic. So could a large-scale polluter whose emissions sicken thousands of individuals with life-threatening respiratory diseases.

Moreover, the consequences will not be confined to the personal injury sphere. Using the same tactics, a corporation could frustrate plaintiffs' ability to hold it accountable for many types of civil wrongs. For example, a rapidly growing tech startup could solicit consumers to invest in a new cryptocurrency by overstating the prospects for success and understating the extreme risks. If the project fails and the company loses the investors' money on the scheme, it could then use the Texas Two Step to isolate its assets from those liabilities, creating a funding agreement that obligates the company to fund the new entity only up to the value of the company's assets at the time of the divisive merger. While investors find themselves battling to recover a share of the limited assets in the company's underfunded special purpose entity to obtain even a fraction of their losses in the bankruptcy proceeding, the parent company has seen its profits, market share, and assets quadruple since the proceedings started—and those ample assets are useless to the wronged investors. Similarly, a well-established tech giant could use the same tactics to shield its plentiful assets in the face of an antitrust lawsuit by small businesses or the government.

Likewise, a large, overly optimistic real estate developer with plenty of capital to back its investments (regardless of whether its investments succeed) could start building luxury apartment complexes across the country. If the residential housing market collapses due to an economic downturn, it could use the Texas Two Step to separate its assets from these liabilities and then file bankruptcy to hinder or delay recovery under state contract law for small-business construction contractors in dire need of cash to keep their businesses running in hard times.

Neither Congress nor the Framers of our Constitution intended for the federal bankruptcy laws to be used for these purposes.[17]

## CONCLUSION

For all these reasons, the Court should reverse the Bankruptcy Court's decision denying the Official Committee of Talc Claimants' Motion to Dismiss.

Dated: July 7, 2022                                  Respectfully Submitted,

                                                     */s/ Glenn E. Chappell*
                                                     Glenn E. Chappell
                                                     Hassan A. Zavareei
                                                     Allison W. Parr
                                                     **TYCKO & ZAVAREEI LLP**

---

[17] Indeed, the Framers included a grant of authority to develop a federal bankruptcy scheme in the Constitution out of a concern that creditors needed protection from debtors using state laws to avoid their obligations. James Madison explained in *Federalist 42* that "[t]he power of establishing uniform laws of bankruptcy" would "prevent so many frauds where the parties or their property may lie or be removed into different States." Put differently, the federal bankruptcy scheme is designed to prevent jurisdictional gamesmanship by the debtor.

1828 L Street NW, Suite 1000
Washington, D.C. 20036
Tel.: (202) 973-0900
Fax: (202) 973-0950
hzavareei@tzlegal.com
gchappell@tzlegal.com
aparr@tzlegal.com

*Counsel for Amicus Curiae Public
Justice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of July 2022, I caused to be served a true and correct copy of the foregoing document on all counsel of record via electronically filing it via the CM/ECF System. All counsel of record are registered CM/ECF users, and will be served via the platform.

*/s/ Glenn E. Chappell*
Glenn E. Chappell

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rule 28.3(d) and Local Rule 46.1(e), I hereby certify that I,

Glenn E. Chappell, am admitted to the Bar of the United States Court of Appeals for

the Third Circuit.


Dated: July 7, 2022                                   */s/ Glenn E. Chappell*
                                                      Glenn E. Chappell

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I, Glenn E. Chappell, certify the following:

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because it contains 5,478 words (exclusive of the portions exempted by Fed. R. App. P. 32(f) and Local Rule 29.1(b)), which is less than one-half the maximum length of 13,000 words allowed for a party's principal brief.

2.    This brief complies with the typeface and formatting requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) as it has been written in a 14-point proportionally spaced font set in plain, roman style.

3.    This brief complies with the electronic filing requirements of Local Rule 31.1(c) as the text of the electronic submission and paper copies are identical. Windows Defender Version 1.369.580.0 was used to scan the electronic file of the brief before its submission. No viruses were detected.


Dated: July 7, 2022                                 */s/ Glenn E. Chappell*
                                                    Glenn E. Chappell