**Nos. 22-2003, 22-2004, 22-2005, 22-2006, 22-2007,
22-2008, 22-2009, 22-2010, 22-2011 (Consolidated)**

---

# United States Court of Appeals
# for the Third Circuit

---

IN RE LTL MANAGEMENT LLC,

*Debtor.*

---

OFFICIAL COMMITTEE OF TALC CLAIMANTS, *et al.*

*Petitioners-Appellants*,

v.

LTL MANAGEMENT LLC,

*Debtor-Appellee.*

---

Direct Appeal from the United States Bankruptcy Court for the
District of New Jersey, Chapter 11 No. 21-30589
(Hon. Michael B. Kaplan, Chief Judge)

---

**BRIEF OF THE AMERICAN ASSOCIATION FOR JUSTICE
AS AMICUS CURIAE IN SUPPORT OF PETITIONERS-APPELLANTS**

---

Jeffrey R. White
*Senior Associate General Counsel*
AMERICAN ASSOCIATION FOR JUSTICE
777 6th Street NW, Suite 200
Washington, DC 20001
(202) 944-2839
jeffrey.white@justice.org

*Counsel for Amicus Curiae*
*American Association for Justice*

July 7, 2022

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae the American Association for Justice certifies that it is a non-profit voluntary national bar association. There is no parent corporation or publicly owned corporation that owns 10% or more of this entity's stock.

Respectfully submitted this 7th day of July, 2022.

/s/ Jeffrey R. White

JEFFREY R. WHITE

*Counsel for Amicus Curiae*
*American Association for Justice*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................... ii

TABLE OF CONTENTS ...................................................................................... iii

TABLE OF AUTHORITIES ................................................................................ iv

AMICUS CURIAE'S IDENTITY, INTEREST
AND AUTHORITY TO FILE ............................................................................... 1

SUMMARY OF ARGUMENT ............................................................................. 2

ARGUMENT ........................................................................................................ 4

I. THE CHAPTER 11 PETITION DEPRIVES VICTIMS HARMED BY
JOHNSON & JOHNSON'S PRODUCTS OF THEIR RIGHT TO AN
ARTICLE III TRIBUNAL AND TRIAL BY JURY THROUGH THE
CREATION OF AN ARTIFICIAL INSOLVENCY .................................... 4

   A. The Sole Purpose of the LTL Management Chapter 11 Petition Is to
Shield Johnson & Johnson's Assets from Claims by Those It Has
Wrongfully Harmed by Creating an Insolvent Subsidiary and
Invoking Chapter 11 Protections Without Submitting Johnson
& Johnson to Chapter 11. ..................................................................... 4

   B. The Chapter 11 Petition Deprives Claimants of Their Right To an
Article III Adjudication, with the Right To Trial by Jury, by
Invalidly Transforming Their Common-Law Causes of Action
into Bankruptcy Claims. ...................................................................... 6

      1. *Article I bankruptcy courts may not, in the name of speed or
efficiency, usurp the role of Article III courts in adjudicating
private common-law tort actions* ................................................. 6

      2. *Article I bankruptcy courts may not adjudicate common-law
claims regardless of whether they may be deemed "core"
proceedings under the Bankruptcy Code.* ................................. 10

II. THE CHAPTER 11 PETITION DEPRIVES VICTIMS OF
WRONGFUL INJURY OF THEIR RIGHTS TO THEIR DAY IN
COURT AND TRIAL BY JURY THROUGH THE CREATION OF
AN ARTIFICIAL LIMITED FUND. ....................................................... 12

   A. A Defendant Facing Claims of Wrongful Injury May Not
Manipulate Its Corporate Structure and the Bankruptcy Code To
Deprive Claimants of Their Constitutional Right To Trial by Jury. . 12

    **B.  Courts May Not Create an Artificial Limited Fund To Deprive Claimants of Their Right To Trial by Jury.**............................................**14**

**III. THE TORT SYSTEM POSSESSES THE AUTHORITY AND FLEXIBILITY TO PROTECT THE INDIVIDUAL RIGHTS OF CLAIMANTS WHILE AFFORDING LEGAL REDRESS FOR VICTIMS OF MASS TORTS.** ....................................................**19**

    **A.  Discovery Tools.**............................................................**21**

    **B.  Trial Tools.**..................................................................**22**

    **C.  Settlement Tools.** ........................................................**24**

**CONCLUSION**....................................................................**28**

**CERTIFICATE OF COMPLIANCE** .................................**29**

**CERTIFICATE OF SERVICE** ..........................................**29**

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n,*
   430 U.S. 442 (1977) ............................................................14

*Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959)........................................13

*Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry,*
   494 U.S. 558 (1990) ............................................................13

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986)..................6, 9

*Dimmick v. Schiedt*, 293 U.S. 474 (1935)..................................................13

*Georgine v. Amchem Products, Inc.*, 521 U.S. 591 (1996) ....................................26

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989)..................................... 13, 14

*In re Arrowmill Dev. Corp.*, 211 B.R. 497 (Bankr. D.N.J. 1997) ............................5

*In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 07-MD-1871,
    2021 WL 5178489 (E.D. Pa. July 12, 2021) ......................................................21

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047,
    2021 WL 50455 (J.P.M.L. Jan. 5, 2021) ...........................................................23

*In re Conserve Hip Implant Prods. Liab. Lit.*,
    844 F.Supp.2d 1371 (J.P.M.L. 2012) .................................................................21

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine)
    Prods. Liab. Litig.*, (MDL No. 1203), No. 99-20593,
    2010 WL 3292787 (E.D. Pa. Aug. 19, 2010) ....................................................22

*In re E. I. du Pont de Nemours & Co. C-8 Personal Inj. Litig.*,
    No. CV 2:13-MD-2433, 2019 WL 6310731 (S.D. Ohio Nov. 25, 2019) ...........23

*In re Nat'l Prescription Opiate Litig.*, 332 F.R.D. 532 (N.D. Ohio 2019)..............27

*In re Nat'l Prescription Opiate Litig.*, 976 F.3d 664 (6th Cir. 2020).....................27

*In re SGL Carbon*, 200 F.3d 154 (3d Cir. 1999) .......................................................6

*In re Vioxx Prods. Liab. Litig.*, 522 F.Supp.2d 799 (E.D. La. 2007) .....................23

*In re Vioxx Prods. Liab. Litig.*, 650 F.Supp.2d 549 (E.D. La. 2009) .....................26

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    MDL No. 2672 CRB (JSC), 2017 WL 4680242 (N.D. Cal. Oct. 18, 2017)........22

*In re Xarelto (Rivaroxaban) Prods. Liab. Lit.*,
    65 F.Supp.3d 1402 (J.P.M.L. 2014) ...................................................................21

*INS v. Chadha*, 462 U.S. 919 (1983) .........................................................................9

*Jacob v. New York*, 315 U.S. 752 (1943)..................................................................13

*Machinists v. Street*, 367 U.S. 740 (1961) .................................................................6

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982) ...................................................................................... 7, 8, 9

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ............................................ passim

*Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322 ...................................................12

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ...........................................15

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995) .........................................8, 9

*Stern v. Marshall*, 564 U.S. 462 (2011) ........................................................... 10, 11

*Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015) ......................... 8, 9, 11

## Statutes

28 U.S.C. § 1407 ........................................................................................................27

## Other Authorities

Ronen Avraham & William H.J. Hubbard, *The Spectrum Of Procedural Flexibility*, 84 U. Chi. L. Rev. 883 (2020) ............................................................19

Lynn A. Baker, *Mass Tort Remedies and the Puzzle of the Disappearing Defendant*, 98 Tex. L. Rev. 1165 (2020) .............................................................25

Lynn A. Baker & Charles Silver, *In Defense of Private Claims Resolution Facilities*, 84 Law & Contemp. Probs. 45 (2021) .................................... 24, 25, 26

Andrew Bradt, *"A Radical Proposal": The Multidistrict Litigation Act of 1968*, 165 U. Pa. L. Rev. 831 (2017) ...............................................................................21

Ralph Brubaker, *Mandatory Aggregation of Mass Tort Litigation in Bankruptcy*, 131 Yale L.J. Forum 960 (2022) .........................................................................28

Stephen J. Carroll, et al., *Asbestos Litigation*, RAND Corporation (2005) ............23

The Declaration of Independence ¶ 11 ....................................................................9

Abbe R. Gluck, *Unorthodox Civil Procedure: Modern Multidistrict Litigation's Place in the Textbook Understandings of Procedure*, 165 U. Pa. L. Rev. 1669 (2017)............................................................. 21, 22, 24

Eldon E. Fallon, et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323 (2008) ...................................................................23

The Federalist No. 78 (C. Rossiter ed. 1961) (A. Hamilton).....................................11

Edith Guild Henderson, *The Background of the Seventh Amendment*, 80 Harv. L. Rev. 289 (1966)....................................................................13

Hon. John G. Heyburn II, *A View From The Panel: Part Of The Solution*, 82 Tul. L. Rev. 2225 (2008)...............................................................................19

Judicial Panel on Multidistrict Litigation, MDL Statistics Report—Docket Summary Listing (June 15, 2022), https://www.jpml.uscourts.gov/ sites/jpml/files/Pending_MDL_Dockets_By_ MDL_Number-Jun-15-2022.pdf. ..........................................................20

Manual For Complex Litigation (Fourth) (2004). .................................................22

Francis E. McGovern, *The What and Why of Claims Resolution Facilities*, 57 Stan. L. Rev. 1361 (2005) ...................................................................25

Francis McGovern, *Towards a Cooperative Strategy of Federal and State Judges in Mass Tort Litigation*, 148 U. Pa. L. Rev. 1867 (2000) .......................22

Francis E. McGovern & William B. Rubenstein, *The Negotiation Class: A Cooperative Approach to Class Actions Involving Large Stakeholders*, 99 Tex. L. Rev. 73 (2020) ...................................................................27

Multidistrict Litigation Terminated Through September 30, 2021, https://www.jpml.uscourts.gov/sites/jpml/files/JPML%20FY%202021% 20Report%20Cumulative%20Terminated%20MDLs.pdf ................................20

Judith R. Starr, *Bankruptcy Court Jurisdiction to Release Insiders from Creditor Claims in Corporate Reorganizations*, 9 Bankr. Dev. J. 485 (1993) ......................5

Zachary B. Savage, *Scaling Up: Implementing Issue Preclusion in Mass Tort Litigation Through Bellwether Trials,* 88 N.Y.U. L. Rev. 439 (2013) ...............23

Margaret S. Thomas, *Morphing Case Boundaries in Multidistrict Litigation Settlements,* 63 Emory L. J. 1339 (2014) ...........................................................20

Jeffrey Robert White, *The Civil Jury: 200 Years Under Siege*, Trial (June 2000) ................................................................................................13

Thomas E. Willging & Emory G. Lee III, *From Class Actions to Multidistrict Consolidations: Aggregate Mass-Tort Litigation After* Ortiz, 58 U. Kan. L. Rev. 775 (2010) .............................................................................20

Charles W. Wolfram, *The Constitutional History of the Seventh Amendment*, 57 Minn. L. Rev. 639 (1973)..............................................................................13

## AMICUS CURIAE'S IDENTITY, INTEREST,
## AND AUTHORITY TO FILE

The American Association for Justice ("AAJ") is a national, voluntary bar association established in 1946 to strengthen the civil justice system, preserve the right to trial by jury, and protect access to the courts for those who have been wrongfully injured. With members in the United States, Canada, and abroad, AAJ is the world's largest plaintiff trial bar. AAJ's members primarily represent plaintiffs in personal injury actions, employment rights cases, consumer cases, and other civil actions, including asbestos litigation. Throughout its over 75-year history, AAJ has served as a leading advocate of the right of all Americans to seek legal recourse for wrongful injury.[1]

This case is of acute interest to AAJ and its members. If allowed to stand, the decision below would improperly extend application of the Bankruptcy Code beyond its purpose of assisting an ongoing business to resolve its overwhelming debts to serving as a tool for solvent companies to escape full accountability for harms they have caused.

---

[1] All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part. No person, other than amicus curiae, its members, and its counsel, contributed money that was intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

1.      The maneuvers that Johnson & Johnson used to create LTL Management were complex, but they have a clear impact on the those who suffered harms caused by Johnson's Baby Powder. With a wave of the bankruptcy court's wand, those victims will see their common-law causes of action transformed into leaden creditor claims redeemable only, and at perhaps a fraction of their worth, from a trust that is yet to be established.

If allowed to stand, the bankruptcy court's decision would undermine the separation of powers that serves as a check on each of the branches of government. The court below viewed this case as a competition between the tort system and a bankruptcy trust. But constitutional concerns must not be brushed aside in the name of speed and efficiency. The bankruptcy court's intrusion into the realm of Article III judges threatens to erode the constitutional structure of separation of powers. Bankruptcy courts lack jurisdiction to decide actions that arise separate from the bankruptcy proceeding and are historically matters reserved to Article III courts. J&J may not invite the court to overstep that boundary.

2.      The Chapter 11 petition that the lower court upheld also attempts by the same wave of a wand to make the constitutional right of the wrongfully injured victims to present their case to a jury disappear. The right to trial by jury is fundamental and any curtailment of that right is to be jealously guarded by the courts.

Bankruptcy adjudications of "private rights," including personal injury tort actions, violate the Seventh Amendment.

The Supreme Court has held in the context of a limited-fund class action, which also precludes a jury trial or right to opt out, that a global class settlement may not be used to justify the questionable mechanism that created the limited fund in the first place.

3.     Nor is the tort system slow and inefficient. The court below erroneously undervalued the MDL procedure, which has handled numerous and widely varied mass tort claims by aggregate resolution of common issues while preserving individual claims destined for remand. MDL panels have developed innovative procedures to resolve mass tort claims efficiently at every stage of litigation. They have made effective use of document repositories, discovery databases, bellwether trials, and fact sheets, all of which vastly reduce expense and wasteful redundancy.

The tort system also possesses tools to advance settlements, including inventory settlements, private claims resolution facilities, and "negotiation classes."

With these tools available, the tort system is far preferable to imposing a mandatory settlement of mass tort victims' claims to the benefit of solvent corporations.

# ARGUMENT

I.  **THE CHAPTER 11 PETITION DEPRIVES VICTIMS HARMED BY JOHNSON & JOHNSON'S PRODUCTS OF THEIR RIGHT TO AN ARTICLE III TRIBUNAL AND TRIAL BY JURY THROUGH THE CREATION OF AN ARTIFICIAL INSOLVENCY.**

   A.  **The Sole Purpose of the LTL Management Chapter 11 Petition Is To Shield Johnson & Johnson's Assets from Claims by Those It Has Wrongfully Harmed by Creating an Insolvent Subsidiary and Invoking Chapter 11 Protections Without Submitting Johnson & Johnson To Chapter 11.**

The complex maneuvers Johnson & Johnson ("J&J") used to split Johnson & Johnson Consumer Inc. ("Old JJCI") into two new entities, Johnson & Johnson Consumer Inc. ("New JJCI") and LTL Management, could be described as "labyrinthine." Slip Op. 5. But the impact it intends for people who suffer ovarian cancer, mesothelioma, and other harms caused by Johnson's Baby Powder is obvious. Perhaps the more fitting metaphor is alchemy, running in reverse: With a wave of the bankruptcy court's wand, those victims will see their common-law causes of action transformed into leaden creditor claims redeemable at perhaps a fraction of their worth from a trust that is yet to be established.

Through a divisional merger under the Texas Business Corporation Act, referred to as the "Texas Two-Step," New JJCI received a substantial portion of the assets of Old JJCI. LTL Management inherited the corporation's talc liabilities, along with limited assets and income provided by J&J and New JJCI through a Funding Agreement. Slip Op. 5-7. LTL immediately filed a petition for relief under

Chapter 11, with the expectation that a settlement trust would be established with its limited assets. Slip Op. 9. Present and future claimants would be subject to channeling injunctions allowing them to recover, if at all, exclusively from the trust. *See* Slip Op. 28.

The goal of LTL's petition is to forever shield from accountability those responsible for making and marketing an unreasonably dangerous product that has harmed tens of thousands of, primarily, women and their families. J&J assets that would otherwise be available to compensate these victims will be placed out of reach by the strong protections of bankruptcy law despite the fact that J&J itself has not petitioned for bankruptcy or placed its assets under the control of the bankruptcy court.

The foundational trade-off of Chapter 11 is this: A debtor facing overwhelming obligations may call upon the bankruptcy court to exercise its "extraordinary power . . . to force a creditor to accept less than full value" and obtain a discharge of its obligations in full. *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997) (quoting Judith R. Starr, *Bankruptcy Court Jurisdiction to Release Insiders from Creditor Claims in Corporate Reorganizations*, 9 Bankr. Dev. J. 485, 498 (1993)). In return for that protection, "the debtor must disclose all its assets and submit them to the control of the bankruptcy court." *Id.* As this Court has succinctly stated, one "who attempts to garner shelter under the Bankruptcy Code…

must act in conformity with the Code's underlying principles." *In re SGL Carbon*, 200 F.3d 154, 161 (3d Cir. 1999).

AAJ agrees with Movants that LTL's Chapter 11 Petition is not filed in good faith and should be dismissed. *See* Slip Op. 8-9.

AAJ submits that, even more fundamentally, J&J's attempts to manipulate the Bankruptcy Code and state corporation provisions, if allowed to stand, will deprive wrongfully injured victims of their constitutional right to present their case to an Article III tribunal and their constitutional right to a trial by jury. The provisions of the Bankruptcy Code must "be so construed as to avoid serious doubt of their constitutionality." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986) (quoting *Machinists v. Street*, 367 U.S. 740, 749 (1961)).

### B. The Chapter 11 Petition Deprives Claimants of Their Right To an Article III Adjudication, with the Right To Trial by Jury, by Invalidly Transforming Their Common-Law Causes of Action into Bankruptcy Claims.

*1. Article I bankruptcy courts may not, in the name of speed or efficiency, usurp the role of Article III courts in adjudicating private common-law tort actions.*

In the eyes of Bankruptcy Judge Michael B. Kaplan, the issue before the court is no more than a contest between the bankruptcy regime and Article III judges in resolving mass torts. And, to Judge Kaplan, the race is not even close: "[T]he tort system produces an uneven, slow-paced race to the courthouse, with winners and losers. Present and future talc claimants should not have to bear the sluggish pace

and substantial risk if there exists another viable option." Slip Op. 27. On the other hand, claims reconciliation through a bankruptcy trust would "establish a far simpler and streamlined process" with "reduced evidentiary and causation burdens," and render results "at a far more expeditious pace than through uncertain litigation in the tort system." *Id.* at 29-30.

The Supreme Court of the United States has repeatedly and consistently instructed that Congress's authority to vest bankruptcy courts with the tools to address issues of insolvency is broad, but not unbounded. The constitutional plan that the United States be governed by separate coequal branches cannot lightly be cast aside in the pursuit of administrative efficiency. The notion that "Congress may create courts free of Art. III's requirements whenever it finds that course expedient. . . . has been [repeatedly] rejected." *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 73 (1982) (plurality).

In *Northern Pipeline*, the Court considered whether Article I bankruptcy judges serving under the Bankruptcy Act of 1978 could "constitutionally be vested with jurisdiction to decide [a] state-law contract claim" against an entity that was not otherwise part of the bankruptcy proceedings. *Id.* at 53 & 87 n.40. The Court acknowledged that Congress's constitutional authority to enact bankruptcy laws, extends to assigning to non-Article III courts adjudications involving "the restructuring of debtor-creditor relations, which is at the core of the federal

bankruptcy power." *Id.* at 71. But because the creditor's claim did not arise from the bankruptcy, but from independent common-law sources, the majority of the Court determined that Article III required an adjudicator with life tenure and salary protection. *See id.* at 84; *id.* at 90-91 (Rehnquist, J., concurring in judgment).[2]

The Court plainly did not view the fork in the road between the bankruptcy and tort systems as merely a matter of choosing the more efficient operation. Rather, the Court emphasized, Article III constitutes "an inseparable element of the constitutional system of checks and balances"—a structural safeguard that must "be jealously guarded." *Id.* at 58 & 60 (plurality opinion).

Chief Justice John Roberts subsequently underscored the importance of maintaining the integrity of the Article III judicial branch against the tendency of Article I tribunals to overreach constitutional boundaries in order to efficiently address thorny problems. "The Framers adopted the formal protections of Article III for good reasons." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 688 (2015) (Roberts, C.J., dissenting). They "lived among the ruins of a system of intermingled legislative and judicial powers." *Id.* at 689 (quoting *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995)). King George III, the colonists complained, "made Judges

---

[2] A full majority of the Court, while not agreeing on the scope of the category of "public rights" actions that Congress could constitutionally assign to Article I courts for resolution, agreed that common law claims were beyond the constitutional reach of the bankruptcy court.

dependent on his Will alone." The Declaration of Independence ¶ 11. Under the Articles of Confederation, state legislatures routinely interfered with judgments of the courts. *Plaut*, 514 U.S. at 519-21. The independence of the Article III judicial branch is an essential safeguard of liberty, the Chief Justice emphasized, and "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *Sharif*, 575 U.S. at 689 (quoting *INS v. Chadha*, 462 U.S. 919, 944 (1983)).

Congress responded to the decision in *Northern Pipeline* by enacting the Bankruptcy Amendments and Federal Judgeship Act of 1984, revising the statutes governing bankruptcy jurisdiction and bankruptcy judges. The Court nevertheless found it necessary to restate that "private, common law rights were historically the types of matters subject to resolution by Article III courts." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 854 (1986) (citing *Northern Pipeline*, 458 U.S. at 68 n.20 & 84; *id.* at 90 (Rehnquist, J., concurring in judgment)). Congress cannot "withdraw[] from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty" and "allocate[] the decision of those matters to a non-Article III forum of its own creation." *Id.* (internal citation and quotation marks omitted).

Without dispute, the injury claims against J&J and Old JJCI are common-law private causes of action which arose independently of the bankruptcy proceeding and thus cannot be allocated by Congress to the bankruptcy court for decision. J&J should not be permitted to indirectly accomplish such an incursion into the realm reserved by the Constitution to Article III judges.

> 2. *Article I bankruptcy courts may not adjudicate common-law claims regardless of whether they may be deemed "core" proceedings under the Bankruptcy Code.*

The Court in *Stern v. Marshall*, 564 U.S. 462 (2011), built upon its earlier jurisprudence to hold that, even where a common-law claim may be deemed to be a "core" proceeding for which the Bankruptcy Code authorizes entry of final judgment by a bankruptcy court, Article III does not permit the bankruptcy court to adjudicate a private tort cause of action.

Following the death of Marshall, one of the richest men in Texas, his widow, Anna Nicole Smith, filed a petition for bankruptcy under chapter 11. Marshall's son filed a proof of claim seeking to recover from the bankruptcy estate for defamation. The widow counterclaimed, alleging tortious interference by the son preventing her from receiving a promised gift from Marshall. Following a bench trial, the bankruptcy court rendered judgment to the widow on the counterclaim and awarded $425 million in damages. *Id.* at 469-71.

The Supreme Court, upholding reversal, held that, although § 157 of the Bankruptcy Code permitted the Bankruptcy Court to enter final judgment on the counterclaim, "Article III of the Constitution does not." *Id.* at 482. Chief Justice Roberts, writing for the Court, emphasized that the Framers of the Constitution "considered it essential that 'the judiciary remain[ ] truly distinct from both the legislature and the executive.'" *Id.* at 483 (quoting The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton)). The responsibility for deciding traditional common-law actions "rests with Article III judges in Article III courts." *Id.* at 484. If that exercise of judicial power can be taken away and bestowed on a bankruptcy court, "then Article III would be transformed from the guardian of individual liberty and separation of powers we have long recognized into mere wishful thinking." *Id.* at 495.

As the Court subsequently reiterated, "Article III prevents bankruptcy courts from entering final judgment on claims that . . . would otherwise 'exis[t] without regard to any bankruptcy proceeding.'" *Sharif*, 575 U.S. at 673 (quoting *Marshall*, 564 U.S. at 499). While the Court there held that the right to an Article III adjudication of common-law claims was personal and could be knowingly and voluntarily waived, the Court did not disturb its fundamental protection of that right.

Again, J&J cannot be permitted to accomplish by creative corporate reorganizing what Congress cannot do directly.

## II.   THE CHAPTER 11 PETITION DEPRIVES VICTIMS OF WRONGFUL INJURY OF THEIR RIGHTS TO THEIR DAY IN COURT AND TRIAL BY JURY THROUGH THE CREATION OF AN ARTIFICIAL LIMITED FUND.

### A.  A Defendant Facing Claims of Wrongful Injury May Not Manipulate Its Corporate Structure and the Bankruptcy Code To Deprive Claimants of Their Constitutional Right To Trial by Jury.

The court below observed that "J&J and Debtor have been candid and transparent about employing Debtor's chapter 11 filing as a vehicle to address the company's growing talc-related liability exposure and costs." Slip Op. 15. Transparency, however, is not the constitutional imperative at stake in this case. The Chapter 11 petition not only seeks to invade the judicial realm that the Constitution reserves to Article III judges, it also attempts by the same wave of a wand to make the constitutional right of the wrongfully injured victims to present their case to a jury disappear.

The right to trial by jury is no mere procedural nicety among dispute resolution techniques. "The founders of our Nation considered the right of trial by jury in civil cases an important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to that of the judiciary." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 343 (Rehnquist, C.J., dissenting).

Indeed, the lack of a guarantee of the right to trial by jury nearly derailed the ratification of the Constitution itself until its proponents committed to adding it as

part of the Bill of Rights. Edith Guild Henderson, *The Background of the Seventh Amendment*, 80 Harv. L. Rev. 289, 293-99 (1966); Charles W. Wolfram, *The Constitutional History of the Seventh Amendment*, 57 Minn. L. Rev. 639, 672 (1973); *see generally*, Jeffrey Robert White, *The Civil Jury: 200 Years Under Siege*, Trial, at 18 (June 2000).

Mindful of this history, the Supreme Court has consistently emphasized the fundamental importance of this right and has instructed:

> Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.

*Dimmick v. Schiedt*, 293 U.S. 474, 486 (1935). The Court had occasion to repeat and reaffirm this principle in *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 501 (1959), and in *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990). *See also Jacob v. New York*, 315 U.S. 752, 752-53 (1943) ("The right of jury trial in civil cases at common law . . . should be jealously guarded by the courts.").

It is no surprise, then, that the Supreme Court has declared that bankruptcy courts must also safeguard the Seventh Amendment jury right, even "in the face of Congress' decision to allow a non-Article III tribunal to adjudicate" claims involving private rights. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 50 (1989). The controversy in that case was whether a bankruptcy court could adjudicate a

13

fraudulent conveyance action filed on behalf of a bankruptcy estate against a non-creditor in the bankruptcy proceeding. Justice Brennan, writing for the majority, reaffirmed that Congress may assign the adjudication of a statutory "public rights" claims, i.e., matters in which the government is a party or which are closely intertwined with a federal regulatory program, to an Article I forum in which jury trials are unavailable. However, "[w]holly private tort, contract, and property cases . . . are not at all" within that constitutional authority. *Id.* at 51 (quoting *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 458 (1977)). "Congress may not deprive parties litigating over [tort causes of action] of the Seventh Amendment's guarantee to a jury trial." *Id.* at 53. "[N]or can Congress conjure away the Seventh Amendment by mandating that traditional legal claims be brought" in a non-Article III tribunal. *Id.* at 52.

Here, the Claimants' right to present their claims to a jury on their tort causes of action that arise entirely separate from this bankruptcy proceeding is entitled to the same vigilant protection.

### B.  Courts May Not Create an Artificial Limited Fund to Deprive Claimants of Their Right to Trial by Jury.

Judge Kaplan's denial of Claimants' motion to dismiss largely reflects his conviction that "the tools available under the Bankruptcy Code [will] ensure that all present and future tort claimants will share distributions through the court-administered claims assessment process." Slip Op. 15. AAJ submits that this is little

more than a "bootstrap argument." *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985). The judge is entrusted with powerful tools under the Bankruptcy Code precisely because they are needed to address overwhelming claims against a debtor with limited assets. The judge may not use those tools to create the limited fund that justifies their use.

The Supreme Court's most instructive decision on this point does not arise out of a bankruptcy settlement, but out of a settlement class action that bears crucial similarities to the proposed bankruptcy settlement presented to this Court.

The parties in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), sought to address "the elephantine mass of asbestos cases," through use of a settlement class action. *Id.* at 821. Facing a rising tide of claims by victims harmed by exposure to its asbestos products, and working with its liability insurers and some plaintiffs' counsel, Fibreboard filed a mandatory "limited fund" class action under Federal Rule of Civil Procedure 23(b)(1)(B). The limited fund consisted of $1.525 billion contributed by the liability insurers and $10 million from Fibreboard. *Id.* at 824-25. The parties then immediately proposed a settlement under which a trust would be established using the limited fund for the purposed of resolving all outstanding and future asbestos injury and death claims against the company. *Id.* at 827. Claimants who could not reach a settlement with the trust could bring suit against the trust exclusively, subject to limits on the amount and nature of recoverable damages. *Id.*

at 827.[3] The district court certified the class and approved the settlement, and the Fifth Circuit affirmed.

The Supreme Court reversed. In an opinion by Justice Souter, the Court noted that a mandatory class action under Rule 23(b)(1)(B) eliminates the opportunity for class members to opt out or to obtain a trial by jury, implicating both "Seventh Amendment jury trial rights of absent class members" and "the due process principle . . . that everyone should have his own day in court." *Id.* at 846 (internal citations and quotations marks omitted). The historical rationale supporting such actions is that "the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims." *Id.* at 838. However, the limited fund which supplies this necessity cannot itself be the result of creating the class action. At a constitutional minimum, a limited fund must be determined through an independent evidentiary process and independent valuation. *Id.* at 853.

The settlement trust envisioned by Judge Kaplan in this case bears a striking resemblance to the limited fund trust the Court struck down in *Ortiz*. The purpose of constructing the limited fund in *Ortiz* was to achieve "global" and "total peace" of

---

[3] In this respect, the Fibreboard trust closely resembles the trust distribution procedures ("TDP") envisioned by Judge Kaplan for this case. Slip Op. 25. But unlike Judge Kaplan, the Supreme Court in *Ortiz* found this plan a clear violation of the Seventh Amendment. 527 U.S. at 846.

virtually all present and future personal-injury asbestos claims against Fibreboard. *Id.* at 824. J&J's stated purpose in constructing LTL Management was to "globally resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding." Slip Op. 5.

The means chosen to achieve this goal were also similar. Fibreboard proposed a mandatory, non-opt-out settlement class which would establish a settlement trust funded by the limited assets it had assembled. *Ortiz*, 527 U.S. at 824-25. J&J created a subsidiary possessing the limited assets that J&J has contributed to establish a court-supervised settlement trust to make distributions to claimants. Slip Op. 25. In both instances, the limited fund that justified the imposition of a mandatory regime on claimants without their consent was constructed by the parties who benefitted themselves by "holding back" some assets from the funds to be paid out to claimants. *Ortiz*, 527 U.S. at 839. The due process and Seventh Amendment deficiencies that proved fatal to the Fibreboard global settlement are equally fatal to J&J's maneuver here.

Judge Kaplan suggests that *Ortiz* "recognizes bankruptcy as a sound and appropriate approach to addressing mass tort claims." Slip Op. 22. Of course, the Supreme Court in *Ortiz* had in mind a bankruptcy filing in which Fibreboard itself placed its own assets under the control of the bankruptcy trustee so that the tortfeasor would have "no opportunity to benefit himself" by "holding back on the amount

distributed to the class." 527 U.S. at 839. Yet that is precisely the tactic that J&J asks this Court to bless. Justice Souter in *Ortiz* also sharply warned that

> if limited fund certification is allowed in a situation where a company provides only a de minimis contribution to the ultimate settlement fund, the incentives such a resolution would provide to companies facing tort liability to engineer settlements similar to the one negotiated in this case would, in all likelihood, significantly undermine the protections for creditors built into the Bankruptcy Code.

*Id.* at 860 n.34.

The *Ortiz* Court's essential message to this Court is to be watchful against bootstrapping. The creation of a mandatory claims trust cannot supply the necessity—the "limited fund"—for its own existence. In short, the "limited fund" cannot be its own justification, as a matter of due process or otherwise. Understandably, J&J seeks to achieve global resolution of the injury claims against it. But the mechanism for doing so cannot justify itself. The justification must exist separately and independently; the justification for the mechanism cannot be the product of the mechanism itself. The bankruptcy court cannot create a limited fund in the guise of a newly incorporated debtor as the rationale to justify using Chapter 11 to  insulate the solvent and financially stable parent corporation from accountability.

### III. THE TORT SYSTEM POSSESSES THE AUTHORITY AND FLEXIBILITY TO PROTECT THE INDIVIDUAL RIGHTS OF CLAIMANTS WHILE AFFORDING LEGAL REDRESS FOR VICTIMS OF MASS TORTS.

A deciding factor in Bankruptcy Chief Judge Kaplan's denial of the Claimant's motion to dismiss in this case was his assessment of "the merits of the competing judicial systems," Slip. Op. 12-13 & n.8, and his conviction that the tort system cannot expeditiously and efficiently render justice for present and future tort claimants. *Id.* at 55.

Acknowledging Chief Judge Kaplan's thorough familiarity with "the tools found within the Bankruptcy Code," *id.*, AAJ suggests that he has undervalued the many tools in the civil justice toolbox available to address and resolve mass tort claims.

The tort system itself is highly adjustable as necessary to meet the needs of a particular case. Ronen Avraham & William H.J. Hubbard, *The Spectrum Of Procedural Flexibility*, 84 U. Chi. L. Rev. 883, 885 (2020). That flexibility has enabled the tort system to handle mass tort actions for decades. *See* Hon. John G. Heyburn II, *A View From The Panel: Part Of The Solution*, 82 Tul. L. Rev. 2225, 2231-33 (2008).

Judge Kaplan rejects out of hand the use of multidistrict litigation ("MDL"), as having yielded "only limited success," Slip Op. 55, based on insufficient progress by a single MDL action. Slip Op. 23-24. In fact, from the Panel's inception in 1968

until September 2021, MDL judges handled 1,587 MDLs, and during that period closed 275,627 civil actions. United States Judicial Panel on Multidistrict Litigation, Multidistrict Litigation Terminated Through September 30, 2021, https://www.jpml.uscourts.gov/sites/jpml/files/JPML%20FY%202021%20Report %20Cumulative%20Terminated%20MDLs.pdf.

MDL judges have, over the past two decades, MDL actions have become "the most important federal procedural device to aggregate (and settle) mass torts." Margaret S. Thomas, *Morphing Case Boundaries in Multidistrict Litigation Settlements,* 63 Emory L. J. 1339, 1346-47 (2014); Thomas E. Willging & Emory G. Lee III, *From Class Actions to Multidistrict Consolidations: Aggregate Mass-Tort Litigation After* Ortiz, 58 U. Kan. L. Rev. 775, 798 (2010) (tracing the "massive increase in MDL aggregate litigation" in federal courts that occurred from 2004-2008).

There are currently 191 MDLs pending in district courts throughout the country. Judicial Panel on Multidistrict Litigation, MDL Statistics Report—Docket Summary Listing (June 15, 2022), https://www.jpml.uscourts.gov/ sites/jpml/files/Pending_MDL_Dockets_By_MDL_Number-Jun-15-2022.pdf. They involve a wide variety of types of cases, including, notably, products liability. *Id.* Over the years, the Judicial Panel on Multidistrict Litigation has consolidated many mass consumer product liability actions not unlike this one *See, e.g., In re*

*Xarelto (Rivaroxaban) Prods. Liab. Lit.*, 65 F.Supp.3d 1402, 1404-05 (J.P.M.L. 2014); *In re Conserve Hip Implant Prods. Liab. Lit.*, 844 F.Supp.2d 1371, 1372-73 (J.P.M.L. 2012).

Indeed, the creators of MDLs intended them to address the kind of mass tort situation presented to the Court in this case. *See generally* Andrew Bradt, *"A Radical Proposal": The Multidistrict Litigation Act of 1968*, 165 U. Pa. L. Rev. 831 (2017) (tracing a detailed history of the origins, drafting, and enactment of the MDL statute, 28 U.S.C. § 1407). To address mass tort issues, the drafters promoted what one scholar has termed "procedural exceptionalism" to enable judges to develop "flexible and creative in every case." Abbe R. Gluck, *Unorthodox Civil Procedure: Modern Multidistrict Litigation's Place in the Textbook Understandings of Procedure*, 165 U. Pa. L. Rev. 1669, 1674, & 1689 (2017). This flexibility has allowed MDL judges to develop and apply innovative tools to address issues in mass tort litigation involving discovery, trial, and settlement.

### A. Discovery Tools.

One highly effective option open to MDL judges is to order the creation and maintenance of centralized document repositories and discovery databases that vastly reduce the redundancy and expense in both document and deposition discovery. *See, e.g.*, *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 07-MD-1871, 2021 WL 5178489, at *1 (E.D. Pa. July 12, 2021), *report and*

*recommendation adopted*, No. 07-MD-1871, 2021 WL 4129426 (E.D. Pa. Sept. 10, 2021); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 4680242, at *1 (N.D. Cal. Oct. 18, 2017); *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, (MDL No. 1203), No. 99-20593, 2010 WL 3292787 (E.D. Pa. Aug. 19, 2010).

Another useful tool that has become widely used in MDLs is the use of "fact sheets," which are "questionnaires eliciting a wide range of information [from claimants], such as the circumstances of their exposures and the severity of their injuries, to facilitate settlement negotiations or improve claim administration following settlement." Manual For Complex Litigation (Fourth) § 22.91 (2004). As one judge declared "It's a big innovation, everyone now uses them . . . Necessity is the reason for innovation." Gluck, *supra,* at 1689.

MDL federal judges have also coordinated with state judges to handle an array of challenges in mass tort litigation, including discovery, pretrial orders, test trials, and bellwether trials, among others. *See* Manual For Complex Litigation (Fourth) *at* § 20.312; *see generally* Francis McGovern, *Towards a Cooperative Strategy of Federal and State Judges in Mass Tort Litigation*, 148 U. Pa. L. Rev. 1867 (2000).

## B.  Trial Tools.

MDL judges also employ devices to achieve efficiency by disaggregating claims or issues. One such tool is to conduct "bellwether" trials to resolve particular

issues that the parties will be precluded from relitigating over and over. *See generally* Zachary B. Savage, *Scaling Up: Implementing Issue Preclusion in Mass Tort Litigation Through Bellwether Trials,* 88 N.Y.U. L. Rev. 439 (2013). Such issue preclusion was effective in assisting courts "to manage asbestos caseloads more efficiently in order to  reduce private and public transaction costs." Stephen J. Carroll, et al., *Asbestos Litigation*, RAND Corporation, 28-31 (2005), *available at* https://www.rand.org/pubs/monographs/MG162.html.

Another example is *In re E. I. du Pont de Nemours & Co. C-8 Personal Inj. Litig.*, No. CV 2:13-MD-2433, 2019 WL 6310731 (S.D. Ohio Nov. 25, 2019), where residents downriver from a DuPont plant alleged that the plant allowed a toxic chemical used in making Teflon to escape into the environment. The MDL court ruled that DuPont would be estopped in future actions from relitigating issues of duty, breach of duty, and foreseeability that were decided adversely to DuPont in two bellwether jury trials and one individual jury trial. *Id.* at *28.

MDL courts also use bellwether trials to allow the parties to assess the strength of their cases or the damage awards that might be realistically anticipated. *See, e.g.*, *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2021 WL 50455, at *2 (J.P.M.L. Jan. 5, 2021); *In re Vioxx Prods. Liab. Litig.*, 522 F.Supp.2d 799 (E.D. La. 2007); *see generally* Eldon E. Fallon, et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323 (2008).

### C.  Settlement Tools.

Recognizing that "99% of all filed civil cases today are resolved without trial," Gluck, *supra*, at 1674, it should be no surprise that MDL judges have developed innovative tools and combinations of procedures to move mass tort claims toward resolution. Some tools involve assembling an aggregate fund to be made available to the aggregate group of claimants, not entirely unlike the settlement trust the lower court envisions for this case. While they are not perfect in all respects, AAJ submits that they are superior to using formal chapter 11 reorganization of an artificial debtor as "a unique opportunity [for the bankruptcy court] to compel the participation of all parties in interest." Slip Op. 27.

Perhaps one of the simplest of these tools is the inventory settlement. "When a defendant undertakes inventory settlements, it seeks to obtain closure by entering into (usually confidential) agreements with law firms that represent large numbers of claimants. Typically, these deals resolve each firm's entire inventory of qualifying claims for a lump-sum dollar amount." Lynn A. Baker & Charles Silver, *In Defense of Private Claims Resolution Facilities*, 84 Law & Contemp. Probs. 45, 56 (2021). It then falls to plaintiff's counsel to allocate specific amounts to individual claimants. There are advantages, not only to the defendant, but also to claimants. Plaintiff's counsel has closer knowledge of his or her client's personal injuries and situation. Claimants may have greater trust in the attorney they have chosen to represent them,

and they have greater transparency in knowing the amounts paid to other claimants and the total amount available for all of them. In the event they are dissatisfied, they can opt to litigate, a factor that motivates the defendant to offer a lump sum that will invite wide acceptance. *Id.* at 58. General Motors, for example, resolved many of the claims in its faulty ignition MDL in this fashion. *Id.* at 55-56. In fact, "[v]irtually all cases in every MDL are resolved through settlement, and the overwhelming majority of those settlements are confidential inventory settlements." Lynn A. Baker, *Mass Tort Remedies and the Puzzle of the Disappearing Defendant*, 98 Tex. L. Rev. 1165, 1185 (2020).

Private claims resolution facilities ("CRF") is a more formal version of this settlement tool, which Professor McGovern explained in detail in Francis E. McGovern, *The What and Why of Claims Resolution Facilities*, 57 Stan. L. Rev. 1361 (2005). CRF is a broad category encompassing an aggregation of claimants and an aggregation of funds to be distributed to them outside the court system, but administered by a neutral party. *Id.* at 1361-62. There is a right to opt out by claimants. *Id.* at 1367. One example is the 9/11 fund administered by Ken Feinberg, created by Congress as an alternative to suits against the airline industry. *Id.* at 1363. Another was the MDL-926 silicone gel breast implant settlement. *Id.* at 1364.

More recently, the Vioxx MDL arose in connection with claims against Merck and its once highly popular anti-inflammatory and analgesic drug, which was

withdrawn from the market after it was linked to an increased risk of heart attack and stroke. *In re Vioxx Prods. Liab. Litig.*, 650 F.Supp.2d 549, 551 (E.D. La. 2009). The MDL transferee court conducted six bellwether trials, and based on those outcomes and results of other trials, the parties agreed upon a $4.85 billion global settlement fund, to compensate some 50,000 eligible claimants. *Id.* at 552-53. Judge Eldon Fallon, the MDL judge, agreed to serve as "chief administrator" overseeing the settlement. *See* Baker & Silver, *supra*, at 56. Again, because participation in the CRF is not forced on claimants, their individual rights are preserved.

Finally, another innovative tool is the "negotiation class" that may potentially be used within multidistrict litigation to achieve a global liability solution while preserving the rights of claimants to opt out as a safeguard of their due process and Seventh Amendment rights.

The court below dismissed any reliance on class actions, stating that the Supreme Court's decisions in *Georgine v. Amchem Products, Inc.*, 521 U.S. 591 (1996) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), "effectively terminated the use of class actions, at least for product liability cases." Slip Op. 21. In fact, the Court held that in assembling "settlement classes," parties and courts must comply with the predominance and adequacy of representation requirements of Rule 23, *Amchem*, 521 U.S. at 628, and preserve the due process and Seventh Amendment rights of absent class members. *Ortiz*, 527 U.S. at 846. The tort system possesses

sufficient flexibility to make those adjustments. A notable example is the late Professor Francis McGovern's innovative proposal to certify "negotiation classes" under Federal Rule of Civil Procedure 23, *see* Francis E. McGovern & William B. Rubenstein, *The Negotiation Class: A Cooperative Approach to Class Actions Involving Large Stakeholders*, 99 Tex. L. Rev. 73 (2020), which is designed to provide the mass tort defendant with global peace, preserve claimants' rights to opt out of unsatisfactory settlement proposals, and maximize the amount of compensation available to settling class members. *Id.* at 104-35. The MDL dealing with claims arising out of the national opioid recently certified just such a class. *In re Nat'l Prescription Opiate Litig.*, 332 F.R.D. 532, 539 (N.D. Ohio 2019). Though a Sixth Circuit panel reversed that decision, holding, over a strong dissent that the proposed class did not conform to the strict Rule 23 predominance requirement, *In re Nat'l Prescription Opiate Litig.*, 976 F.3d 664 (6th Cir. 2020), nevertheless, this tool remains available if this case is returned to the tort system, for construction of a proper class.

AAJ submits that the tort system as stands is both experienced and innovative in resolving mass tort claims. Multidistrict litigation in particular is capable of achieving dramatic efficiencies by temporarily coordinating the use of discovery, trial, and settlement tools under 28 U.S.C. § 1407, while safeguarding the individual rights of claimants whose cases remain preserved for remand. This system is far

preferable to the "profoundly disturbing" trend among bankruptcy courts, which the decision below presses further, to invent an "immense, extraordinary power to impose mandatory non-opt-out settlements of mass tort victims' claims against eminently solvent *non*debtors, who have *not* filed bankruptcy themselves." Ralph Brubaker, *Mandatory Aggregation of Mass Tort Litigation in Bankruptcy*, 131 Yale L.J. Forum 960, 961 (2022).

## CONCLUSION

For the foregoing reasons, AAJ urges this Court to reverse the decision of the bankruptcy court below.

Date: July 7, 2022

Respectfully submitted,

/s/ Jeffrey R. White
Jeffrey R. White
*Senior Associate General Counsel*
AMERICAN ASSOCIATION FOR JUSTICE
777 6th Street NW, Suite 200
Washington, DC 20001
(202) 944-2839
jeffrey.white@justice.org

*Counsel for Amicus Curiae*
*American Association for Justice*

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 6,488 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type style.

Date: July 7, 2022

/s/ Jeffrey R. White
JEFFREY R. WHITE

*Counsel for Amicus Curiae*
*American Association for Justice*

## CERTIFICATE OF SERVICE

I, Jeffrey R. White, counsel for amicus curiae and a member of the Bar of this Court, certify that on July 7, 2022, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I also certify that the foregoing document is being served on this day on all counsel of record via transmission of the Notice of Electronic Filing generated by CM/ECF. All participants in this case are registered CM/ECF users.

/s/ Jeffrey R. White
JEFFREY R. WHITE

*Counsel for Amicus Curiae*
*American Association for Justice*