Nos. 22-2003, 22-2006, 22-2009, 22-2010 (Consolidated)

# United States Court of Appeals for the Third Circuit

---

IN RE: LTL MANAGEMENT, LLC,
*Debtor*,

---

ARNOLD & ITKIN LLP ON BEHALF OF
APPROXIMATELY 7,000 TALC PERSONAL INJURY CLAIMANTS
WHO ARE REPRESENTED BY ARNOLD & ITKIN LLP,
*Appellant,*

v.

LTL MANAGEMENT, LLC
*Appellee.*

---

Direct Appeal from the United States Bankruptcy Court
for the District of New Jersey, Chapter 11 No. 21-30589

---

## REPLY BRIEF FOR APPELLANT

---

Laura Davis Jones
Isaac M. Pachulski
Karen B. Dine
Jeffrey M. Dine
Colin R. Robinson
Peter J. Keane
PACHULSKI STANG ZIEHL & JONES LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100
ljones@pszjlaw.com
ipachulski@pszjlaw.com
kdine@pszjlaw.com
jdine@pszjlaw.com
crobinson@pszjlaw.com
pkeane@pszjlaw.com

David C. Frederick
Gregory G. Rapawy
Ariela M. Migdal
Matthew N. Drecun
KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
dfrederick@kellogghansen.com
grapawy@kellogghansen.com
amigdal@kellogghansen.com
mdrecun@kellogghansen.com

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................iv

INTRODUCTION ............................................................................................1

STANDARD OF REVIEW ...............................................................................3

ARGUMENT ....................................................................................................3

I. LTL'S PETITION DOES NOT SERVE VALID BANKRUPTCY
PURPOSES..................................................................................................3

    A.    LTL's Petition Neither Preserves A Going Concern Nor
Maximizes Value For Creditors ............................................................3

    B.    Reducing J&J's Litigation Costs Is Not A Valid Bankruptcy
Purpose ..................................................................................................4

    C.    Redistributing Assets Among Claimants Is Not A Valid
Bankruptcy Purpose On Its Own............................................................6

    D.    LTL's Criticisms Of Tort Litigation Do Not Justify Its
Bankruptcy ............................................................................................8

II. LTL CANNOT SHOW THE REQUISITE FINANCIAL DISTRESS.........10

    A.    LTL Was Not In Immediate Financial Distress .................................10

    B.    The Bankruptcy Court's Financial-Distress Analysis Was
Erroneous.............................................................................................14

    C.    LTL Is Unlike Other Mass-Tort Debtors .........................................18

III. LTL SOUGHT LITIGATION ADVANTAGES FOR ITS PARENTS .......19

IV. THE LTL RESTRUCTURING SCHEME EVINCES BAD FAITH ..........22

V. UNUSUAL CIRCUMSTANCES DO NOT PRECLUDE
DISMISSING LTL'S BANKRUPTCY .......................................................28

CONCLUSION ................................................................................................29

CERTIFICATE OF COMPLIANCE ..........................................................................31

CERTIFICATE OF FILING AND SERVICE .........................................................32

CERTIFICATE OF BAR MEMBERSHIP ...............................................................33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*15375 Mem'l Corp. v. BEPCO L.P., In re,*
589 F.3d 605 (3d Cir. 2009) .................................................. 1, 3, 4, 8, 18, 19, 20

*Am. Capital Equip., LLC, In re,*
688 F.3d 145 (3d Cir. 2012) ..................................................................28

*A.H. Robins, In re,*
89 B.R. 555 (E.D. Va. 1988) ........................................................ 19, 21

*A.H. Robins Co. v. Piccinin,*
788 F.2d 994 (4th Cir. 1986) ...............................................................5

*Combustion Eng'g, Inc., In re,*
391 F.3d 190 (3d Cir. 2004) .................................................... 8, 23, 24

*Dow Corning Corp., In re,*
244 B.R. 673 (Bankr. E.D. Mich. 1999)............................................19

*Dow Corning Corp., In re,*
187 B.R. 919 (E.D. Mich. 1995)........................................................19

*Estate of Fox v. Johnson & Johnson,*
539 S.W.3d 48 (Mo. Ct. App. 2017) ...................................................9

*Fed.-Mogul Glob. Inc., In re,*
684 F.3d 355 (3d Cir. 2012) ..............................................................23

*Garlock Sealing Techs. LLC, In re,*
2017 WL 2539412 (W.D.N.C. June 12, 2017)...................................26

*Halvajian, In re,*
216 B.R. 502 (D.N.J. 1998),
*aff'd,* 168 F.3d 478 (3d Cir. 1998) ....................................................28

*HomeBanc Mortg. Corp., In re,*
945 F.3d 801 (3d Cir. 2019) ................................................................3

*Ingham v. Johnson & Johnson,*
608 S.W.3d 663 (Mo. Ct. App. 2020),
*cert. denied*, 141 S. Ct. 2716 (2021) ............................................................. 8, 10

*Integrated Telecom Express, Inc., In re,*
384 F.3d 108 (3d Cir. 2004) ............................................... 6, 7, 11, 12

*Johns-Manville Corp., In re,*
36 B.R. 727 (Bankr. S.D.N.Y. 1984) ........................................... 13, 19

*Laguna Assocs. Ltd. P'ship, In re,*
30 F.3d 734 (6th Cir. 1994) ................................................................24

*N.Y.C. Asbestos Litig., In re,*
171 N.Y.S.3d 503 (N.Y. App. Div. 2022) ..........................................8

*Little Creek Dev. Co., In re,*
779 F.2d 1068 (5th Cir. 1986) ..........................................................24

*Owens Corning v. Credit Suisse First Boston,*
322 B.R. 719 (D. Del. 2005) ...............................................................6

*Paddock Enters., LLC, In re,*
2022 WL 1746652 (Bankr. D. Del. May 31, 2022) ..................... 6, 27

*Quigley Co., In re,*
437 B.R. 102 (Bankr. S.D.N.Y. 2010) ...............................................26

*Rent-A-Wreck of Am., Inc., In re,*
580 B.R. 364 (Bankr. D. Del. 2018) ..................................................12

*Revel AC, Inc., In re,*
802 F.3d 558 (3d Cir. 2015) ..............................................................22

*SGL Carbon Corp., In re,*
200 F.3d 154 (3d Cir. 1999) ......................... 1, 10, 11, 12, 15, 17, 18, 19, 20, 22

*Shapiro v. Wilgus,*
287 U.S. 348 (1932) .................................................................... 24, 25

*W.R. Grace & Co., In re,*
900 F.3d 126 (3d Cir. 2018) ...............................................................7

## STATUTES

11 U.S.C. § 102(3) ...........................................................................................29

11 U.S.C. § 363 ...............................................................................................24

11 U.S.C. § 521 ...............................................................................................24

11 U.S.C. § 524(g) ............................................................................. 7, 12, 22, 23

11 U.S.C. § 524(g)(2)(B)(i) .............................................................................23

11 U.S.C. § 524(g)(2)-(4) ................................................................................12

11 U.S.C. § 1112(b)(2)................................................................................ 28, 29

11 U.S.C. § 1112(b)(2)(A) ...............................................................................28

11 U.S.C. § 1112(b)(2)(B) ...............................................................................29

11 U.S.C. § 1112(b)(4)......................................................................................29

## RULES

Fed. R. Bankr. P. 7062 .....................................................................................22

Fed. R. Bankr. P. 8007 .....................................................................................22

Fed. R. Bankr. P. 9014(c) .................................................................................22

Fed. R. Civ. P. 62 .............................................................................................22

## OTHER AUTHORITIES

10 *Collier on Bankruptcy* § 8007.06
    (Richard Levin & Henry J. Sommer, eds., 16th ed. 2022) .................................22

Kristin Compton, *Vioxx Lawsuits*, Drugwatch (Mar. 4, 2021),
    https://www.drugwatch.com/vioxx/lawsuits/ ........................................................6

Bill Chappell, *Bayer to Pay More Than $10 Billion to Resolve Cancer Lawsuits Over Weedkiller Roundup*, NPR (June 24, 2020) https://www.npr.org/2020/06/24/882949098/bayer-to-pay-more-than-10-billion-to-resolve-roundup-cancer-lawsuits ........................................................... 6

Disclosure Statement, *Garlock Sealing Techs. LLC, In re*, No. 10-bk-31607 (Bankr. W.D.N.C. June 21, 2016), ECF No. 5372 ............................................. 26

Kenneth R. Feinberg, *The Dalkon Shield Claimants Trust*, 53 Law & Contemp. Probs. 79 (1990) ..................................................................................... 8

Mem. of Law of U.S. Trustee in Supp. of Mot. for Order Converting This Case Under Chapter 7 or Dismissing This Case, *Quigley Co., In re*, No. 04-bk-15739 (Bankr. S.D.N.Y. May 11, 2007), ECF No. 1089 ......................... 27

Mot. of Ad-Hoc. Comm. to Appoint Trustee and Modify Temporary Injunction, *Quigley Co., In re*, No. 04-bk-15739 (Bankr. S.D.N.Y. May 2, 2007), ECF No. 1075 ................................................ 27

## **INTRODUCTION**

LTL is a litigation-management vehicle that financially healthy Johnson & Johnson ("J&J") created to isolate talc plaintiffs and compel them to resolve litigation against J&J and its subsidiary, Johnson & Johnson Consumer Inc. ("JJCI") in J&J's chosen forum. The bankruptcy court's ruling that LTL filed for bankruptcy in good faith was erroneous: LTL has no business to reorganize, was not financially distressed when it filed, exists to insulate non-debtors from litigation, and flouts the Bankruptcy Code's design. LTL's responses lack merit.

This Court has recognized bankruptcy's "lure" for mass-tort defendants and defined good-faith standards to prevent abuse. *See In re SGL Carbon Corp.*, 200 F.3d 154, 169 (3d Cir. 1999). The bankruptcy court misapplied those standards, deeming it "far more significant" to consider "which judicial system"—litigation or bankruptcy—"serves best the interests of this bankruptcy estate." JA12-13. Based on its preference for bankruptcy, that court overrode talc claimants' near-unanimous opposition, Congress's provision of the MDL system for mass-tort litigation, and this Court's holding that "the creation of a central forum to adjudicate claims against [debtors] is not enough to satisfy the good faith inquiry." *In re 15375 Mem'l Corp. v. BEPCO L.P. (BEPCO)*, 589 F.3d 605, 622 (3d Cir. 2009).

1

LTL contradicts itself in defending the bankruptcy court's decision. It purports (at 55-58) to act in claimants' interests, yet insists (at 1-2) their lawsuits lack merit. It claims (at 43) immediate financial distress, yet cites (at 61) its abundant funding to assert talc claimants will not be prejudiced. It equates (at 41-42) itself to Old JJCI, yet touts (at 49-50) funding from J&J that it says Old JJCI did not receive. LTL denies (at 66) conferring tactical litigation advantages on its parents, yet admits (at 18, 20) it was created to compel a global resolution of claims against them that would be "elusive," if not "impossible," outside bankruptcy.

Contrary to its claims, LTL is unlike earlier mass-tort defendants, many of whom achieved broad settlements outside bankruptcy. Those that entered bankruptcy had resolved far more claims than did J&J before LTL's creation; they also experienced genuine financial distress. When those defendants entered bankruptcy, they accepted bankruptcy's constraints without contriving to evade them.

Endorsing LTL's conduct would invite other mass-tort defendants to opt out of litigation and even normal bankruptcy, undermining the constitutional order governing civil litigation. Such abuses of bankruptcy threaten federalism by taking tort cases from state courts, elide Article III by assigning cases to Article I bankruptcy judges, erode Seventh Amendment protections by circumventing

claimants' rights to jury trials, and undermine due process by compelling mass adjudication. The good-faith requirement ensures that bankruptcy is not manipulable. This Court should reverse.

## STANDARD OF REVIEW

The bankruptcy court's decision is subject to plenary review, not clear-error review as LTL argues (at 26, 34). Whether the "facts of a case support the conclusion of good faith in the filing of a Chapter 11 bankruptcy petition, *i.e.*, whether the application of law to fact was proper, is reviewed as an ultimate fact and is subject to plenary review because it is, essentially, a conclusion of law." *BEPCO*, 589 F.3d at 616; *see also In re HomeBanc Mortg. Corp.*, 945 F.3d 801, 810-11 (3d Cir. 2019) ("[T]he ultimate fact of good faith receives plenary review.").

## ARGUMENT

## I.    LTL'S PETITION DOES NOT SERVE VALID BANKRUPTCY PURPOSES

### A.    LTL's Petition Neither Preserves A Going Concern Nor Maximizes Value For Creditors

Even a debtor in financial distress must "prove that its petition served a valid bankruptcy purpose by showing that the petition preserved a going concern" or that bankruptcy will maximize the value of its estate. *BEPCO*, 589 F.3d 619, 624 (quotation omitted) (debtors lacked good faith despite poor financial condition). LTL's petition serves neither purpose.

3

LTL has no business to preserve. *See* A&I Br. 20. It is a newborn entity earning only passive royalties. Its petition also does not "add or preserve value that would otherwise be unavailable to creditors outside of bankruptcy," because LTL has few "real assets to preserve." *BEPCO*, 589 F.3d at 620, 625; A&I Br. 32-34. LTL's cash, insurance, and royalties would have the same value outside bankruptcy. A&I Br. 21.

The Funding Agreement—LTL's primary asset—would have greater value to creditors outside bankruptcy, where it obligates J&J to "satisfy . . . [the Debtor's] Talc Related Liabilities" whenever judgments or settlements occur. JA483-484. Bankruptcy limits J&J's obligation to funding trusts under a plan "confirmed by a final, nonappealable order of the Bankruptcy Court." A&I Br. 21. LTL will seek to limit claimants' recovery to a single capped contribution by J&J to the trust. The final-order condition also could prevent funding from reaching claimants for years, because LTL can delay by appealing—which pressures claimants not to seek a plan LTL might appeal.

## B.    Reducing J&J's Litigation Costs Is Not A Valid Bankruptcy Purpose

LTL fails to justify its petition by arguing (at 52-53) that bankruptcy will save costs. Because the Funding Agreement requires J&J to pay all talc litigation costs, as it has historically, cost savings go to J&J, not the estate to which

claimants will have access. JA4317-4319.[1]  Adding value for J&J by cutting off litigation is not a valid bankruptcy purpose.  Claimants cannot benefit from these savings unless the $60-billion Funding Agreement proves insufficient to pay claims and litigation expenses.  LTL did not establish, nor did the bankruptcy court find, this was likely.

LTL's reliance (at 52-53) on *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986), is misplaced, because that case did not address the good-faith standard. The debtor had no corporate parent like J&J paying litigation costs.  Here, litigation will not "consume all the assets of the debtor and exhaust" its resources, *id.* at 1013, because costs are paid by J&J and LTL never convincingly argues J&J is financially unsound.

The bankruptcy court's conclusion (at JA47-48) and LTL's argument (at 54) that bankruptcy "preserves" value for claimants by reducing costs that would have ensued had Old JJCI filed for bankruptcy is unavailing.  LTL offered no evidence that savings on costs like "professional fees" will yield increased recoveries for claimants.  Those savings instead will benefit New JJCI and J&J.

---

[1] Despite LTL's insistence (at 12) that J&J transferred all talc liability to Old JJCI, J&J paid talc litigation costs and judgments for its own talc-related conduct out of a centralized account.  *See* JA6379; JA4706-4707 (verdicts against J&J).

LTL argues (at 52) it can reduce costs only by entering bankruptcy now and must otherwise try nearly every case.  But J&J settled 6,800 talc cases between 2014 and 2021 (JA20), contrary to LTL's complaint (at 18) that "reasonable settlements" have been "elusive."  Some mass-tort defendants resolve litigation without bankruptcy, including in cases involving latent health risks.[2]  Others that resorted to bankruptcy resolved far more cases first.[3]

### C.    Redistributing Assets Among Claimants Is Not A Valid Bankruptcy Purpose On Its Own

The bankruptcy court's conclusion that LTL's petition maximized available value by ensuring "balanced recoveries for present and future claimants" (JA15) erred by confusing *maximizing* value with *allocating* value among claimants.  *See* A&I Br. 33.  Bankruptcy must "create or preserve some value that would otherwise be lost—*not merely distributed to a different stakeholder*."  *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 128-29 (3d Cir. 2004) (emphasis added).  LTL's bankruptcy maximizes value only for J&J, which pays LTL's expenses and

---

[2] *See, e.g.*, Kristin Compton, *Vioxx Lawsuits*, Drugwatch (Mar. 4, 2021) ($4.85 billion settlement of 60,000-case Vioxx MDL), https://www.drugwatch.com/vioxx/lawsuits/; Bill Chappell, *Bayer to Pay More Than $10 Billion to Resolve Cancer Lawsuits Over Weedkiller Roundup*, NPR (June 24, 2020) (approximately 100,000 claims), https://www.npr.org/2020/06/24/ 882949098/bayer-to-pay-more-than-10-billion-to-resolve-roundup-cancer-lawsuits.

[3] *See, e.g.*, *In re Paddock Enters., LLC*, 2022 WL 1746652, at *6 (Bankr. D. Del. May 31, 2022) (over 400,000 claims); *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 722 (D. Del. 2005) (over 330,000 claims).

keeps every dollar LTL gains through delay and settlement pressure.  *See supra* Part I.B.

LTL further errs (at 51) in proposing a new bankruptcy purpose, separate from asset maximization:  addressing future claimants' interests (citing *In re W.R. Grace & Co.*, 900 F.3d 126, 130 (3d Cir. 2018)).  *Grace* did not apply the good-faith standard; it concerned whether a channeling injunction under 11 U.S.C. § 524(g) covered insurers.  LTL cites a passage explaining *Congress's* purpose in enacting § 524(g).  LTL's desire to use that provision does not transform it into a petitioner's valid bankruptcy purpose.  The redistributions effected by the Bankruptcy Code "are not [its] *purpose*.  Instead, the purposes of the Code are to preserve going concerns and to maximize the value of the debtor's estate." *Integrated Telecom*, 384 F.3d at 128-29; *see also id.* at 127-28 ("[A] desire to take advantage of the protections of the Code . . . cannot establish *good* faith as a matter of law.").

Moreover, LTL misunderstands that a properly crafted § 524(g) plan must further these same fundamental bankruptcy purposes; invoking the provision does not distinctly justify a bankruptcy filing.  Section 524(g)'s key feature, the channeling injunction, *restrains* future claimants, barring suit against the debtor and others, and forcing claimants to use the claims trust.  This "relieves the debtor of the uncertainty of future asbestos liabilities," which "helps achieve the purpose

of Chapter 11 by facilitating the reorganization and rehabilitation of the debtor as an economically viable entity." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004). LTL cannot evade the valid bankruptcy purposes the good-faith standard already recognizes and requires just by invoking future claimants.

**D.    LTL's Criticisms Of Tort Litigation Do Not Justify Its Bankruptcy**

Criticizing tort litigation (at 55-56) cannot justify LTL's petition. "[T]he creation of a central forum to adjudicate claims against the Debtor[] is not enough to satisfy the good faith inquiry." *BEPCO*, 589 F.3d at 622. True, litigation can take time and yield varying results. *See* Kenneth R. Feinberg, *The Dalkon Shield Claimants Trust*, 53 Law & Contemp. Probs. 79, 87 (1990) (recounting same critiques). If complaints about tort litigation alone justified bankruptcy, virtually any mass-tort defendant could file. Such complaints are properly directed to lawmakers, not this Court.

Varied outcomes often mean the court system is working. Individual plaintiffs' success depends on showing that J&J's products specifically caused their injuries. *Compare, e.g., In re N.Y.C. Asbestos Litig.*, 171 N.Y.S.3d 503 (N.Y. App. Div. 2022) (plaintiff failed to establish sufficient asbestos exposure to cause mesothelioma), *with Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 684, 712-14 (Mo. Ct. App. 2020) (affirming plaintiffs proved exposure caused their ovarian cancer), *cert. denied*, 141 S. Ct. 2716 (2021). J&J also has won some cases by

defeating personal jurisdiction.  *See* LTL Br. 13; *Estate of Fox v. Johnson &*
*Johnson*, 539 S.W.3d 48 (Mo. Ct. App. 2017).  Such outcomes hardly "vindicate[]"
LTL's claim (at 1-2) that J&J's talc "never contained asbestos."[4]  The victories
LTL can tout do not support cutting litigation short in favor of bankruptcy.

LTL's assurances that the bankruptcy court intends to proceed "at a far more
expeditious pace" are inapposite.  LTL Br. 56 (quoting JA29).  The good-faith
inquiry focuses on the debtor, not on individual judges' intent to move quickly or
views of MDL efficacy.  Whatever the bankruptcy court's intentions, LTL and J&J
are financially incentivized to exploit delay to pressure talc claimants into settling
their claims for less money.

Ultimately, the choice here is not between settlement in bankruptcy versus
tort litigation lasting "hundreds—if not thousands—of years."  LTL Br. 2.
Because J&J has stopped selling talc, that hyperbole is unwarranted; going forward
what matters are cases' individual facts and in which system the parties will
negotiate settlement.  Litigation illuminated J&J's and Old JJCI's "outrageous
conduct":  deceptively denying asbestos in their products; discrediting scientists
who discovered otherwise; rejecting safe alternatives; and persuading the industry
to adopt less-sensitive testing methods, all while knowing their products contained

---

[4] Plaintiffs prevailed in the last seven mesothelioma verdicts before
bankruptcy.  *See* JA4706-4707.

asbestos. *Ingham*, 608 S.W.3d at 713-16. If litigation continues, J&J can induce plaintiffs to stop litigating only by making offers commensurate with their harms and their proof of causation. The desire to avoid those contests is not a valid bankruptcy purpose.

## II.   LTL CANNOT SHOW THE REQUISITE FINANCIAL DISTRESS

### A.   LTL Was Not In Immediate Financial Distress

Good faith requires "immediate financial difficulty . . . at the time of the filing." *SGL Carbon*, 200 F.3d at 163. Potential liability in litigation—even "potentially crippling" liability—is not enough. *Id.* LTL did not face immediate financial difficulty when it filed for bankruptcy. A&I Br. 22-24.

The Funding Agreement stated that LTL would have "financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Talc Related Liabilities." JA479 (¶¶ E-F). It committed at least $60 billion in funding capacity from J&J. JA10. In contrast, LTL showed talc litigation cost $100-$200 million per year. JA34. Fifty years of litigation at that rate would cost $10 billion at most, a sixth of the Agreement's limit. Talc judgments over the past five years amounted to $3.5 billion, and J&J settled 6,800 cases for $1 billion over the same period. JA34 n.22. Liabilities on that scale do not show immediate financial distress for an entity with access to $60 billion.

LTL disregards (at 46-47) those direct financial indicators to focus on worst-case scenarios.  But this Court gauges financial distress by comparing present financial capacity to present financial obligations.  In *Integrated Telecom*, the debtor was not in financial distress because it was "highly solvent and cash rich at the time of the bankruptcy filing," with assets over $100 million and liabilities under $30 million.  384 F.3d at 123-24.  In *SGL Carbon*, the debtor's assets exceeded liabilities by $124 million, and it could pay obligations and borrow money.  200 F.3d at 166.

The bankruptcy court failed to analyze immediate financial distress.  LTL incorrectly believes (at 43) the court did, pointing to discussions of "contingent" liabilities and "pending (although contested) indemnification obligations," and asserting (at 39-40, 47) that "future liabilities *could be* far more substantial" than in recent years.  Such speculation about potential future liability is insufficient.  *See SGL Carbon*, 200 F.3d at 163.  LTL quotes (at 35, 39) *SGL Carbon*'s statement that the Code "encourages early filing" and its observation that companies have permissibly sought bankruptcy when litigation "posed a serious threat to the companies' long term viability," but omits its next point:  those "debtors experienced serious financial and/or managerial difficulties at the time of filing."  200 F.3d at 163-64.  LTL did not.

Actual rather than potential financial distress is critical, because the "lure" of bankruptcy to defendants risks abuses that "must be guarded against." *Id*. at 169. Looking to "potential costs and liabilities," LTL Br. 35, creates no administrable standard and has no limiting principle. Contrary to LTL's argument (at 39), actual distress is especially important in the § 524(g) context because it gives debtors extraordinary powers: to impose non-consensual third-party releases; to override dissenting creditors; and to bind future claimants. *See* 11 U.S.C. § 524(g)(2)-(4).

LTL misses the point by arguing (at 42-43) that good faith does not require *insolvency*. No one argues it does. "Saying that there is no insolvency requirement, however, does not mean that all solvent firms should have unfettered access to Chapter 11." *Integrated Telecom*, 384 F.3d at 122. The touchstone is immediate financial distress, which LTL has never faced and the bankruptcy court erred by not considering.

LTL's other response (at 47-48) that a debtor need not seriously analyze its financial distress before filing ignores that "the burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith," including the requisite financial distress. *Integrated Telecom*, 384 F.3d at 118; *see, e.g., In re Rent-A-Wreck of Am., Inc.*, 580 B.R. 364, 375-82 (Bankr. D. Del. 2018) (dismissing petitioner for "high-level and conclusory" showing of financial distress). LTL's analogy (at 39-40) to *In re Johns-Manville Corp.* fails due to that

debtor's "lengthy, careful and detailed analysis" of its liabilities before filing. *See* 36 B.R. 727, 734 (Bankr. S.D.N.Y. 1984). LTL says (at 47-48) that *Johns-Manville* is different because creditors argued that the debtor's petition should be dismissed as fraudulent. But *Johns-Manville* was a good-faith case, like this one. *See* 36 B.R. at 734 (motion to dismiss premised on "Manville's 'bad faith'").

LTL offers vague claims (at 48) that its Board had "hours and hours of briefings" and "did a lot of research, a lot of education" before making its supposedly independent decision to file for bankruptcy. But LTL has no answer to LTL's Board not knowing the value of the Funding Agreement; receiving no forecast of litigation costs; not knowing how many cases settled or what J&J paid to settle them; and being fed outlandish hypotheticals by J&J's in-house counsel. *See* A&I Br. 38; TCC Br. 12-13. LTL also cannot justify counsel's testimony that estimating future talc liabilities would be "virtually impossible," when this bankruptcy proceeding will necessitate exactly that. *See* A&I Br. 39.

What analysis J&J did before filing indicates it viewed talc liabilities as manageable. *See* JA2689 ($2.4 billion reserve for "reasonably estimable" near-term litigation costs); JA3423-3424 ($7-$7.5 billion "worst case scenario" given to S&P). LTL's arguments (at 44-45) about these figures' significance only underscore its failure to present the bankruptcy court with a serious analysis of its financial condition. That failure required dismissal.

### B.    The Bankruptcy Court's Financial-Distress Analysis Was Erroneous

**1.**    The bankruptcy court relied on unsupported speculation and improper evidence, inverting *SGL Carbon*'s rule that good faith requires immediate financial distress, not just potential liability.  The court used unfounded estimates, derived from a defunct plan in the *Imerys* bankruptcy, of "pending (although contested) indemnification obligations."  *See* A&I Br. 45; JA16, JA37.  Contradicting its assertion (at 46 n.3) that evidence supports those estimates, LTL previously called them "exponentially inflated."  JA1863.5-.6 n.26.

The bankruptcy court had no basis to find it would cost "up to $190 billion" to litigate pending ovarian cancer claims.  *See* A&I Br. 44-45.  LTL excuses (at 45) this flawed analysis as a mere "range for trial costs," but the court cited that figure to support its holding that "[financial] distress is patently apparent in the case at bar."  JA37.  To arrive at $190 billion, the court assumed trial in every case— 38,000 ovarian cancer cases, each costing $5 million—even though LTL's expert testified that 98% of asbestos claims end in dismissal or settlement and J&J resolved far more claims through dismissal or settlement.  *See* A&I Br. 38 (6,800 settlements and 1,550 dismissals in talc litigation versus 49 trials).  The $190 billion figure also exceeds by a thousand times LTL's reported annual defense costs of $100 to $200 million.  *See* JA34.

14

The bankruptcy court further improbably multiplied the total number of pending claims by the largest recent verdicts to reach the conclusion that "the continued viability of *all J&J companies* is imperiled." JA36 (emphasis added). The court also multiplied the average value of 13 recent mesothelioma verdicts ($36.6 million) by the number of pending mesothelioma claims. JA17; LTL Br. 17. It had no basis to assume that every pending case would be tried, let alone yield such a verdict.

LTL labors to salvage the bankruptcy court's reasoning, arguing (at 37) that even "a very low plaintiff success rate" would be enough to cause distress. This Court should assess the bankruptcy court's reasoning on its own terms. That court's speculation about "potentially crippling" liability is inadequate, *see SGL Carbon*, 200 F.3d at 163, and conflicts with the realities of settlement and dismissal. Over the same period as the 13 mesothelioma verdicts highlighted by the bankruptcy court, J&J settled *more than a thousand* mesothelioma cases for under half a million dollars on average. *See* JA4548 (1,098 claims resolved for $439.7 million).[5]

---

[5] LTL's own *amici* Bankruptcy Law Professors further undermine the bankruptcy court's speculations, showing that 97% of cases in MDL courts over the past half-century ended in settlement or dispositive motion, while only 3% were remanded for trial. Bankr. Law Profs.' Br. 17-18.

The bankruptcy court disregarded this history, saying *Ingham* and the failure of settlement talks in *Imerys* "changed the landscape." JA41. Appellate affirmance of the *Ingham* verdict doubtless raised other plaintiffs' confidence, but J&J told investors in October 2021 that *Ingham* was "unique" and "not representative." JA4404. Concluding from these developments that settlements and dismissals would disappear, requiring trials in every case, abandons reality. Speculation that other plaintiffs might repeat *Ingham*'s unusual success cannot warrant finding immediate financial distress when LTL has $60 billion in funding.

**2.** The bankruptcy court's and LTL's focus (at 36-38) on hypothetical justifications for *Old JJCI* declaring bankruptcy is misplaced. Old JJCI is not the debtor; J&J eliminated Old JJCI to forgo that possibility. LTL is a litigation-management vehicle, not a functioning business like Old or New JJCI. It could litigate and resolve claims outside bankruptcy without having to worry about ordinary business concerns. It makes no sense to say "*LTL* could not 'sustain operations and remain viable in the long term,'" LTL Br. 37-38 (emphasis added) (quoting JA37), because LTL has no operations to sustain; nor to cite reputational risk to Old JJCI, *id.* at 38, because LTL has no brand to protect.

LTL unpersuasively denies (at 49) J&J would have continued to support Old JJCI's talc litigation costs. LTL then claims (at 21) to have "the same, if not a greater, ability to resolve present and future talc claims" than Old JJCI and argues

(at 60) that J&J's support means the LTL restructuring scheme does not harm talc claimants. If that were so, J&J's commitment to fund LTL but not Old JJCI means the two cannot be equated when assessing financial distress.

**3.**    Even if Old JJCI's financial condition were relevant, it was healthier than the bankruptcy court contended. J&J assured investors that talc liabilities could be paid in the ordinary course, and Old JJCI had access to AAA-rated financing through J&J. A&I Br. 42. Old JJCI's executives never considered putting it into bankruptcy. JA3409-3410. When J&J's counsel sought approval for the scheme that yielded this bankruptcy, their memo explaining the scheme never said it was necessary to save Old JJCI from financial distress. *See* JA4444-4449.

The bankruptcy court ignored economic reality by treating Old JJCI as an independent entity, even though J&J paid all talc litigation costs out of a central account. A&I Br. 41-44. That approach contravened *SGL Carbon*, which held a debtor was not in financial distress partly because the debtor's parent created a substantial litigation reserve that covered the debtor. *See* 200 F.3d at 163. The bankruptcy court's view that claimants had to prove J&J would stop supporting Old JJCI (JA38) improperly shifted the burden of proof away from LTL. LTL offers no evidence for its assertion (at 49) that J&J would have ceased supporting Old JJCI's talc litigation costs.

The bankruptcy court also erred in accepting J&J's misleading accounting. Though J&J paid litigation costs and incurred its own substantial damages obligations, J&J charged them all to Old JJCI, manufacturing its apparent loss. A&I Br. 41. J&J's own punitive damages from *Ingham* accounted for almost all of Old JJCI's pre-tax loss before LTL's bankruptcy. *Id.* ($716 million in punitive damages); LTL Br. 36 ($893.4 million loss). Meanwhile, Old JJCI's income statement—prepared for this litigation—improperly excluded income from foreign subsidiaries. A&I Br. 41.

The formal allocations of booked expenses within J&J that LTL invokes (at 49-50) are beside the point. A bankruptcy court may not close its eyes to economic reality. LTL's approach renders irrelevant a wealthy parent that covers the debtor's costs. *See* JA4380 (J&J net earnings of $16.1 billion, dividends of $8.2 billion, and $2.5 billion in stock buybacks in nine months before bankruptcy). This Court has taken a pragmatic view of debtors' economic relationships to their non-debtor parents. *See BEPCO*, 589 F.3d at 624-26; *SGL Carbon*, 200 F.3d at 163. The bankruptcy court erred by failing to do the same.

### C.    LTL Is Unlike Other Mass-Tort Debtors

LTL's self-comparison (at 39-40) to the debtors in *Johns-Manville*, *In re A.H. Robins, Co.*, and *In re Dow Corning Corp.* only confirms its lack of good faith. Unlike LTL, those debtors faced genuine financial distress at filing. Johns-

Manville was forced to "book a $1.9 billion reserve thereby triggering potential default on a $450 million debt which, in turn, could have forced partial liquidation" if not for bankruptcy. *SGL Carbon*, 200 F.3d at 164 (citing *Johns-Manville*, 36 B.R. at 730). The *A.H. Robins* debtor had "only $5 million in unrestricted funds" and "financial institutions were unwilling to lend it money." 89 B.R. 555, 558 (E.D. Va. 1988). The *Dow Corning* debtor faced ninety trials within six months, with 440,000 registered claimants. 187 B.R. 919, 923-24 (E.D. Mich. 1995). LTL did not face comparable risks.

Also, those debtors were product-producing businesses that themselves incurred the liabilities at issue. *See Johns-Manville*, 36 B.R. at 738 ("Manville is a real business with real creditors in pressing need of economic reorganization."); *In re Dow Corning Corp.*, 244 B.R. 673, 677 (Bankr. E.D. Mich. 1999) (same). None was a liability vessel crafted by a well-resourced parent to gain bankruptcy's advantages without its obligations.

## III.    LTL SOUGHT LITIGATION ADVANTAGES FOR ITS PARENTS

A petition lacks good faith if the "primary, if not sole, purpose of the filing was a litigation tactic." *BEPCO*, 589 F.3d at 625. LTL's acts and admissions confirm that its filing's purpose was to shift resolution of talc claims to bankruptcy court, where it could exercise greater leverage over individual claimants.

As in *SGL Carbon*, LTL executives admitted their litigation aims and targeted a particular creditor class—talc claimants—through restructuring and bankruptcy. *See* A&I Br. 24-25. LTL admits it exists "to get rid of all the [talc] liability" and to "permanently protect" its parent entities. JA2436; JA464 (¶ 59). LTL defends (at 62) segregating talc plaintiffs in bankruptcy, but the "differing treatment" of antitrust plaintiffs in *SGL Carbon* led this Court to conclude that the petition was filed improperly "to put pressure on [them] to accept the company's settlement terms." 200 F.3d at 167.

The timing of LTL's petition confirms an intent to protect its parents from litigation. *See BEPCO*, 589 F.3d at 625 & n.15 (good faith absent when reducing parents' litigation exposure is "principal factor" and petition's "timing . . . evidences an intent to delay or frustrate" creditors) (emphasis omitted). J&J openly sought to "cap [its] talc liability," JA1901, after the Supreme Court denied review in *Ingham* and J&J lost *Daubert* motions in the talc MDL. Exploiting bankruptcy to cap liabilities would benefit J&J shareholders, contravening the absolute priority rule, to which the good-faith inquiry is "particularly sensitive." A&I Br. 26.

Talc plaintiffs' fatal illnesses mean they suffer greater prejudice from delay than the plaintiffs in *SGL Carbon* and *BEPCO*. They acutely risk losing the "ability to effectively prosecute [their] claims." *BEPCO*, 589 F.3d at 626. The

bankruptcy court erroneously disregarded *BEPCO*, instead applauding J&J's effort to cap talc exposure through LTL as an acceptable "business decision." *See* A&I Br. 47-50. LTL fails (at 69) to distinguish *BEPCO*. It cannot dispute that its purpose is to protect J&J from substantial litigation. LTL argues (at 69-70) that its timing differs from *BEPCO* because J&J paid the *Ingham* judgment before the filing. That distinction makes no difference because J&J sought to avoid other pending claims arising from its same tortious conduct at issue in *Ingham*.

LTL's assertion (at 70) that estimates of J&J's talc liability may have increased after the *Ingham* judgment withstood appeal supports the conclusion that LTL's bankruptcy is intended to deprive plaintiffs in pending litigation of a remedy against its parent. LTL says (at 17) talc claimants could not all get their "day in court," but the bankruptcy court's stay enables J&J to avoid all jury trials indefinitely, particularly the large punitive damages juries may award after learning of J&J and Old JJCI's conduct. *See* A&I Br. 28. Using bankruptcy may enable J&J to avoid punitive damages altogether. *See A.H. Robins*, 89 B.R. at 563-64 (disallowing mass-tort claimants' punitive-damages claims).

Delay from bankruptcy also strengthens J&J's hand in settlement negotiations. *See* A&I Br. 15-16. While litigation is stayed and claimants wait for plan confirmation, J&J can extract revenue from New JJCI, creating pressure on claimants (but not LTL or J&J) to settle. Using bankruptcy to "pressure . . .

plaintiffs to accept the company's settlement terms" is a textbook improper

purpose. *SGL Carbon*, 200 F.3d at 167.

The Funding Agreement's final-order condition further pressures claimants

to reach a deal with J&J; otherwise, they cannot recover until LTL's appeal

concludes. *See supra* Part I.A.  LTL falsely equates (at 73) the delay caused by the

final-order condition and stays pending appeal in conventional litigation.  Tort

defendants can stay a money judgment by posting a bond, but parties in bankruptcy

cannot stay a confirmed reorganization plan without satisfying the traditional

factors governing stays pending appeal and posting any bond the court requires.

*See In re Revel AC, Inc.*, 802 F.3d 558, 568-69 (3d Cir. 2015); Fed. R. Bankr. P.

8007; 10 *Collier on Bankruptcy* § 8007.06 (16th ed. 2022).[6]  The final-order

condition frees J&J and New JJCI of both obligations.  Because LTL cannot draw

on the Funding Agreement until any appeal has concluded, LTL's funders get a

stay pending appeal without having to request one or post a bond.  The financial

burden of appeal thereby falls solely on claimants.

## IV.    THE LTL RESTRUCTURING SCHEME EVINCES BAD FAITH

**1.**    Congress designed § 524(g) to protect future claimants subject to a

channeling injunction by requiring the reorganized debtor to contribute equity,

---

[6] LTL incorrectly cites (at 73) Federal Rule of Civil Procedure 62, which
applies in bankruptcy only to adversary proceedings.  *See* Fed. R. Bankr. P. 7062,
9014(c).

securities, future payments, and a majority of voting shares to the claims trust, which would provide "an 'evergreen' source of funding to pay future claims." *Combustion Eng'g*, 391 F.3d at 234; 11 U.S.C. § 524(g)(2)(B)(i) (claimants' trust-funding rights); *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 359 (3d Cir. 2012) ("claimants' interests are protected by the bankruptcy court's power to use *future earnings* to compensate similarly situated tort claimants equitably") (emphasis added). That is the *quid pro quo* for the debtor's extraordinary ability to channel future claims to the trust.

LTL's divisional-merger scheme flouts Congress's design, replacing the stake claimants should have had in Old JJCI's business with a capped contribution by J&J upon final confirmation of a reorganization plan, which may prove inadequate to cover future claims. Claimants have no share in the earnings and growth of New JJCI—those benefit only J&J.[7] Although the bankruptcy court invoked § 524(g) (at JA32, JA36, JA49), as does LTL (at 9-11, 39, 57-59, 67), neither addresses the problem that LTL's restructuring contravenes Congress's design.

---

[7] The Funding Agreement also caps the JJCI-value benchmark of the cash contribution by J&J. If New JJCI's assets are spun off to a new entity, any subsequent growth does not count toward the benchmark. *See* JA4316 ("JJCI Value," cl. (b)(ii)).

**2.**     Although the divisional merger gave LTL access to vast funding capacity through the Funding Agreement (ruling out financial distress), it gave the new vessel scant real assets.[8]  The assets and earnings of J&J's consumer health business remain outside bankruptcy, insulated from the transparency and oversight that bankruptcy would impose.  *See*, *e.g.*, 11 U.S.C. §§ 363, 521.  J&J instead extracts revenue from those assets and distributes it to shareholders.

Long-standing principles condemn this scheme.  A&I Br. 29-31.  When non-debtors have "no need to reorganize," they may not "cleanse themselves of . . . liability without enduring the rigors of bankruptcy."  *Combustion Eng'g*, 391 F.3d at 237.  The Supreme Court has rejected restructuring moves undertaken with the "intent to hinder and delay [creditors]."  *Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932).  Courts similarly reject "new debtor syndrome" bankruptcies, which use bankrupt shell entities to forestall creditors' exercise of their rights.  *See*, *e.g.*, *In re Laguna Assocs. Ltd. P'ship*, 30 F.3d 734, 738 (6th Cir. 1994); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072-73 (5th Cir. 1986).

LTL's efforts to distinguish this authority are unpersuasive.  Like the non-debtors in *Combustion Engineering*, J&J and New JJCI seek to exploit an

---

[8] Contrary to LTL's mischaracterization (at 6), Appellant's Opening Brief (at 23) stated there was "virtually no chance that J&J will be unable to fulfill [its] guarantee" in the Funding Agreement.

unneeded bankruptcy to cleanse themselves of liability. *Contra* LTL Br. 81-82. In *Shapiro*, the wrongdoer was a debtor who aimed to forestall creditors by manipulating state corporate law. 287 U.S. at 356 (debtor brought "the corporation into being with the hindrance and delay of suitors the very aim of its existence"); *contra* LTL Br. 69. J&J's actions were worse. The debtor in *Shapiro* at least placed assets into the new entity, but J&J transferred assets away from creditors.

LTL erroneously contends (at 60) that "Old JJCI's restructuring did not separate Claimants from any value." The restructuring replaced direct access to Old JJCI's assets with indirect, conditional access to funding via the Funding Agreement—which only LTL can enforce.

LTL also incorrectly argues (at 61-62) that it would have been burdensome for Old JJCI to file for bankruptcy, without benefiting anyone. But the burdens would have benefitted claimants in three ways: *first*, by dissuading Old JJCI's management from entering bankruptcy unnecessarily;[9] *second*, by giving claimants direct access to Old JJCI's assets and a stake in its earnings; *third*, by motivating Old JJCI to devise a plan acceptable to claimants promptly so that it could free itself from court oversight. LTL, by contrast, has every incentive to test claimants' patience as long as possible. It provides no goods, has no employees depending on

---

[9] Old JJCI's president confirmed that she never discussed putting Old JJCI into bankruptcy. JA3409-3410.

it for jobs, and is beholden to J&J, which benefits from postponing and reducing any draw on the Funding Agreement.

**3.**    LTL's failed attempt (at 63-64) to equate its restructuring with *Garlock*, *Paddock*, and *Quigley* underscores its bad faith.  In *Garlock*, the debtors were Garlock, a functioning company that had made products with asbestos; Garrison, a litigation-management entity that litigated claims for fifteen years before bankruptcy; and Coltec, Garlock's parent, which was not a debtor at first. *See* Disclosure Statement at 25-27, *In re Garlock Sealing Techs. LLC*, No. 10-bk-31607 (Bankr. W.D.N.C. June 21, 2016), ECF No. 5372; *see In re Garlock Sealing Techs. LLC*, 2017 WL 2539412 (W.D.N.C. June 12, 2017).  Coltec underwent a restructuring negotiated with claimants, unlike Old JJCI's unilateral restructuring here.  The equivalent would be if J&J had a specific talc-powder subsidiary; LTL litigated claims for fifteen years; and then the subsidiary, LTL, and a restructured parent all were in bankruptcy together.  Nothing like that happened here.

In *Quigley*, the supposed "restructuring" was twelve years before the bankruptcy.  The debtor incurred asbestos liability from products it made until the early 1970s, retained its liability when selling all its assets in 1992, and did not file for bankruptcy until 2004.  *In re Quigley Co.*, 437 B.R. 102, 111, 118 (Bankr. S.D.N.Y. 2010).  In *Paddock*, the debtor did not seek a stay of litigation against its

non-debtor affiliates, in contrast to LTL's aggressive effort to protect J&J. *In re Paddock Enters., LLC*, 2022 WL 1746652, at *7 (Bankr. D. Del. May 31, 2022).

The claimants in *Garlock* and *Paddock* did not move to dismiss for lack of good faith, likely because the debtors had already litigated for decades. *See, e.g., id.* at *6 (over 400,000 claims resolved, exhausting insurance). In *Quigley*, the U.S. Trustee and ad hoc claimants moved to dismiss because the debtor had not moved forward for eight months after its initial plan was rejected, not because of any flaw in the filing itself.[10]

LTL also unpersuasively relies (at 65) on three divisional-merger bankruptcies that its counsel undertook in North Carolina. None has yet faced circuit review, and they are not worth emulating. *Bestwall*, the earliest filed, has been pending for nearly five years with no end in sight. *See* A&I Br. 28-29.

Contrary to LTL's contention (at 65), this Court need not adopt a "bright-line" rule governing all bankruptcies involving a pre-filing restructuring or a petitioner's solvent parent. It need only determine that, on all the facts and circumstances, LTL did not file in good faith.

---

[10] *See In re Quigley Co.*, No. 04-bk-15739 (Bankr. S.D.N.Y. May 2, 2007), ECF No. 1075 (ad hoc committee motion); *id.* ECF No. 1089 (May 11, 2007) (Trustee's motion).

## V.    UNUSUAL CIRCUMSTANCES DO NOT PRECLUDE DISMISSING LTL'S BANKRUPTCY

The bankruptcy court's alternative holding that "unusual circumstances" preclude dismissal cannot stand.  *See* JA13 n.8 (citing 11 U.S.C. § 1112(b)(2)). The court purported to hold that dismissal would not be "in the best interests of the creditors," *id.*, ignoring the near-unanimity of talc claimants in favor of dismissal. A&I Br. 54-55.  LTL has no answer to this point (at 74-76).

The bankruptcy court failed to find "a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time."  11 U.S.C. § 1112(b)(2)(A). LTL's argument (at 75) that the statute requires the debtor to "establish," rather than the court to "find," the requisite likelihood does not help its cause.  LTL did not press the unusual-circumstances exception or establish that it could confirm a plan in a reasonable period of time.

LTL scrounges (at 75) for indications that the bankruptcy court analyzed the reasonable-period requirement, but it did not, stating that "the success of [LTL's] reorganization is speculative."  JA186.  The reasonable-period analysis is not a foregone conclusion.  *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 161-64 (3d Cir. 2012) (affirming conversion where debtor failed to propose confirmable plan in five years); *see also In re Halvajian*, 216 B.R. 502, 513 (D.N.J.), *aff'd*, 168 F.3d 478 (3d Cir. 1998) (tbl.) (dismissal after 22 months).  If the *Bestwall* case handled by LTL's counsel is any guide, delay is likely here.  And LTL's insistence (at 1-3)

that J&J's products never caused anyone's cancer makes it doubtful LTL will propose a plan that 75% of claimants will approve.

Finally, the bankruptcy court did not determine that LTL filing its bankruptcy petition in bad faith was reasonably justified or curable "within a reasonable period of time fixed by the court." 11 U.S.C. § 1112(b)(2)(B). Nor could it; LTL's bad faith is intrinsic to its design and its petition. A&I Br. 55-56.

LTL misreads the statute in arguing (at 75-76) that the bankruptcy court need not consider justification or curability because lack of good faith is not enumerated in § 1112(b)(4). Subsection (b)(1) authorizes dismissal "for cause"; subsection (b)(2) applies the "unusual circumstances" exception to such dismissals; and subsection (b)(4) explains that "'cause' includes" various enumerated grounds. The Bankruptcy Code's rules of construction establish that "includes" is "not limiting." *See* 11 U.S.C. § 102(3). Lack of good faith triggers the justification and curability requirements of subsection (b)(2), like any other "cause."

## <u>CONCLUSION</u>

This Court should reverse the bankruptcy court's order denying Appellant's motion to dismiss.

Dated: September 6, 2022                    Respectfully submitted,

                                            */s/ David C. Frederick*

Laura Davis Jones                           David C. Frederick
Isaac M. Pachulski                          Gregory G. Rapawy
Karen B. Dine                               Ariela M. Migdal
Jeffrey M. Dine                             Matthew N. Drecun
Colin R. Robinson                           KELLOGG, HANSEN, TODD,
Peter J. Keane                                 FIGEL & FREDERICK, P.L.L.C.
PACHULSKI STANG ZIEHL & JONES LLP           1615 M Street, N.W., Suite 400
919 N. Market Street, 17th Floor            Washington, D.C. 20036
Wilmington, DE 19801                        Telephone: (202) 326-7900
Telephone: (302) 652-4100                   dfrederick@kellogghansen.com
ljones@pszjlaw.com                          grapawy@kellogghansen.com
ipachulski@pszjlaw.com                      amigdal@kellogghansen.com
kdine@pszjlaw.com                           mdrecun@kellogghansen.com
jdine@pszjlaw.com
crobinson@pszjlaw.com
pkeane@pszjlaw.com

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,499 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

3. In addition, pursuant to 3rd Cir. L.A.R.  31.1(c) (2011), the undersigned hereby certifies that the text of the electronic brief filed with the Court is identical to the paper copies, that a virus detection program (CylancePROTECT) has been run on the electronic file, and that no virus was detected.


Dated: September 6, 2022   */s/ David C. Frederick*
          David C. Frederick

## <u>CERTIFICATE OF FILING AND SERVICE</u>

The undersigned hereby certifies that on September 6, 2022, I caused an electronic copy of the Reply Brief for Appellant to be electronically filed with the United States Court of Appeals for the Third Circuit using the CM/ECF system, which will automatically send notification of such filing to counsel of record.

Dated: September 6, 2022          */s/ David C. Frederick*
                                                      David C. Frederick

## <u>CERTIFICATE OF BAR MEMBERSHIP</u>

Pursuant to 3rd Cir. L.A.R. 28.3(d) and 46.1 (2011), I, David C. Frederick,

hereby certify that I am a member in good standing of the bar of the United States

Court of Appeals for the Third Circuit.


Dated: September 6, 2022            */s/ David C. Frederick*
                                    David C. Frederick

33