PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 22-2003, 22-2004, 22-2005, 22-2006, 22-0007,
22-2008, 22-2009, 22-2010, 22-2011

_____

In re:  LTL MANAGEMENT, LLC
                                        Debtor


LTL MANAGEMENT, LLC

v.

THOSE PARTIES LISTED ON APPENDIX A TO
COMPLAINT
AND JOHN AND JANE DOES 1-1000

*OFFICIAL COMMITTEE OF TALC CLAIMANTS,
Appellant in case Nos. 22-2003, 22-2004 and 22-2005

*OFFICIAL COMMITTEE OF TALC CLAIMANTS;
PATRICIA COOK;
EVAN PLOTKIN; RANDY DEROUEN; KRISTIE DOYLE,
as estate representative of Dan Doyle; KATHERINE
TOLLEFSON;
TONYA WHETSEL, as estate representative of Brandon
Wetsel;
GIOVANNI SOSA; JAN DEBORAH MICHELSON-
BOYLE,

Appellants in case Nos. 22-2006, 22-2007 and 22-2008

ARNOLD & ITKIN LLP, on behalf of certain personal injury
claimants represented by Arnold & Itkin,
Appellant in case No. 22-2009

AYLSTOCK WITKIN KREIS & OVERHOLTZ PLLC, on
behalf of more
than three thousand holders of talc claims,
Appellant in case Nos. 22-2010 and 22-2011

*(Amended per Court's Order dated 06/10/2022)

———————————————

Appeal from the United States Bankruptcy Court
for the District of New Jersey
(District Court No.:  21-bk-30589; 21-ap-03032)
Bankruptcy Judge:  Honorable Michael B. Kaplan

———————————————

Argued September 19, 2022

Before AMBRO, RESTREPO, and FUENTES, <u>Circuit
Judges</u>

(Opinion filed:  January 30, 2023)

Brad J. Axelrod
Skadden Arps Slate Meagher & Flom
One Rodney Square
920 North King Street, 7th Floor
Wilmington, DE  19801

Caitlin K. Cahow
Brad B. Erens
Jones Day
110 North Wacker Drive
Suite 4800
Chicago, IL   60606

Paul R. DeFilippo
Wollmuth, Maher & Deutsch
500 Fifth Avenue
12th Floor
New York, NY   10110

Kristen R. Fournier
King & Spalding
1185 Avenue of the Americas
New York, NY   10036

Kathleen A. Frazier
Shook, Hardy & Bacon
600 Travis Street
JP Morgan Chase Tower, Suite 3400
Houston, TX   77002

Gregory M. Gordon
Daniel B. Prieto
Mark W. Rasmussen
Amanda Rush
Jones Day
2727 North Harwood Street
Suite 600
Dallas, TX  75201

Robert W. Hamilton
Jones Day
901 Lakeside Avenue
North Point
Cleveland, OH  44114

James M. Jones
Jones Day
500 Grant Street
Suite 4500
Pittsburgh, PA  15219

Neal K. Katyal **(Argued)**
Sean M. Marotta
Hogan Lovells US
555 Thirteenth Street, N.W.
Columbia Square
Washington, DC  20004

Glenn M. Kurtz
Jessica C. Lauria
White & Case
1221 Avenue of the Americas
New York, NY  10020

James N. Lawlor
Joseph F. Pacelli
Wollmuth, Maher & Deutsch
500 Fifth Avenue
12th Floor
New York, NY   10110

C. Kevin Marshall
Jones Day
51 Louisiana Avenue, N. W.
Washington, DC  20001

John R. Miller, Jr.
Miller, Kistler, Campbell, Miller, Williams & Benson
124 North Allegheny Street
Bellefonte, PA   16823

Matthew L. Tomsic
Rayburn, Cooper, Durham
227 West Trade Street
Suite 1200
Charlotte, NC  28202

Lyndon M. Treeter
Wollmuth, Maher & Deutsch
12th Floor
New York, NY  10110

Counsel for Debtor-Appellee

Melanie L. Cyganowski
Adam C. Silverstein
Otterbourg
230 Park Avenue
29th Floor
New York, NY  10169

Angelo J. Genova
Genova Burns
494 Broad Street
Newark, NJ  07102

Jeffrey A. Lamken **(Argued)**
MoloLamken
600 New Hampshire Avenue, N. W.
The Watergate
Washington, DC  20037

Jonathan S. Massey
Massey & Gail
1000 Maine Avenue, S. W.
Suite 450
Washington, DC  20024

David J. Molton
Michael S. Winograd
Brown Rudnick
7 Times Square
47th Floor
New York, NY  10036

Counsel for Petitioner-Appellant Official
Committee of Talc Claimants

Matthew I.W. Baker
Genova Burns
494 Broad Street
Newark, NJ  07102

Sunni P. Beville
Shari I. Dwoskin
Jeffrey L. Jonas
Brown Rudnick
One Financial Center
Boston, MA  02111

Donald W. Clarke
Wasserman, Jurista & Stolz
110 Allen Road
Suite 304
Basking Ridge, NJ  07920

Daniel Stolz
Genova Burns LLC
110 Allen Road
Suite 304
Basking Ridge, NJ  07920

Jennifer S. Feeney
Otterbourg
230 Park Avenue
29th Floor
New York, NY 10169

Leonard M. Parkins
Charles M. Rubio
Parkins & Rubio
700 Milam Street
Pennzoil Place, Suite 1300
Houston, TX 77002

Robert J. Stark
Brown Rudnick
7 Times Square
47th Floor
New York, New York 10036

    Counsel for Petitioner Official Committee of
    Talc Claimants I

Jeffrey M. Dine
Karen B. Dine
Pachulski Stang Ziehl & Jones
780 Third Avenue
34th Floor
New York, NY 10017

Matthew Drecun
David C. Frederick **(Argued)**
Ariela Migdal
Gregory G. Rapawy
Kellogg Hansen Todd Figel & Frederick
1615 M Street, N.W.
Sumner Square, Suite 400
Washington, DC 20036

Laura D. Jones
Peter J. Keane
Colin R. Robinson
Pachulski Stang Ziehl & Jones
919 North Market Street
P. O. Box 8705, 17th Floor
Wilmington, DE  19801

Isaac M. Pachulski
Pachulski Stang Ziehl & Jones
10100 Santa Monica Boulevard
Suite 2300
Los Angeles, CA  00067

Counsel for Respondent Arnold & Itkin,
LLP

Samuel M. Kidder
Nir Maoz
Robert J. Pfister
Michael L. Tuchin
Klee, Tuchin, Bogdanoff & Stern
1801 Century Park East
26th Floor
Los Angeles, CA  90067

Paul J. Winterhalter
Offit Kurman
99 Wood Avenue South
Suite 302
Iselin, NJ 08830

> Counsel for Respondent Aylstock, Witkin,
> Kreis & Overholtz, PLLC

Allen J. Underwood, II
Lite, DePalma, Greenberg & Afanador
570 Broad Street
Suite 1201
Newark, NJ  07102

> Counsel for Respondent DeSanto Canadian
> Class Action Creditors

Mark Tsukerman
Cole Schotz
1325 Avenue of the Americas
19th Floor
New York, NY  10019

Felice C. Yudkin
Cole Schotz
25 Main Street
Court Plaza North, P.O. Box 800
Hackensack, NJ 07601

        Counsel for Respondent Claimants
        Represented by Barnes Law Group

Arthur J. Abramowitz
Alan I. Moldoff
Ross J. Switkes
Sherman, Silverstein, Kohl, Rose & Podolsky
308 Harper Drive
Suite 200, Eastgate Corporate Center
Moorestown, NJ  08057

Kevin W. Barrett
Maigreade B. Burrus
Bailey & Glasser
209 Capitol Street
Charleston, WV 25301

Thomas B. Bennett
Brian A. Glasser
Bailey & Glasser
1055 Thomas Jefferson Street, N.W.
Suite 540
Washington, DC 20007

Michael Klein
Evan M. Lazerowitz
Lauren A. Reichardt
Erica J. Richards
Cullen D. Speckhart
Cooley
55 Hudson Yards
New York, NY  10001

James C. Lanik
Jennifer B. Lyday
Thomas W. Waldrep
Waldrep, Wall, Babcock & Bailey
370 Knollwood Street
Suite 600
Winston-Salem, NC  27103

Kevin L. Sink
Waldrep, Wall, Babcock & Bailey
3600 Glenwood Avenue
Suite 210
Raleigh, NC  27612

Counsel for Respondent Official Committee
of Talc Claimants II

Lauren Bielskie
Jeffrey M. Sponder
Office of United States Trustee
1085 Raymond Boulevard
One Newark Center, Suite 2100
Newark, NJ  07102

Sean Janda **(Argued)**
United States Department of Justice
Appellate Section
Room 720
950 Pennsylvania Avenue, N. W.
Washington, D. C. 20530

    Counsel for Amicus Appellant United States
    Trustee

Cory L. Andrews
John M. Masslon, II
Washington Legal Foundation
2009 Massachusetts Avenue, N. W.
Washington, D. C. 20036

    Counsel for Amicus Appellee Washington
    Legal Foundation

R. Craig Martin
DLA Piper
1202 North Market Street
Suite 2100
Wilmington, DE  19801

Ilana H. Eisenstein
DLA Piper
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103

Counsel for Amici Appellees United States
Chamber of Commerce and American Tort
Reform Association

Natalie D. Ramsey
Robinson & Cole
1650 Market Street
One Liberty Place, Suite 3030
Philadelphia, PA  19103

Counsel for Amicus Appellant Erwin
Chemerinsky

Jaime A. Santos
Benjamin T. Hayes
Goodwin Procter
1900 N. Street, N. W.
Washington, D. C.  20036

Counsel for Amici Appellees National
Association of Manufacturers and Product
Liability Advisory Council, Inc.

Sean E. O'Donnell
Stephen B. Selbst
Steven B. Smith
Herrick Feinstein
2 Park Avenue
New York, NY 10016

Counsel for Amici Appellants Kenneth Ayotte, Susan Block-Lieb, Jared Ellias, Bruce A. Markell, Yesha Yadav, Robert K. Rasmussen and Diane Lourdes Dick

Peter M. Friedman
O'Melveny & Myers
1625 Eye Street, N. W.
Washington, D. C. 2006

Emma L. Persson
Laura L. Smith, Esq.
O'Melveny & Myers
2501 North Harwood Street
Suite 1700
Dallas, TX  75201

Daniel S. Shamah
O'Melveny & Myers
7 Times Square
Time Square Tower, 33rd Floor
New York, NY 10036

Counsel for Amici Appellees Samir Parikh, Anthony Casey, Joshua C. Macey and Edward Morrison

Glen Chappell
Allison W. Parr
Hassan A. Zavareei
Tycko & Zavareei
2000 Pennsylvania Avenue, N.W.
Suite 1010
Washington, DC 20006

  Counsel for Amicus Appellant Public
  Justice

Jeffrey R. White
American Association for Justice
777 6th Street, N.W.
Suite 200
Washington, DC 20001

  Counsel for Amicus Appellant American
  Association of Justice

Thomas A. Pitta
Emmet, Marvin & Martin
120 Broadway
32nd Floor
New York, NY  10005

  Counsel for Amici Appellants Maria Glover,
  Andrew Bradt, Brooke Coleman, Robin Effron,
  D. Theodore Rave, Alan M. Trammell, and
  Adam Zimmerman

---

## OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

Johnson & Johnson Consumer Inc. ("Old Consumer"), a wholly owned subsidiary of Johnson & Johnson ("J&J"), sold healthcare products with iconic names branded on consumers' consciousness—Band-Aid, Tylenol, Aveeno, and Listerine, to list but a few. It also produced Johnson's Baby Powder, equally recognizable for well over a century as a skincare product. Its base was talc, a mineral mined and milled into a fine powder. Concerns that the talc contained traces of asbestos spawned in recent years a torrent of lawsuits against Old Consumer and J&J alleging Johnson's Baby Powder has caused ovarian cancer and mesothelioma. Some of those suits succeeded in verdicts, some failed (outright or on appeal), and others settled. But more followed into the tens of thousands.

With mounting payouts and litigation costs, Old Consumer, through a series of intercompany transactions primarily under Texas state law, split into two new entities: LTL Management LLC ("LTL"), holding principally Old Consumer's liabilities relating to talc litigation and a funding support agreement from LTL's corporate parents; and Johnson & Johnson Consumer Inc. ("New Consumer"), holding virtually all the productive business assets previously held by Old Consumer. J&J's stated goal was to isolate the talc liabilities in a new subsidiary so that entity could file for

Chapter 11 without subjecting Old Consumer's entire operating enterprise to bankruptcy proceedings.

Two days later, LTL filed a petition for Chapter 11 relief in the Bankruptcy Court for the Western District of North Carolina. That Court, however, transferred the case to the Bankruptcy Court for the District of New Jersey.

Talc claimants there moved to dismiss LTL's bankruptcy case as not filed in good faith. The Bankruptcy Court, in two thorough opinions, denied those motions and extended the automatic stay of actions against LTL to hundreds of nondebtors that included J&J and New Consumer. Appeals followed and are consolidated before us.

We start, and stay, with good faith. Good intentions—such as to protect the J&J brand or comprehensively resolve litigation—do not suffice alone. What counts to access the Bankruptcy Code's safe harbor is to meet its intended purposes. Only a putative debtor in financial distress can do so. LTL was not. Thus we dismiss its petition.

## I. BACKGROUND

### A. <u>J&J, Baby Powder, and Old Consumer</u>

The story of LTL begins with its parent company, J&J. It is a global company and household brand well-known to the public for its wide range of products relating to health and well-being. Many are consumer staples, filling pharmacies, supermarkets, and medicine cabinets throughout the country and beyond.

One of these products was Johnson's Baby Powder, first sold by J&J in 1894. It became particularly popular, being used by or on hundreds of millions of people at all stages of life.

J&J has not always sold baby powder directly, though. In 1979, it transferred all assets associated with its Baby Products division, including Johnson's Baby Powder, to Johnson & Johnson Baby Products Company ("J&J Baby Products"), a wholly owned subsidiary (the "1979 Spin-Off"). A series of further intercompany transactions in ensuing decades ultimately transferred Johnson's Baby Powder to Old Consumer.

So since 1979 only Old Consumer and its predecessors, and not J&J, have directly sold Johnson's Baby Powder. LTL maintains that the 1979 Spin-Off included an agreement between J&J and J&J Baby Products that makes Old Consumer, as successor to the latter, responsible for indemnifying J&J for all past, present, and future liabilities stemming from Johnson's Baby Powder. Thus, according to LTL, Old Consumer was liable for all claims relating to Johnson's Baby Powder, either directly or indirectly through its responsibility to indemnify J&J.

## B. Baby Powder Litigation

Talc triggered little litigation against J&J entities before 2010. There had been but a small number of isolated claims alleging the products caused harms such as talcosis (a lung disease caused by inhalation of talc dust or talc), mesothelioma (a cancer of organ membranes, typically in the lungs, associated with exposure to asbestos), and rashes. But trials in

2013 and 2016 resulted in jury verdicts for plaintiffs alleging Old Consumer's talc-based products caused ovarian cancer. Despite the first resulting in no monetary award, and the second being reversed on appeal, these trials ushered in a wave of lawsuits alleging Johnson's Baby Powder caused ovarian cancer and mesothelioma.[1]  Governmental actions, including the U.S. Food and Drug Administration's finding of asbestos traces in a sample of Johnson's Baby Powder in 2019 and Health Canada's confirmation in 2021 of its 2018 finding of a significant association between exposure to talc and ovarian cancer, also heightened J&J's and Old Consumer's potential exposure.

With the door wide open, over 38,000 ovarian cancer actions (most consolidated in federal multidistrict litigation in New Jersey) and over 400 mesothelioma actions were pending against Old Consumer and J&J when LTL filed its Chapter 11 petition.  Expectations were for the lawsuits to continue, with thousands more in decades to come.  The magnitude of the award in one case also raised the stakes.  There, a Missouri jury awarded $4.69 billion to 22 ovarian cancer plaintiffs, reduced on appeal to $2.24 billion to 20 plaintiffs who were not dismissed.  *Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. Ct. App. 2020), *cert. denied,* 141 S. Ct. 2716 (2021).

---

[1] The talc litigation also involves claims regarding Shower to Shower, a different talc-containing product initially produced by J&J and later by Old Consumer and its predecessors. LTL maintains intercompany transactions involving J&J and Old Consumer ultimately made the latter responsible for all claims stemming from Shower to Shower.  Because the talc litigation concerns mainly Johnson's Baby Powder, for convenience references herein to that name may include other talc products.

Yet other trials reaching verdicts for plaintiffs were not so damaging to J&J entities. Since 2018, damages in all other monetary awards to plaintiffs that were not reversed averaged about $39.7 million per claim. Moreover, Old Consumer and J&J often succeeded at trial. According to LTL's expert, of 15 completed ovarian cancer trials, only *Ingham* resulted in a monetary award for the plaintiffs that was not reversed; and of 28 completed mesothelioma trials, fewer than half resulted in monetary awards for the plaintiffs that were not reversed (and many of those were on appeal at the time of LTL's bankruptcy filing). In addition, Old Consumer and J&J often avoided trial before bankruptcy, settling roughly 6,800 talc-related claims for just under $1 billion in total and successfully obtaining dismissals without payment of about 1,300 ovarian cancer, and over 250 mesothelioma, actions.

Undoubtedly, the talc litigation put financial pressure on Old Consumer. Before LTL's petition, it paid approximately $3.5 billion for talc-related verdicts and settlements. It also paid nearly $1 billion in defense costs, and the continuing run rate was between $10 million to $20 million per month. LTL's expert identified talc-related costs as a primary driver that caused the income before tax of J&J's Consumer Health business segment (for which Old Consumer was the primary operating company in the U.S.) to drop from a $2.1 billion profit in 2019 to a $1.1 billion loss in 2020.

Old Consumer also faced billions in contested indemnification obligations to its bankrupt talc supplier, Imerys Talc America, Inc. and affiliates (collectively "Imerys"), as well as parties who had owned certain of Imerys's talc mines. These remained after J&J's settlement

proposal of about $4 billion to $5 billion in the Imerys bankruptcy case—which, per LTL, had been tentatively agreed by attorneys for talc plaintiffs—ultimately fell through by June 2021. An LTL representative testified that, if that proposal succeeded, it would have settled (subject to an opt-out) virtually all ovarian cancer claims in the multidistrict tort litigation and corresponding additional claims against J&J entities in the Imerys case. Old Consumer was also the target of both state and federal talc-related governmental complaints and investigations, as well as securities and shareholder actions, that could result in their own financial penalties and defense costs. LTL's expert opined, and the Bankruptcy Court accepted, that the total talc-related liabilities threatened Old Consumer's ability to make substantial talc-related payments from working capital or other readily marketable assets while funding its costs of operations (including marketing, distribution, research and development).

Still, Old Consumer was a highly valuable enterprise, estimated by LTL to be worth $61.5 billion (excluding future talc liabilities), with many profitable products and brands. And much of its pre-filing talc costs were attributable to the payment of one verdict, *Ingham*, a liability J&J described in public securities filings as "unique" and "not representative of other claims." App. 2692-93. Further, while it allocated all talc-related payments to Old Consumer per the 1979 Spin-Off, J&J functionally made talc payments from its accounts and received an intercompany payable from Old Consumer in return. Addressing the scope of its litigation exposure in an October 2021 management representation letter to its auditors, J&J valued its and its subsidiaries' probable and reasonably estimable contingent loss for products liability litigation, including for talc, under Generally Accepted Accounting

Principles ("GAAP"), at $2.4 billion for the next 24 months.[2] It also continued to stand by the safety of its talc products and deny liability relating to their use.

Consistent with their fiduciary duties, and likely spurred by the U.S. Supreme Court's denial of certiorari in *Ingham*, members of J&J's management explored ways to mitigate Old Consumer's exposure to talc litigation. In a July 2021 email with a ratings agency, J&J's treasurer described a potential restructuring that would capture all asbestos liability in a subsidiary to be put into bankruptcy.

### C. Corporate Restructuring and Divisional Merger

On October 12, 2021, Old Consumer moved forward with this plan, undergoing a corporate restructuring relying principally on a merger under Texas law. Counterintuitively, this type of merger involves "the division of a [Texas] entity into two or more new . . . entities." Tex. Bus. Orgs. Code Ann. § 1.002(55)(A); *see generally id.* §§ 10.001 *et seq*. When the original entity does not survive the merger, it allocates its property, liabilities, and obligations among the new entities according to a plan of merger and, on implementation, its separate existence ends. *Id*. §§ 10.003, 10.008(a)(1). Except as otherwise provided by law or contract, no entity created in the merger is "liable for the debt or other obligation" allocated to any other new entity. *Id.* § 10.008(a)(4). In simplified terms, the merger splits a legal entity into two, divides its assets

---

[2] Adam Lisman, assistant controller for J&J, suggested in his trial testimony that it was J&J's general policy to consider the next 24 months when calculating contingent costs under GAAP.

and liabilities between the two new entities, and terminates the original entity. While some pejoratively refer to it as the first step in a "Texas Two-Step" when followed by a bankruptcy filing, we more benignly call it a "divisional merger."

In our case, Old Consumer's restructuring was designed as a series of reorganizational steps with the divisional merger at center.[3] Ultimately, the restructuring created two new entities, LTL and New Consumer, and on its completion Old Consumer ceased to exist. It also featured the creation of a Funding Agreement, which had Old Consumer stand in momentarily as the payee, but ultimately (after some corporate maneuvers[4]) gave LTL rights to funding from New Consumer and J&J.

---

[3] A slightly abbreviated summary of the many steps is as follows. Old Consumer merged into Chenango Zero, LLC, a Texas limited liability company and indirect, wholly owned subsidiary of J&J ("Chenango Zero"), with Chenango Zero surviving the merger. Chenango Zero (formerly Old Consumer) effected a divisional merger under the Texas Business Organizations Code by which two new Texas limited liability companies were created, Chenango One LLC ("Chenango One") and Chenango Two LLC ("Chenango Two"), and Chenango Zero ceased to exist. Chenango One then converted into a North Carolina limited liability company and changed its name to "LTL Management LLC." Chenango Two merged into Curahee Holding Company Inc., the direct parent company of LTL ("Curahee"). Curahee survived the merger and changed its name to "Johnson & Johnson Consumer Inc." (now New Consumer).

[4] On the day of the divisional merger, the Funding Agreement was executed by Chenango Zero (formerly Old Consumer), as

As the most important step, the merger allocated LTL responsibility for essentially all liabilities of Old Consumer tied to talc-related claims.[5]  This meant, among other things, it would take the place of Old Consumer in current and future talc lawsuits and be responsible for their defense.

Old Consumer also transferred to LTL assets in the merger, including principally the former's contracts related to talc litigation, indemnity rights, its equity interests in Royalty A&M LLC ("Royalty A&M"), and about $6 million in cash. Carved out from Old Consumer and its affiliates just before the divisional merger, Royalty A&M owns a portfolio of royalty streams that derive from consumer brands and was valued by LTL at approximately $367.1 million.

Of the assets Old Consumer passed to LTL, most important were Old Consumer's rights as a payee under the Funding Agreement with J&J and New Consumer.  On its transfer, that gave LTL, outside of bankruptcy, the ability to cause New Consumer and J&J, jointly and severally, to pay it cash up to the value of New Consumer for purposes of satisfying any talc-related costs as well as normal course

---

payee, along with J&J and Curahee, as payors.  Then, per the divisional merger, LTL was allocated rights as payee under the Funding Agreement, replacing Chenango Zero.  Chenango Two (which assumed Old Consumer's assets not allocated to LTL) then merged into Curahee, one of the two original payors, and became New Consumer.

[5] LTL's liability was for all talc claims except those where the exclusive remedy existed under a workers' compensation statute or similar laws.

expenses.  In bankruptcy, the Agreement gave LTL the right to cause New Consumer and J&J, jointly and severally, to pay it cash in the same amount to satisfy its administrative costs and to fund a trust, created in a plan of reorganization, to address talc liability for the benefit of existing and future claimants.  In either scenario, there were few conditions to funding and no repayment obligation.[6]  The value of the payment right could not drop below a floor defined as the value of New Consumer measured as of the time of the divisional merger, estimated by LTL at $61.5 billion, and was subject to increase as the value of New Consumer increased after it.[7]

On the other side of the divisional-merger ledger, New Consumer received all assets and liabilities of Old Consumer not allocated to LTL.  It thus held Old Consumer's productive business assets, including its valuable consumer products, and, critically, none of its talc-related liabilities (except those related to workers' compensation).  After this, the organizational chart was reshuffled to make New Consumer the direct parent company of LTL.

---

[6] For LTL to require J&J and New Consumer to fund, certain customary representations and warranties made by LTL must be true, such as those addressing its good standing under state law, the due authorization of the Funding Agreement, and the absence of any required governmental approval.  And LTL must not have violated its covenants, specifically, that it will use the funds for only permitted uses and materially perform its indemnification obligations owed to New Consumer for all talc liabilities as set out in the plan of divisional merger.

[7] In each calculation of New Consumer's value, its obligation under the Funding Agreement is not included.

When the ink dried, LTL—having received Old Consumer's talc liability, rights under the Funding Agreement, a royalties business, and cash—was prepared to fulfill its reason for being: a bankruptcy filing.  Meanwhile, New Consumer began operating the business formerly held by Old Consumer and would essentially remain unaffected (save for its funding obligation) by any bankruptcy filing of LTL.

LTL became in bankruptcy talk the "bad company," and New Consumer became the "good company."  This completed the first steps toward J&J's goal of "globally resolv[ing] talc-related claims through a chapter 11 reorganization without subjecting the entire Old [Consumer] enterprise to a bankruptcy proceeding."  App. 450 (Decl. of John Kim 6).

### D. **LTL Bankruptcy Filing and Procedural History**

On October 14, 2021, two days after the divisional merger, LTL filed a petition for Chapter 11 relief in the Bankruptcy Court for the Western District of North Carolina. It also sought (1) to extend the automatic stay afforded to it under the Bankruptcy Code to talc claims arising from Johnson's Baby Powder asserted against over six hundred nondebtors (the "Third-Party Claims"), including affiliates such as J&J and New Consumer, as well as insurers and third-party retailers (all nondebtors collectively the "Protected Parties"), or alternatively, (2) a preliminary injunction enjoining those claims.  LTL's first-day filings described the bankruptcy as an effort to "equitably and permanently resolve all current and future talc-related claims against it through the consummation of a plan of reorganization that includes the establishment of a [funding] trust."  App. 3799 (LTL's Compl. for Decl. and Inj. Relief 2); App. 316 (LTL's Info. Br. 1).

A month later, the North Carolina Bankruptcy Court issued an order enjoining Third-Party Claims against the Protected Parties. But the order expired after 60 days and would not bind a subsequent court. The next day, following motions from interested parties (including representatives for talc claimants) and a Show Cause Order, the Court transferred LTL's Chapter 11 case to the District of New Jersey under 28 U.S.C. § 1412. It rejected what it viewed as LTL's effort to "manufacture venue" and held that a preference to be subject to the Fourth Circuit's two-prong bankruptcy dismissal standard[8] could not justify its filing in North Carolina. App. 1515 (N.C. Transfer Order 10).

---

[8] In the Fourth Circuit, a court can only dismiss a bankruptcy petition for lack of good faith on a showing of the debtor's "subjective bad faith" and the "objective futility of any possible reorganization." *Carolin Corp. v. Miller,* 886 F.2d 693, 694 (4th Cir. 1989). The Bankruptcy Court in the District of New Jersey described this as a "much more stringent standard for dismissal of a case for lacking good faith" than the Third Circuit's test. App. 13 (Mot. to Dismiss Op. 13). Perhaps not by coincidence then, debtors formed by divisional mergers and bearing substantial asbestos liability seem to prefer filing in the Fourth Circuit, with four such cases being filed in the Western District of North Carolina in the years before LTL's filing. *See In re Bestwall LLC,* Case No. 17-31795 (Bankr. W.D.N.C.); *In re DBMP LLC,* Case No. 20-30080 (Bankr. W.D.N.C.); *In re Aldrich Pump LLC,* Case No. 20-30608 (Bankr. W.D.N.C.); *In re Murray Boiler LLC,* Case No. 20-30609 (Bankr. W.D.N.C.).

With the case pending in the Bankruptcy Court for the District of New Jersey, the Official Committee of Talc Claimants (the "Talc Claimants' Committee") moved to dismiss LTL's petition under § 1112(b) of the Bankruptcy Code as not filed in good faith.  Soon after, Arnold & Itkin LLP, on behalf of talc claimants it represented ("A&I"), also moved for dismissal on the same basis.  LTL opposed the motions.  Two other law firms—including Aylstock, Witkin, Kreis & Overholtz, PLLC, on behalf of talc claimants ("AWKO")—joined the motions.  For ease of reference, we refer collectively to the Talc Claimants' Committee, A&I, and AWKO as the "Talc Claimants."

At the same time, LTL urged the New Jersey Bankruptcy Court to extend the soon-to-expire order enjoining Third-Party Claims against the Protected Parties.  The Talc Claimants' Committee and AWKO opposed this motion.

In February 2022, the Bankruptcy Court held a five-day trial on the motions to dismiss and LTL's third-party injunction motion.  It denied soon thereafter the motions to dismiss and granted the injunction motion.  App. 1, 57, 140, 194 (Mot. to Dismiss Op.; Mot. to Dismiss Order; Third-Party Inj. Op.; Third-Party Inj. Order).

In its opinion addressing the motions to dismiss, the Bankruptcy Court applied Third Circuit case law and held that LTL filed its bankruptcy petition in good faith.  The Court ruled the filing served a valid bankruptcy purpose because it sought to resolve talc liability by creating a trust for the benefit of claimants under § 524(g) of the Bankruptcy Code.  At a high level, that provision allows a debtor satisfying certain conditions to establish, in a plan of reorganization, a trust for

the benefit of current and future claimants against which an injunction channels all asbestos litigation.[9]  The Court highlighted what it viewed as several benefits of claims administration through a § 524(g) trust, compared to mass asbestos litigation in trial courts, including the possibility it could resolve claims more efficiently (from both a cost and time perspective), ensure more balanced recoveries among claimants, and preserve funds for future claimants.

The Court also held LTL was in financial distress.  It focused on the scope of litigation faced by Old Consumer (and transferred to LTL), the historic costs incurred by Old Consumer in connection with talc litigation, and the effect of these costs on its business.  It suggested that extrapolating this talc liability into the future showed the "continued viability of all J&J companies [was] imperiled." App. 36 (Mot. to Dismiss Op. 36).  Yet it appeared to doubt LTL would completely exhaust its payment right under the Funding Agreement.  App. 35 (*Id.* at 35).

Finally, the Court determined LTL's corporate restructuring and bankruptcy were not undertaken to secure an unfair tactical litigation advantage against talc claimants, but constituted "a single integrated transaction" that did not prejudice creditors and eliminated costs that would otherwise be imposed on Old Consumer's operating business had it been subject to bankruptcy.  App. 43 (*Id.* at 43).  The Court ultimately saw the bankruptcy forum as having a superior ability, compared to trial courts, to protect the talc claimants'

---

[9] Under certain conditions, the injunction can also channel to the trust claims against third parties affiliated with the debtor. 11 U.S.C. § 524(g)(4).

interests, viewing this as an "unusual circumstance[]" that precluded dismissal under 11 U.S.C. § 1112(b)(2).  App. 13 (*Id*. at 13 n.8).

At the same time the Bankruptcy Court grappled substantively with existing Circuit case law, it made much of LTL's novel design and the reasons for it.  Its bankruptcy, the Court believed, presented a "far more significant issue" than equitable limitations on bankruptcy filings: "which judicial system [better served talc claimants]—the state/federal court trial system, or a trust vehicle established under a chapter 11 reorganization plan . . . [in Bankruptcy Court]."  App. 12-13 (*Id*. at 12-13).  Answering this question, it provided a full defense of its "strong conviction that the bankruptcy court is the optimal venue for redressing the harms of both present and future talc claimants in this case."  App. 19 (*Id.* at 19).[10]

The Talc Claimants timely appealed the Bankruptcy Court's order denying the motions to dismiss.  The Talc Claimants' Committee and AWKO also appealed the order enjoining Third-Party Claims against the Protected Parties.  On request of the Talc Claimants, the Bankruptcy Court certified the challenged orders to our Court under 28 U.S.C. § 158(d)(2).

---

[10] In the separate opinion explaining its order preserving the injunction of Third-Party Claims against Protected Parties, the Court held that "unusual circumstances" warranted extension of the automatic stay to those claims under Bankruptcy Code §§ 362(a)(1) and 362(a)(3).  It also held that Bankruptcy Code § 105(a) provided it independent authority to issue a preliminary injunction enjoining them.  App. 140 (Third-Party Inj. Op.).

In May 2022, we authorized direct appeal of the orders under the same statute.

The Bankruptcy Court had jurisdiction of the bankruptcy case under, *inter alia*, 28 U.S.C. §§ 157(a) and 1334(a).[11] We have jurisdiction of the appeals under 28 U.S.C. § 158(d)(2)(A).

## II.  ANALYSIS

### A. <u>Standard of Review</u>

We review for an abuse of discretion the Bankruptcy Court's denial of the motions to dismiss the Chapter 11 petition for lack of good faith.  *In re 15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 616 (3d Cir. 2009).  That exists when the decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Id.* (citation omitted).  We give fresh (*i.e.*, plenary or *de novo*) review to a conclusion of law and review for clear error findings of fact leading to the decision. *Id.*

Facts subject to clear-error review include those that are basic, "the historical and narrative events elicited from the evidence presented at trial . . .," and those that are inferred, which are "drawn from basic facts and are permitted only when, and to the extent that, logic and human experience indicate a probability that certain consequences can and do

---

[11] The parties contest whether the Bankruptcy Court had jurisdiction to issue the order enjoining the Third-Party Claims against the Protected Parties.  Dismissing LTL's petition obviates the need to reach that question.

follow from the basic facts." *Universal Mins., Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir. 1981). These are distinguished from an "ultimate fact," which is a "legal concept with a factual component." *Id.* at 103. Examples include negligence or reasonableness. *Wells Fargo, N.A. v. Bear Stearns & Co. (In re HomeBanc Mortg. Corp.)*, 945 F.3d 801, 810 (3d Cir. 2019). Reviewing an ultimate fact, "we separate [its] distinct factual and legal elements . . . and apply the appropriate standard to each component." *Universal Mins.*, 669 F.2d at 103.

Concluding a bankruptcy petition is filed in good faith is an "ultimate fact." *BEPCO*, 589 F.3d at 616. While the underlying basic and inferred facts require clear-error review, the culminating determination of whether those facts support a conclusion of good faith gets plenary review as "essentially[] a conclusion of law." *Id.* A conclusion of financial distress, like the broader good-faith inquiry of which it is a part, likewise is subject to mixed review. Whether financial distress exists depends on the underlying basic facts, such as the debtor's ability to pay its current debts, and inferred facts, such as projections of how much pending and future liabilities (like litigation) could cost it in the future. But the conclusion, like good faith, gets a fresh look.

## B. <u>Good Faith</u>

Chapter 11 bankruptcy petitions are "subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith." *BEPCO*, 589 F.3d at 618 (citing *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004)). Section 1112(b) provides for dismissal for "cause." A lack of good

faith constitutes "cause," though it does not fall into one of the examples of cause specifically listed in the statute. *See In re SGL Carbon Corp.*, 200 F.3d 154, 159-62 (3d Cir. 1999). Because the Code's text neither sets nor bars explicitly a good-faith requirement, we have grounded it in the "equitable nature of bankruptcy" and the "purposes underlying Chapter 11." *Id.* at 161-62 ("A debtor who attempts to garner shelter under the Bankruptcy Code . . . must act in conformity with the Code's underlying principles.").

Once at issue, the burden to establish good faith is on the debtor. *BEPCO*, 589 F.3d at 618 (citing *Integrated Telecom*, 384 F.3d at 118); *SGL Carbon*, 200 F.3d at 162 n.10. We "examine the totality of facts and circumstances and determine where a petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." *BEPCO*, 589 F.3d at 618 (internal quotation marks omitted) (citing *Integrated Telecom,* 384 F.3d at 118). Though a debtor's subjective intent may be relevant, good faith falls "more on [an] objective analysis of whether the debtor has sought to step outside the 'equitable limitations' of Chapter 11." *Id.* at 618 n.8 (citing *SGL Carbon*, 200 F.3d at 165).

"[T]wo inquiries . . . are particularly relevant": "(1) whether the petition serves a valid bankruptcy purpose[;] and (2) whether [it] is filed merely to obtain a tactical litigation advantage." *Id.* at 618 (internal quotation marks omitted) (citing *Integrated Telecom*, 384 F.3d at 119-20). Valid bankruptcy purposes include "preserv[ing] a going concern" or "maximiz[ing] the value of the debtor's estate." *Id.* at 619. Further, a valid bankruptcy purpose "assumes a debtor in financial distress." *Integrated Telecom*, 384 F.3d at 128.

## C. <u>Financial Distress as a Requirement of Good Faith</u>

Our precedents show a debtor who does not suffer from financial distress cannot demonstrate its Chapter 11 petition serves a valid bankruptcy purpose supporting good faith. We first applied this principle in *SGL Carbon*. The debtor there filed for Chapter 11 protection in the face of many antitrust lawsuits—in its words, to "protect itself against excessive demands made by plaintiffs" and "achieve an expeditious resolution of the claims." 200 F.3d at 157. But we dismissed the petition for lack of good faith, relying on the debtor's strong financial health. *Id.* at 162-70. We rejected arguments that the suits seriously threatened the company and could force it out of business, suggesting the magnitude of potential liability would not likely render it insolvent. *Id.* at 162-64. And the filing was premature, as one could be later made—without risking the debtor's ability to reorganize—at a time a company-threatening judgment occurred. *Id.* at 163. Finally, in considering whether the petition served a valid bankruptcy purpose, we discerned none in light of the debtor's substantial equity cushion and a lack of evidence suggesting it had trouble paying debts or impaired access to capital markets. *Id.* at 166. Were the debtor facing "serious financial and/or managerial difficulties at the time of filing," the result may have been different. *Id.* at 164.

*Integrated Telecom* made clear that "good faith *necessarily requires* some degree of financial distress on the part of a debtor." 384 F.3d at 121 (emphasis added). That debtor was a non-operating, nearly liquidated shell company that was "highly solvent and cash rich at the time of the bankruptcy." *Id.* at 124. And its financial condition was key to the petition's dismissal. We said that Chapter 11 could not

improve its failing business model nor resolve pending securities litigation in a way that increased recoveries for creditors. *Id.* at 120-26. Thus the proceeding could preserve no "value that otherwise would be lost outside of bankruptcy," showing those problems were not the kinds of financial issues Chapter 11 aimed to address. *Id.* at 120, 129. And absent financial distress, the debtor's desire to benefit from certain Code provisions (such as those capping claims for future rents) could not justify its presence in bankruptcy. *Id.* at 126-29.

We note that, when considering the whole of the circumstances in these decisions, we evaluated rationales for filing offered by the debtor that were only modestly related to its financial health—even after recognizing it was not in financial distress. Yet we rejected all of them and stuck to the debtor's financial condition. *Id.*; *SGL Carbon*, 200 F.3d at 167-68.

The theme is clear: absent financial distress, there is no reason for Chapter 11 and no valid bankruptcy purpose. "Courts, therefore, have consistently dismissed . . . petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11. . . . [I]f a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed." *Integrated Telecom*, 384 F.3d at 122 (quoting *SGL Carbon*, 200 F.3d at 166).

But what degree of financial distress justifies a debtor's filing? To say, for example, that a debtor must be in financial distress is not to say it must necessarily be insolvent. We recognize as much, as the Code conspicuously does not contain any particular insolvency requirement. *See SGL Carbon*, 200

F.3d at 163; *Integrated Telecom*, 384 F.3d at 121. And we need not set out any specific test to apply rigidly when evaluating financial distress. Nor does the Code direct us to apply one.

Instead, the good-faith gateway asks whether the debtor faces the kinds of problems that justify Chapter 11 relief. Though insolvency is not strictly required, and "no list is exhaustive of all the factors which could be relevant when analyzing a particular debtor's good faith," *SGL Carbon*, 200 F.3d at 166 n.16, we cannot ignore that a debtor's balance-sheet insolvency or insufficient cash flows to pay liabilities (or the future likelihood of these issues occurring) are likely always relevant. This is because they pose a problem Chapter 11 is designed to address: "that the system of individual creditor remedies may be bad for the creditors *as a group* when there are *not enough assets to go around*." *Integrated Telecom*, 384 F.3d at 121 (second set of italics added) (quoting Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* 10 (1986)).

Still, we cannot today predict all forms of financial difficulties that may in some cases justify a debtor's presence in Chapter 11. Financial health can be threatened in other ways; for instance, uncertain and unliquidated future liabilities could pose an obstacle to a debtor efficiently obtaining financing and investment. As we acknowledged in *SGL Carbon*, certain financial problems or litigation may require significant attention, resulting in "serious . . . managerial difficulties." 200 F.3d at 164. Mass tort cases may present these issues and others as well, like the exodus of customers and suppliers wary of a firm's credit-risk. *See, e.g.*, Mark J. Roe, *Bankruptcy and Mass Tort*, 84 Colum. L. Rev. 846, 855 (1984) (describing the "adverse" and "severe" effects large-

scale, future tort claims may have on a firm).  So many spokes can lead to financial distress in the right circumstances that we cannot divine them all.  What we can do, case-by-case, is consider all relevant facts in light of the purposes of the Code.

Financial distress must not only be apparent, but it must be immediate enough to justify a filing.  "[A]n attenuated possibility standing alone" that a debtor "may have to file for bankruptcy in the future" does not establish good faith.  *SGL Carbon*, 200 F.3d at 164; *see, e.g., Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222, 228 (2d Cir. 1991) ("Although a debtor need not be *in extremis* in order to file[,] . . . it must, at least, face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future.").  Yet we recognize the Code contemplates "the need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation."  *SGL Carbon*, 200 F.3d at 163.  A "financially troubled" debtor facing mass tort liability, for example, may require bankruptcy to "enable a continuation of [its] business and to maintain access to the capital markets" even before it is insolvent.  *Id.* at 169.

Still, encouragement of early filing "does not open the door to premature filing."  *Id.* at 163.  This may be a fine line in some cases, but our bankruptcy system puts courts, vested with equitable powers, in the best position to draw it.

Risks associated with premature filing may be particularly relevant in the context of a mass tort bankruptcy.  Inevitably those cases will involve a bankruptcy court estimating claims on a great scale—introducing the possibility of undervaluing future claims (and underfunding assets left to

satisfy them)[12] and the difficulty of fairly compensating claimants with wide-ranging degrees of exposure and injury. On the other hand, a longer history of litigation outside of bankruptcy may provide a court with better guideposts when tackling these issues.[13]

To take a step back, testing the nature and immediacy of a debtor's financial troubles, and examining its good faith more generally, are necessary because bankruptcy significantly disrupts creditors' existing claims against the debtor: "Chapter 11 vests petitioners with considerable powers—the automatic

---

[12] *See* Report of the National Bankruptcy Review Commission 343-44 (Oct. 20, 1997) (recognizing claims-estimation accuracy is an important component of the integrity of the mass tort bankruptcy process and noting underestimation of claims occurred in the Johns-Manville case, one of the earliest asbestos bankruptcy cases, while also pointing to the adequate funding of trusts in subsequent cases to show those risks are surmountable).

[13] For instance, the A.H. Robins claimants' trust has been recognized as one that functioned effectively and remained solvent for years. There the Court and stakeholders had the benefit of data from 15 years of tort litigation by A.H. Robins before its filing. *See* Report of the National Bankruptcy Review Commission 328 n.813, 344-45 (Oct. 20, 1997) (citing Jack B. Weinstein*, Individual Justice in Mass Tort Litigation: The Effect of Class Actions, Consolidations, and other Multiparty Devices* 280 n.88, 326 n.149 (Northwestern Press 1995), and Ralph R. Mabey & Peter A. Zisser*, Improving Treatment of Future Claims: The Unfinished Business Left by the Manville Amendments,* 69 Am. Bankr. L.J. 487, 497 n.45 (1995)).

stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.—that can impose significant hardship on particular creditors. When *financially troubled* petitioners seek a chance to remain in business, the exercise of those powers is justified." *Integrated Telecom*, 384 F.3d at 120 (emphasis added) (citing *SGL Carbon*, 200 F.3d at 165-66). Accordingly, we have said the availability of certain debtor-favored Code provisions "assume[s] the existence of a valid bankruptcy, which, in turn, assumes a debtor in financial distress." *Id.* at 128. Put another way, "Congress designed Chapter 11 to give those businesses teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability." *Cedar Shore Resort, Inc v. Mueller (In re Cedar Shore Resort, Inc.)*, 235 F.3d 375, 381 (8th Cir. 2000) (internal quotation marks omitted).

Our confidence in the conclusion that financial distress is vital to good faith is reinforced by the central role it plays in other courts' inquiries.[14]  Chapter 11's legislative history also

---

[14] *See, e.g.*, *Little Creek Dev. Co. v. Commonw. Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986) ("Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities."); *Cedar Shore Resort, Inc.*, 235 F.3d at 379-80 (in evaluating good faith, courts "consider the totality of the circumstances, including . . . the debtor's financial condition, motives, and the local financial realities"; dismissing petition, in part, because the debtor was "not in dire financial straits"); *In re James Wilson Assocs.*, 965 F.2d 160,

suggests it was meant to "deal[] with the reorganization of a financially distressed enterprise." *SGL Carbon*, 200 F.3d at 166 (quoting S. Rep. No. 95-989, at 9, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5795).

The takeaway here is that when financial distress is present, bankruptcy may be an appropriate forum for a debtor to address mass tort liability. Our *SGL Carbon* decision specifically addressed this in distinguishing the financial distress faced by Johns-Manville in its Chapter 11 case. It was prompted by a tide of asbestos litigation that, but for its filing, would have forced the debtor to book a $1.9 billion liability reserve "trigger[ing] the acceleration of approximately $450

---

170 (7th Cir. 1992) (recognizing that, while the Code permits a firm to file though it is not insolvent, such filings usually involve "impending insolvency"); *Cohoes Indus. Terminal*, 931 F.2d at 228 (in the context of whether a petition was frivolous under Bankruptcy Rule 9011, stating "[a]lthough a debtor need not be *in extremis* in order to file[,] . . . it must, at least, face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future"); *see also, e.g.*, *Barclays-Am./Bus. Credit, Inc. v. Radio WBHP, Inc.* (*In re Dixie Broad., Inc.)*, 871 F.2d 1023, 1027-28 (11th Cir. 1989) (stating that whether a debtor is "financially distressed" is one factor evidencing bad faith and that "the Bankruptcy Code is not intended to insulate 'financially secure' [debtors]"); *Carolin Corp.*, 886 F.2d at 701 (one prong of the good-faith inquiry is meant to ensure the petition bears "some relation to the statutory objective of resuscitating a financially troubled [debtor]") (brackets in original) (citing *Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.)*, 709 F.2d 762, 765 (1st Cir. 1983)).

million of outstanding debt, [and] possibly resulting in a forced liquidation of key business segments." *In re Johns-Manville Corp.*, 36 B.R. 727, 730 (Bankr. S.D.N.Y. 1984). That created a "compelling need [for the debtor] to reorganize in order to meet" its obligations to creditors. *Id.* This urgency stood in stark contrast to the circumstances in *SGL Carbon*, where the debtor faced no suits, or even liquidated judgments, that threatened its ongoing operations.

A.H. Robins Company, before its bankruptcy, faced financial woes like Johns-Manville's, in both cases caused by mass product liabilities litigation. Before filing, Robins had only $5 million in unrestricted funds and a "financial picture . . . so bleak that financial institutions were unwilling to lend it money." *In re A.H. Robins Co., Inc.*, 89 B.R. 555, 558 (Bankr. E.D.V.A. 1988). The Court concluded Robins "had no choice but to file for relief under Chapter 11." *Id.*

And in Dow Corning's Chapter 11 case, the Court described the company's resolve to address mass tort liability as "a legitimate effort to rehabilitate a solvent but *financially-distressed* corporation." *In re Dow Corning Corp.*, 244 B.R. 673, 676-77 (Bankr. E.D. Mich. 1999) (emphasis added). It specifically recognized that "the legal costs and logistics of defending the worldwide product liability lawsuits against the [d]ebtor threatened its vitality by depleting its financial resources and preventing its management from focusing on core business matters." *Id.* at 677.

These cases show that mass tort liability can push a debtor to the brink. But to measure the debtor's distance to it, courts must always weigh not just the scope of liabilities the debtor faces, but also the capacity it has to meet them. We now

go there, but only after detouring to a problem particular to our case: For good-faith purposes, should we judge the financial condition of LTL by looking to Old Consumer—the operating business with valuable assets, but damaging tort liability, that the restructuring and filing here aimed to protect?  Or should we look to LTL, the entity that actually filed for bankruptcy?  Or finally, like the Bankruptcy Court, should we consider "the financial risks and burdens facing both Old [Consumer] and [LTL]"?  App. 14 (Mot. to Dismiss Op. 14).

## D. Only LTL's Financial Condition is Determinative.

Weighing the totality of facts and circumstances might seem on the surface to require that we evaluate the state of affairs of both Old Consumer and LTL when judging the latter's financial distress.  That said, we must not underappreciate the financial reality of LTL while unduly elevating the comparative relevance of its pre-bankruptcy predecessor that no longer exists.  Even were we unable to distinguish the financial burdens facing the two entities, we can distinguish their vastly different sets of available assets to address those burdens.  On this we part from the Bankruptcy Court.

Thus for us, the financial state of LTL—a North Carolina limited liability company formed under state law and existing separate from both its predecessor company (Old Consumer) and its newly incorporated counterpart company (New Consumer)—should be tested independent of any other entity.  That means we focus on its assets, liabilities, and, critically, the funding backstop it has in place to pay those liabilities.

Doing so reflects the principle that state-law property interests should generally be given the same effect inside and outside bankruptcy: "Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States,* 440 U.S. 48, 55 (1979).  No one doubts that the state-law divisional merger passed talc liabilities to LTL.  Why in bankruptcy would we recognize the effectiveness of this state-law transaction, but at the same time ignore others that augment LTL's assets, such as its birth gift of the Funding Agreement?  To say the financial condition of Old Consumer prior to the restructuring—which was not bolstered by such a contractual payment right—determines the availability of Chapter 11 to LTL would impose on the latter a lookback focused on the nonavailability of a funding backstop to what is now a nonentity.

Instead, we must evaluate the full set of state-law transactions involving LTL to understand the makeup of its financial rights and obligations that, in turn, dictate its financial condition.  Even were we to agree that the full suite of reorganizational steps was a "single integrated transaction," App. 43 (Mot. to Dismiss Op. 43), this conclusion does not give us license to look past its effect: the creation of a new entity with a unique set of assets and liabilities, and the elimination of another.  Only the former is in bankruptcy and subject to its good-faith requirement.  *See* Ralph Brubaker, *Assessing the Legitimacy of the "Texas Two-Step" Mass-Tort Bankruptcy*, 42 No. 8 Bankr. L. Letter NL 1 (Aug. 2022) (observing that the Bankruptcy Code is designed to address the financial distress of the entity *in* bankruptcy).

We cannot say a "federal interest requires a different result." *See Butner*, 440 U.S. at 55. That is because the Bankruptcy Code is an amalgam of creditor-debtor tradeoffs balanced by a Congress that assumed courts applying it would respect the separateness of legal entities (and their respective assets and liabilities). "[T]he general expectation of state law and of the Bankruptcy Code . . . is that courts respect entity separateness absent compelling circumstances calling equity . . . into play." *In re Owens Corning,* 419 F.3d 195, 211 (3d Cir. 2005). Put differently, as separateness is foundational to corporate law, which in turn is a predicate to bankruptcy law, it is not easily ignored. It is especially hard to ignore when J&J's pre-bankruptcy restructuring—ring-fencing talc liabilities in LTL and forming the basis for this filing—depended on courts honoring this principle.

The Bankruptcy Code is designed in important part to protect and distribute a debtor's assets to satisfy its liabilities. It strains logic then to say the condition of a defunct entity should determine the availability of Chapter 11 to the only entity subject to it. To do so would introduce uncertainty regarding how far back and to what entities a court can look when evaluating a debtor's financial distress.

Thus, while we agree with the Bankruptcy Court that both entities are part of our discussion of financial distress, the financial condition of Old Consumer is relevant only to the extent it informs our view of the financial condition of LTL itself.

### E. **LTL Was Not in Financial Distress.**

With our focus properly set, we now evaluate the financial condition of LTL. It is here we most disagree with

the Bankruptcy Court, as it erred by overemphasizing the relevance of Old Consumer's financial condition. And while we do not second-guess its findings on the scope and costs of talc exposure up to the filing date, we do not accept its projections of future liability derived from those facts.

After these course corrections, we cannot agree LTL was in financial distress when it filed its Chapter 11 petition. The value and quality of its assets, which include a roughly $61.5 billion payment right against J&J and New Consumer, make this holding untenable.

The Funding Agreement merits special mention. To recap, under it LTL had the right, outside of bankruptcy, to cause J&J and New Consumer, jointly and severally, to pay it cash up to the value of New Consumer as of the petition date (estimated at $61.5 billion) to satisfy any talc-related costs and normal course expenses. Plus this value would increase as the value of New Consumer's business and assets increased. App. 4316-17 (Funding Agreement 4-5, § 1 Definition of "JJCI Value").[15] The Agreement provided LTL a right to cash that was very valuable, likely to grow, and minimally conditional. And this right was reliable, as J&J and New Consumer were highly creditworthy counterparties (an understatement) with the capacity to satisfy it.

---

[15] While, as described above, the uses for which LTL may draw on the payment right change in bankruptcy (*i.e.*, LTL is permitted to draw on it to fund a claimant trust and satisfy administrative expenses), we focus on the rights available to it just prior to its filing for good-faith purposes.

As for New Consumer, it had access to Old Consumer's cash-flowing brands and products along with the profits they produced, which underpinned the $61.5 billion enterprise value of New Consumer as of LTL's filing. And the sales and adjusted income of the consumer health business showed steady growth in the last several years when talc costs were excluded. Most important, though, the payment right gave LTL direct access to J&J's exceptionally strong balance sheet. At the time of LTL's filing, J&J had well over $400 billion in equity value with a AAA credit rating and $31 billion just in cash and marketable securities. It distributed over $13 billion to shareholders in each of 2020 and 2021. It is hard to imagine a scenario where J&J and New Consumer would be unable to satisfy their joint obligations under the Funding Agreement. And, of course, J&J's primary, contractual obligation to fund talc costs was one never owed to Old Consumer (save for the short moment during the restructuring that it was technically a party to the Funding Agreement).

Yet the Bankruptcy Court hardly considered the value of LTL's payment right to its financial condition. True, it noted its jurisdictional authority could "ensure that [LTL] pursue[d] its available rights" under the Funding Agreement. App. 43 (Mot. to Dismiss Op. 43). But, in discussing LTL's financial condition, the Court was "at a loss to understand, why—merely because [LTL] contractually has the right to exhaust its funding options [under the Funding Agreement]"— it was "not to be regarded as being in 'financial distress.'" App. 35 (*Id.* at 35). It speculated that a draw on the payment right could force J&J to deplete its available cash or pursue a forced liquidation of New Consumer and have a "horrific impact" on those companies. *Id.* The assumption seems to be that, out of concern for its affiliates, LTL may avoid drawing

on the payment right to its full amount. But this is unsupported and disregards the duty of LTL to access its payment assets.

Ultimately, whether this assumption was made or not, the Bankruptcy Court did not consider the full value of LTL's backstop when judging its financial condition. And at the same time it acutely focused on how talc litigation affected *Old Consumer*. *See, e.g.,* App. 34 (Mot. to Dismiss Op. 34) ("The evidence confirms that the talc litigation . . . forced *Old [Consumer]* into a loss position in 2020"); App. 36 (*Id.* at 36) ("*Old [Consumer]* was not positioned to continue making substantial [t]alc [l]itigation payments"); App. 38 (*Id.* at 38) ("*Old [Consumer]* need not have waited until its viable business operations were threatened past the breaking point") (emphasis added in each citation). Directing its sight to Old Consumer and away from the Funding Agreement's benefit to LTL essentially made the financial means of Old Consumer, and not LTL, the lodestar of the Court's financial-distress analysis. This misdirection was legal error.

We also find a variable missing in the Bankruptcy Court's projections of future liability for LTL extrapolated from the history of Old Consumer's talc litigation: the latter's successes. To reiterate, before bankruptcy Old Consumer had settled about 6,800 talc-related claims for under $1 billion and obtained dismissals of about 1,300 ovarian cancer and over 250 mesothelioma claims without payment. And a minority of the completed trials resulted in verdicts against it (with some of those verdicts reversed on appeal). Yet the Court invoked calculations that just the legal fees to defend all existing ovarian cancer claims (each through trial) would cost up to $190 billion. App. 37 (*Id.* at 37). It surmised "one could argue" the exposure from the existing mesothelioma claims

alone exceeded $15 billion.  App. 17 (*Id.* at 17).  These conjectures ballooned its conclusion that, "[e]ven without a calculator or abacus, one can multiply multi-million dollar or multi-billion dollar verdicts by tens of thousands of existing claims, let alone future claims," to see that "the continued viability of all J&J companies is imperiled."  App. 36 (*Id.* at 36).

What these projections ignore is the possibility of meaningful settlement, as well as successful defense and dismissal, of claims by assuming most, if not all, would go to and succeed at trial.  In doing so, these projections contradict the record.  And while the Bankruptcy Court questioned the continuing relevance of the past track record after *Ingham* and the breakdown of the Imerys settlement talks, this assumes too much too early.  Nothing in the record suggests *Ingham*—one of 49 pre-bankruptcy trials and described even by J&J as "unique" and "not representative," App. 2692-93—was the new norm.  Nor is there anything that shows all hope of a meaningful global or near-global settlement was lost after the initial Imerys offer was rebuffed.  The Imerys bankruptcy remained a platform to negotiate settlement.  And the progression of the multidistrict litigation on a separate track would continue to sharpen all interested parties' views of mutually beneficial settlement values.

Finally, we cannot help noting that the casualness of the calculations supporting the Court's projections engenders doubt as to whether they were factual findings at all, but instead back-of-the-envelope forecasts of hypothetical worst-case scenarios.  Still, to the extent they were findings of fact, we cannot say these were inferences permissibly drawn and entitled to deference.  *See Universal Mins.*, 669 F.2d at 102.

And as we locate no other inferences or support in the record to bear the Court's assertion that the "talc liabilities" "far exceed [LTL's] capacity to satisfy [them]," we cannot accept this conclusion either.[16]  App. 23 (Mot. to Dismiss Op. 23).

In this context, it becomes clear that, on its filing, LTL did not have any likely need in the present or the near-term, or even in the long-term, to exhaust its funding rights to pay talc liabilities.  In the over five years of litigation to date, the aggregate costs had reached $4.5 billion (less than 7.5% of the $61.5 billion value on the petition date), with about half of these costs attributable to one ovarian cancer verdict, *Ingham*,

---

[16] Because we arrive at the same result assuming the Bankruptcy Court was correct to determine LTL was responsible to indemnify J&J for *all* talc costs it incurs, we need not opine on this conclusion.  Still, we note certain pertinent factors lack full discussion in the Court's analysis of the indemnity agreement relating to Johnson's Baby Powder in the 1979 Spin Off.  App. 163-69 (Third-Party Inj. Op. 24-30).  For example, it is not obvious LTL must indemnify J&J for the latter's independent, post-1979 conduct that is the basis of a verdict rendered against it.  *See* App. 4957 (Agreement for Transfer of Assets and Bill of Sale 5 ¶ 4) (Old Consumer's predecessor agrees to assume and indemnify J&J against "all . . . liabilities and obligations of every kind and description *which are allocated on the books or records of J&J* as pertaining to the BABY Division.") (emphasis added).  It is also not clear the indemnity should be read to reach punitive damage verdicts rendered against J&J for its own conduct.  Additionally, the Court never discussed how it reached its conclusion that Old Consumer assumed responsibility from J&J for *all* claims relating to Shower to Shower.

to date an outlier victory for plaintiffs. While the number of talc claims had surged in recent years, still J&J, as of October 2021, valued the probable and reasonably estimable contingent loss for its products liability litigation, including for talc, under GAAP, at $2.4 billion for the next two years. Further, though settlement offers are only that, we do not disregard LTL's suggestion that $4 billion to $5 billion was at one time considered by plaintiffs' lawyers to be in the ballpark to resolve virtually all multidistrict ovarian cancer claims as well as corresponding additional claims in the Imerys bankruptcy. And as noted, we view all this against a pre-bankruptcy backdrop where Old Consumer had success settling claims or obtaining dismissal orders, and where, at trial, ovarian cancer plaintiffs never won verdicts that withstood appeal outside of *Ingham* and mesothelioma plaintiffs had odds of prevailing that were less than stellar.

From these facts—presented by J&J and LTL themselves—we can infer only that LTL, at the time of its filing, was highly solvent with access to cash to meet comfortably its liabilities as they came due for the foreseeable future. It looks correct to have implied, in a prior court filing, that there was not "*any imminent or even likely need of [it] to invoke the Funding Agreement to its maximum amount or anything close to it.*" App. 3747 (LTL's Obj. to Mots. for Cert. of Direct Appeal 22) (emphasis added). Indeed, the Funding Agreement itself recited that LTL, after the divisional merger and assumption of that Agreement, held "assets having a value at least equal to its liabilities and had financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, *including any [t]alc [r]elated [l]iabilities.*" App. 4313 (Funding Agreement 1, ¶ E) (emphasis added).

We take J&J and LTL at their word and agree. LTL has a funding backstop, not unlike an ATM disguised as a contract, that it can draw on to pay liabilities without any disruption to its business or threat to its financial viability. It may be that a draw under the Funding Agreement results in payments by New Consumer that in theory might someday threaten its ability to sustain its operational costs. But those risks do not affect LTL, for J&J remains its ultimate safeguard. And we cannot say any potential liquidation by LTL of Royalty A&M—a collection of bare rights to streams of payments cobbled together on the eve of bankruptcy—to pay talc costs would amount to financial distress. Plus LTL had no obligation, outside of bankruptcy, to sell those assets for cash before drawing on the Funding Agreement.

At base level, LTL, whose employees are all J&J employees, is essentially a shell company "formed," almost exclusively, "to manage and defend thousands of talc-related claims" while insulating at least the assets now in New Consumer. App. 449 (Decl. of John Kim 5). And LTL was well-funded to do this. As of the time of its filing, we cannot say there was any sign on the horizon it would be anything but successful in the enterprise. It is even more difficult to say it faced any "serious financial and/or managerial difficulties" calling for the need to reorganize during its short life outside of bankruptcy. *SGL Carbon,* 200 F.3d at 164.[17]

---

[17] In saying the nature of the payment right and a lack of meaningful operations show that LTL did not suffer from sufficient kinds of financial distress, we focus on the special circumstances here and do not suggest the presence of these

But what if, contrary to J&J's statements, *Ingham* is not an anomaly but a harbinger of things to come?  What if time shows, with the progression of litigation outside of bankruptcy, that cash available under the Funding Agreement cannot adequately address talc liability? Perhaps at that time LTL could show it belonged in bankruptcy.  But it could not do so in October 2021.  While LTL inherited massive liabilities, its call on assets to fund them exceeded any reasonable projections available on the record before us.  The "attenuated possibility" that talc litigation may require it to file for bankruptcy in the future does not establish its good faith as of its petition date. *Id.* at 164.  At best the filing was premature.[18]

In sum, while it is unwise today to attempt a tidy definition of financial distress justifying in all cases resort to Chapter 11, we can confidently say the circumstances here fall outside those bounds.  Because LTL was not in financial

---

characteristics would preclude a finding of financial distress in every case.

[18] Some might read our logic to suggest LTL need only part with its funding backstop to render itself fit for a renewed filing.  While this question is also premature, we note interested parties may seek to "avoid any transfer" made within two years of any bankruptcy filing by a debtor who "receive[s] less than a reasonably equivalent value in exchange for such transfer" and "became insolvent as a result of [it]."  11 U.S.C. § 548(a).  So if the question becomes ripe, the next one might be: Did LTL receive reasonably equivalent value in exchange for forgoing its rights under the Funding Agreement?

distress, it cannot show its petition served a valid bankruptcy purpose and was filed in good faith under Code § 1112(b).[19]

## F. "Unusual Circumstances" Do Not Preclude Dismissal

The Bankruptcy Court held, as an independent basis for its decision, that even if LTL's petition were not filed in good faith, § 1112(b)(2) of the Code authorized it nonetheless to deny dismissal. For a petition to be saved under that provision, a court must identify "unusual circumstances establishing that . . . [dismissal] is not in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(2). The debtor (or any other party in interest) must also establish "the grounds for . . . [dismissal] include an act or omission" (1) "for which there exists a reasonable justification" and (2) "that will be cured within a reasonable period of time." *Id.*

The Bankruptcy Court ruled that "the interests of current tort creditors and the absence of viable protections for future tort claimants outside of bankruptcy . . . constitute such

---

[19] Because we conclude LTL's petition has no valid bankruptcy purpose, we need not ask whether it was filed "merely to obtain a tactical litigation advantage." *BEPCO,* 589 F.3d at 618. Yet it is clear LTL's bankruptcy filing aimed to beat back talc litigation in trial courts. Still "[i]t is not bad faith to seek to gain an advantage from declaring bankruptcy—why else would one declare it?" *James Wilson Assoc.*, 965 F.2d at 170. While we ultimately leave the question unaddressed, a filing to change the forum of litigation where there is no financial distress raises, as it did in *SGL Carbon*, the specter of "abuse which must be guarded against to protect the integrity of the bankruptcy system." 200 F.3d at 169.

'unusual circumstances' as to preclude . . . dismissal." App. 13 (Mot. to Dismiss Op. 13 n.8). But what is unusual instead is that a debtor comes to bankruptcy with the insurance accorded LTL. Our ground for dismissal is LTL's lack of financial distress. No "reasonable justification" validates that missing requirement in this case. And we cannot currently see how its lack of financial distress could be overcome. For these reasons, we go counter to the Bankruptcy Court's conclusion that "unusual circumstances" sanction LTL's Chapter 11 petition.

## III. CONCLUSION

Our decision dismisses the bankruptcy filing of a company created to file for bankruptcy. It restricts J&J's ability to move thousands of claims out of trial courts and into bankruptcy court so they may be resolved, in J&J's words, "equitably" and "efficiently." LTL Br. 8. But given Chapter 11's ability to redefine fundamental rights of third parties, only those facing financial distress can call on bankruptcy's tools to do so. Applied here, while LTL faces substantial future talc liability, its funding backstop plainly mitigates any financial distress foreseen on its petition date.

We do not duck an apparent irony: that J&J's triple A-rated payment obligation for LTL's liabilities, which it views as a generous protection it was never required to provide to claimants, weakened LTL's case to be in bankruptcy. Put another way, the bigger a backstop a parent company provides a subsidiary, the less fit that subsidiary is to file. But when the backstop provides ample financial support to a debtor who then seeks shelter in a system designed to protect those without it, we see this perceived incongruity dispelled.

That said, we mean not to discourage lawyers from being inventive and management from experimenting with novel solutions. Creative crafting in the law can at times accrue to the benefit of all, or nearly all, stakeholders. Thus we need not lay down a rule that no nontraditional debtor could ever satisfy the Code's good-faith requirement.

But here J&J's belief that this bankruptcy creates the best of all possible worlds for it and the talc claimants is not enough, no matter how sincerely held. Nor is the Bankruptcy Court's commendable effort to resolve a more-than-thorny problem. These cannot displace the rule that resort to Chapter 11 is appropriate only for entities facing financial distress. This safeguard ensures that claimants' pre-bankruptcy remedies—here, the chance to prove to a jury of their peers injuries claimed to be caused by a consumer product—are disrupted only when necessary.

Some may argue any divisional merger to excise the liability and stigma of a product gone bad contradicts the principles and purposes of the Bankruptcy Code. But even that is a call that awaits another day and another case. For here the debtor was in no financial distress when it sought Chapter 11 protection. To ignore a parent (and grandparent) safety net shielding all liability then foreseen would allow tunnel vision to create a legal blind spot. We will not do so.

We thus reverse the Bankruptcy Court's order denying the motions to dismiss and remand this case with the instruction to dismiss LTL's Chapter 11 petition. Dismissing its case annuls the litigation stay ordered by the Court and makes moot the need to decide that issue.