Nos. 22-2003, 22-2004, 22-2005, 22-2006, 22-2007,
22-2008, 22-2009, 22-2010, 22-2011 (Consolidated)

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

IN RE: LTL MANAGEMENT, LLC,

*Debtor*,

*OFFICIAL COMMITTEE OF TALC CLAIMANTS,

*Appellants*,

*(Amended per Court's Order dated 06/10/2022)

On Direct Appeal from the United States Bankruptcy Court
for the District of New Jersey, No. 21-30589, Adv. Proc. No. 21-3032

## *AMICI CURIAE* BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND THE AMERICAN TORT REFORM ASSOCIATION SUPPORTING DEBTOR-APPELLEE AND REHEARING EN-BANC

Jennifer B. Dickey
Janet Galeria
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, D.C. 20062

R. Craig Martin
DLA PIPER LLP (US)
1201 N. Market St., Suite 2100
Wilmington, DE 19801

Richard A. Chesley
DLA PIPER LLP (US)
203 North LaSalle Street,
Suite 1900
Chicago, IL 60601

Ilana H. Eisenstein
*Counsel of Record*
DLA PIPER LLP (US)
1650 Market St., Suite 5000
Philadelphia, PA 19103
(215) 656-3351
ilana.eisenstein@us.dlapiper.com

H. Sherman Joyce
Lauren Sheets Jarrell
AMERICAN TORT REFORM
ASSOCIATION
Suite 400
Washington, D.C. 20036

February 21, 2023

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. iii

INTEREST OF *AMICI CURIAE* ....................................................................... 1

ARGUMENT ..................................................................................................... 2

    I.   Bankruptcy Court Resolution Of Mass Tort Liabilities Has Been A Key Tool For U.S. Businesses Since The Bankruptcy Code Was Enacted In 1978 ................................... 2
hundre

    II.  The Panel's Novel Interpretation of Financial Distress Is Not Supported by Precedent and Warrants Consideration by an En Banc Panel of this Court. ........................................ 6

    III. The Panel's Standard for Financial Distress is Unworkable and Divorced from the Reality Businesses Face in the Context of Mass Torts ....................................................................... 8

CONCLUSION ................................................................................................ 13

CERTIFICATE OF COMPLIANCE ................................................................ 15

CERTIFICATE OF SERVICE......................................................................... 16

# **TABLE OF AUTHORITIES**

**Cases**

*In re Federal-Mogul Global Inc.*, 684 F.3d 355 (3d Cir. 2012) ......... 12

*In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004) ................................................................................................. 7

*In re Johns-Manville Corp.*, 36 B.R. 727 (Bankr. S.D.N.Y. 1984), *leave to appeal denied* 39 B.R. 234 (S.D.N.Y. 1984), *mandamus denied*, 749 F.2d 3 (2d Cir. 1984) .......................... 3, 4

*In re Muralo Co., Inc.*, 301 B.R. 690 (Bankr. D.N.J. 2003) ........... 5, 7

*In re Plant Insulation Co.*, 734 F.3d 900 (9th Cir. 2013) ................ 12

*In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999) .................. 4, 8

*Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. Ct. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021) ................................ 10

**Statutes**

11 U.S.C. § 524(g) ................................................................... 6, 12

**Other Authorities**

Brief for The Chamber of Commerce and ATRA as Amici Curiae Supporting the Debtor 7–9, *In re LTL Management*, LLC, No. 22-2003, ECF No. 118 (3d Cir. filed Aug. 22, 2022) ..................... 5

H.R.Rep. No. 595, 95th Cong., 1st Sess. (1977) ............................. 4

Mark A. Behrens, *Asbestos Trust Transparency*, 87 Fordham. L. Rev. 107 (2018) ................................................................... 13

Nat'l Bankr. Rev. Comm'n, *Bankruptcy: The Next Twenty Years, Final Report* (1997) ................................................................. 7

REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, H.R.Doc. No. 137, Part II, 93rd Cong., 1st Sess. 75 (1973) .................................................................................................. 3

Sheldon S. Toll, *Bankruptcy and Mass Torts: The Commission's Proposal*, 5 Am. Bankr. Inst. L. Rev. 363 (1997) ............................ 7

U.S. Chamber of Commerce Institute for Legal Reform, *Unlocking the Code: The Value of Bankruptcy to Resolve Mass Torts* (Dec. 2022) ....................................................................... 9

## INTEREST OF AMICI CURIAE[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation. It directly represents 300,000 members and indirectly represents the interests of more than three million companies and professional organizations of every size, in each industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members before Congress, the Executive Branch, and the courts. The Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The American Tort Reform Association ("ATRA") is a broad-based coalition of businesses, corporations, municipalities, associations, and professional firms that have pooled their resources to promote reform of the civil justice system with the goal of ensuring fairness, balance, and predictability in civil litigation. For more than

---

[1] Counsel for *Amici Curiae* certify that no party or party's counsel authored any part of this brief. No one, apart from *Amici Curiae*, their members, or their counsel, contributed money intended to fund the brief's preparation or submission. This brief is filed by leave of the Court.

three decades, ATRA has filed *amicus curiae* briefs in cases involving important liability issues.

Many of *Amici's* members participate in bankruptcy proceedings in different capacities, including during plan confirmations under Chapter 11. Therefore, *Amici* have a strong interest in the appropriate interpretation of bankruptcy court powers and the ability of businesses to address mass tort liabilities under U.S. bankruptcy law.

## ARGUMENT

### I. Bankruptcy Court Resolution Of Mass Tort Liabilities Has Been A Key Tool For U.S. Businesses Since The Bankruptcy Code Was Enacted In 1978

After the Bankruptcy Code was enacted in 1978, Johns-Manville Corporation ("Manville"), a solvent company whose building products contained asbestos, filed a voluntary bankruptcy case to address mounting lawsuits (16,000 at the time of filing). Those lawsuits were anticipated to cause a "crushing burden" to Manville over the next 20-30 years as a staggering number of suits would manifest at some time in the future. *In re Johns-Manville Corp.*, 36

B.R. 727, 729 (Bankr. S.D.N.Y. 1984), *leave to appeal denied* 39 B.R. 234 (S.D.N.Y. 1984), *mandamus denied*, 749 F.2d 3 (2d Cir. 1984).

Because of Manville's solvency, the filing "was greeted with great surprise and consternation" by its creditors. *Id.* A committee of asbestos litigants filed a motion to dismiss the case, asserting arguments like those Appellants make in this case. As the *Manville* court stated, the issue was whether "over-calculation of Manville's financial problems are relevant to establish the kind of bad faith in the sense of an abuse of th[e] Court's jurisdiction which will vitiate the filing of a Chapter 11 petition." *Id.* at 730.

The *Manville* court resolved that issue by making the fundamental point that a debtor need not wait until the financial situation is dire to file a Chapter 11 petition. *Id.* at 730–40. The reasoning, based on Congress's intent in enacting the Bankruptcy Code, was that the bankruptcy process should be open and resort to it should be encouraged to permit rehabilitation efforts since "[b]elated commencement of a case may kill an opportunity for reorganization . . ." *Id.* at 736 (citing REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, H.R.Doc. No. 137, Part II, 93rd Cong., 1st Sess. 75, 75 (1973); H.R.Rep. No. 595, 95th Cong.,

1st Sess. 220 (1977)). Manville then proposed a plan that channeled all asbestos claims to a trust that was intended to provide fair and equal payments to those harmed by their products.

This Court has acknowledged that it is appropriate to use the bankruptcy process for mass tort cases like Manville's, where a debtor faces a growing wave of tens of thousands of asbestos-related claims over the course of 20-30 years and significant financial difficulties from large judgments that had already been entered. *See In re SGL Carbon Corp.*, 200 F.3d 154, 164 (3d Cir. 1999). *SGL Carbon* specifically noted that mass tort cases with large numbers of pending or potential claims were justified filings. *Id.* at 164 n.15 (referencing the bankruptcy of A.H. Robins Company, which had settled 9,238 claims but still had 5,000 claims related to the Dalkon Shield medical device pending, and the bankruptcy of Dow Corning Corporation, which faced 19,000 individual silicone-gel breast implants and 45 putative class actions at the time of filing).

Since *Manville*, lower courts in this circuit and others have rejected asbestos claimants' efforts to contend that solvent, well-funded debtors facing asbestos mass tort claims should be dismissed

under § 1112(b) for cause.[2] *See, e.g., In re Muralo Co., Inc.*, 301 B.R. 690, 697 (Bankr. D.N.J. 2003) ("The Asbestos Committee here simply ignores the undeniable destructive effect on Debtors' everyday business operations wrought by their sudden immersion in the world of asbestos mass tort. . . . this consideration, without more, is a significant factor evidencing the good faith of Debtors' filings.").

For the last 40 years, businesses facing mass tort claims have filed Chapter 11 petitions to address those liabilities and the courts have consistently permitted them to do so irrespective of the solvency of the debtor or the state, nature, and timing of the company's financial distress. As a result of these bankruptcy filings, millions of people have received compensation for their claims, often in a prompt and efficient manner, while at the same time preserving the beneficial aspects of those businesses.

This all changed on January 22, 2023, when a panel of this Court applied a new standard to an asbestos mass tort case that has

---

[2]　As *Amici* detailed in their brief submitted before the panel, businesses with non-asbestos, mass tort claims have also filed Chapter 11 cases to utilize the type of trust used in the *Manville* case. Brief for The Chamber of Commerce and ATRA as Amici Curiae Supporting the Debtor 7–9, *In re LTL Management*, LLC, No. 22-2003, ECF No. 118 (3d Cir. filed Aug. 22, 2022).

never been applied before. Namely, a standard of financial distress that considers only numbers on a balance sheet and does not consider the existential risk of present and future liability that could one day destroy the company. This rule is bad for companies and tort plaintiffs and if it is going to be imposed as a new standard, it should be imposed by Congress or, at a minimum, by a full *en banc* panel of this Court.

**II.   The Panel's Novel Interpretation of Financial Distress Is Not Supported by Precedent and Warrants Consideration by an En Banc Panel of this Court.**

After Johns-Manville's plan was confirmed, Congress enacted legislation, 11 U.S.C. § 524(g), to specifically address asbestos mass tort claims in Chapter 11 reorganization and to allow companies with immense liability to use the structured bankruptcy system to better manage those liabilities. Within a few years of the Act's passage, "[a]t least 15 asbestos manufacturers, including UNR, Amatex, Johns-Manville, National Gypsum, Eagle-Picher, Celotex, and Raytech organized or liquidated in attempts to address massive numbers of known and unknown asbestos claimants using Chapter 11 of the Bankruptcy Code." Sheldon S. Toll, *Bankruptcy and Mass Torts: The Commission's Proposal,* 5 Am. Bankr. Inst. L. Rev. 363, 364 n. 8

6

(1997) (citing Nat'l Bankr. Rev. Comm'n, *Bankruptcy: The Next Twenty Years, Final Report* 315 n. 6 (1997)).

The "financial distress" standard this Court now applies to asbestos mass tort cases is not in the Bankruptcy Code. This standard originated in situations outside the mass tort context. *See SGL Carbon*, 200 F.3d at 166. As noted in *Muralo*, a mass tort asbestos case is different from the situation in *SGL Carbon* where there were only six antitrust claims pending against the debtor, who was using bankruptcy "to gain leverage" over the antitrust plaintiffs. *Muralo*, 301 B.R. at 697, 699. In a case with limited litigation or a two-party dispute like *SGL Carbon,* "financial distress" is a proxy for potential litigation tactics,[3] not a stand-alone standard for determining whether a debtor acted in bad faith.

This Court's "financial distress" precedent—once understood as a proxy for whether bankruptcy was being used as a litigation tactic in a two- or limited-party dispute—has never been used to dismiss a petition of a debtor facing mass tort asbestos liability, and should not

---

[3] Similarly, in *In re Integrated Telecom Express, Inc.*, the "financial distress" test was used as a proxy for the solvent debtor's litigation tactic to use bankruptcy to reduce its obligation to the landlord. 384 F.3d 108, 122 (3d Cir. 2004).

7

have been used do so here. The panel's decision did not find that the Debtor used bankruptcy as a litigation tactic. Panel Op. 54 n. 19. Instead, it found bad faith because the Debtor ensured that present and future tort claimants would have access to similar and sufficient resources. The panel's conception of bad faith is anathema. And it is a highly significant expansion of *SGL Carbon* and *Integrated Telecom* that changes the trajectory of how mass tort bankruptcy filings in the United States have been treated under the Bankruptcy Code for the last 40 years.

The issue is of nationwide significance and justifies rehearing.

### III. The Panel's Standard for Financial Distress is Unworkable and Divorced from the Reality Businesses Face in the Context of Mass Torts

The panel's decision also dispensed with the familiar financial distress standard on which businesses have come to rely. Thousands of claims and billions in actual and potential liability are now insufficient to create financial distress. In its place, businesses must look to a new, apophatic standard for financial distress—one entirely derived through negation. According to the panel, in the mass tort context, if a debtor cannot fund recoveries, then it is too financially distressed. But if it can fund recoveries, then it is not financially

distressed enough. No real guidance, however, is given to explain how a businesses is to know if it is appropriately financially distressed and where and when the line should be drawn.

Worse, the Court's approach seems rooted in a fundamental misperception about the MDL process. MDLs handle pre-trial coordination of mass-tort proceedings. In some instances, but not here, pre-trial legal rulings can eliminate some or all claims. Moreover, MDL parties may allow bellwether trials, which often provide an idea about the viability of certain legal theories. But individual bellwether trials are voluntary, are often self-selected by one of the parties, and do not necessarily help determine the validity or valuation of thousands of unresolved and future claims. Especially with asbestos, which involves "latent injuries and an unknown class of potential future claimants," MDLs "have limited utility in providing effective, timely, and final global resolution." U.S. Chamber of Commerce Institute for Legal Reform, *Unlocking the Code: The Value of Bankruptcy to Resolve Mass Torts*, 30 (Dec. 2022). Indeed, the Debtor has thus far been unable to achieve a global resolution.

One thing is clear—the Debtor here faces financial distress. There are presently over 38,000 ovarian cancer actions and over 400

mesothelioma actions pending against the Debtor, and "thousands more in the decade to come" are expected. Panel Op. 20. The bankruptcy court found that exposure from the mesothelioma claims alone surpassed $15 billion. The Debtor already lost massive judgments, including a single jury awarding $4.69 *billion*, reduced on appeal to $2.24 billion to 20 plaintiffs. *Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. Ct. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021). In total, it has already paid approximately $3.5 billion, with almost $1 billion in defense costs and monthly expenditures between $10 to $20 million. As the bankruptcy court found, the value of all present and future claims may exceed tens of billions of dollars. And the Debtor must also face the enormous disruptive effect of managing the litigation that will take place across the country over the next couple of decades. These facts justified a bankruptcy filing and support a finding that it was made in good faith.

Outside of bankruptcy, plaintiffs will continue to sue, seeking billions. In bankruptcy, these claims would be considered valid unless proven otherwise or estimated at a lower value. But here the panel paid little attention to the factors relevant to financial distress in the mass tort context. Instead, contrary to findings below, the

panel took upon itself to engage in fact finding to reduce the value of the thousands of claims facing the Debtor. Experience proves the panel's exercise in reduction wrong because the bankruptcy process itself has a notice and claim filing process that invariably results in the actual claims submitted during the bankruptcy process surpassing the estimated value of the pending claims in existence at time of filing.

The panel's decision also directed the Debtor to wait until there is "a longer history of litigation outside of bankruptcy." Panel Op. 39. According to the panel, over five years of litigation, over 38,000 claims, and over $4.5 billion in costs is not enough. The breakdown of a potential multi-billion-dollar global settlement was also not enough. Rather, the panel supposes that somehow more litigation may allow the Debtor to better value, and potentially settle, the claims against it. The panel's speculation is not supported by the record, and it creates an unworkable standard for financial distress—one that requires businesses to guess at how a court will weigh a variety of factors.

In finding the Debtor was not financially distressed, the panel's decision also contravenes the purpose of § 524(g), which Congress

11

enacted specifically to resolve asbestos-related mass-tort claims. *See In re Federal-Mogul Global Inc.*, 684 F.3d 355, 359, 362 (3d Cir. 2012) (observing that § 524(g) was intended to "enabl[e] corporations saddled with asbestos liability to obtain the fresh start promised by bankruptcy" and to "remedy[] some of the intractable pathologies of asbestos litigation."). Section 524(g) "affirms what Chapter 11 reorganization is supposed to be about: allowing an otherwise viable business to quantify, consolidate, and manage its debt so that it can satisfy its creditors to the maximum extent feasible, but without threatening its continued existence and the thousands of jobs that it provides." *Id.* at 359 n. 8 (quoting 140 Cong. Rec. 28,358 (1994) (statement of Sen. Brown)).

Until the panel's decision, no petition filed to benefit from § 524(g) has ever been dismissed for bad faith. That makes sense: "given the lengthy latency period of asbestos-related diseases, companies facing asbestos risk have no way finally to resolve or even effectively estimate their exposure." *In re Plant Insulation Co.*, 734 F.3d 900, 905-906 (9th Cir. 2013). There are more than 60 asbestos trusts in operation, holding billions of dollars to "compensate claimants expeditiously at minimal cost." Mark A. Behrens, *Asbestos*

12

*Trust Transparency*, 87 Fordham. L. Rev. 107, 111 (2018). But the panel's decision casts doubt on whether § 524(g) is available to businesses facing catastrophic asbestos liability as Congress intended. After the panel's decision, a business may need to wait until numerous present claimants have been paid in full and insurance coverage is depleted or exhausted while later, future claimants are left with much less to compensate them for the same harm from the same product.

## CONCLUSION

The panel's decision creates a new, unworkable rule for mass torts. Under this panel's new policy and court-made gloss, a business cannot file a bankruptcy case to address thousands of tort claims, billions in judgments, and tens of billions in contingent liabilities. At a minimum, such a significant and important issue should be taken up by the full Court in an en banc hearing. *Amici* respectfully request the Court to grant the petition.

| | |
|---|---|
| Dated: February 21, 2023 | Respectfully submitted, |
| | /s/ Ilana H. Eisenstein |
| Jennifer B. Dickey<br>Janet Galeria<br>U.S. CHAMBER LITIGATION CENTER<br>1615 H Street, NW<br>Washington, D.C. 20062 | Ilana H. Eisenstein<br>*Counsel of Record*<br>(PA # 94907)<br>DLA PIPER LLP (US)<br>1650 Market St., Suite 5000<br>Philadelphia, PA 19103<br>(215) 656-3351 |
| R. Craig Martin<br>DLA PIPER LLP (US)<br>1201 N. Market St., Suite 2100<br>Wilmington, DE 19801 | ilana.eisenstein@us.dlapiper.com<br><br>H. Sherman Joyce<br>Lauren Sheets Jarrell<br>AMERICAN TORT REFORM |
| Richard A. Chesley<br>DLA PIPER LLP (US)<br>203 North LaSalle Street,<br>Suite 1900<br>Chicago, IL 60601 | ASSOCIATION<br>Suite 400<br>Washington, D.C. 20036 |

# **CERTIFICATE OF COMPLIANCE**

I hereby certify as follows.

Pursuant to this Court's Local Rule 28.3(d), I am a member of the bar of this Court.

Pursuant to this Court's Local Rule 31.1(c), the text in the electronic copy of this brief is identical to the text in the paper copies of the brief filed with the Court.

This document complies with the requirement of this Court's Local Rule 31.1(c) because this document was scanned for viruses using Microsoft Defender, and no viruses were detected.

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(b)(4) because this brief contains 2,596 words, excluding the parts of the brief exempted from that calculation under the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface Microsoft Word for Office 365Word processing program in 14-point Bookman Old Style font.

Dated:  February 21, 2023                    /s/ Ilana H. Eisenstein
                                             Ilana H. Eisenstein

**CERTIFICATE OF SERVICE**

I hereby certify that on February 21, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

/s/ Ilana H. Eisenstein
Ilana H. Eisenstein