Nos. 22-2003, 22-2004, 22-2005, 22-2006, 22-2007,
22-2008, 22-2009, 22-2010, 22-2011

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

IN RE: LTL MANAGEMENT, LLC,

*Debtor*,

―――――――――――――

*OFFICIAL COMMITTEE OF TALC CLAIMANTS,

*Appellant.*

*(Amended per Court's Order dated 06/10/2022)

Direct Appeal from the United States Bankruptcy Court
for the District of New Jersey
Chapter 11 No. 21-30589, Adv. Proc. No. 21-3023

**BRIEF FOR THE NATIONAL ASSOCIATION OF MANUFACTURERS
AND PRODUCT LIABILITY ADVISORY COUNCIL, INC. AS *AMICI
CURIAE* IN SUPPORT OF PETITION FOR REHEARING AND
REHEARING EN BANC**

Erica Klenicki
Michael A. Tilghman II
NAM LEGAL CENTER
733 10th Street, N.W., Suite 700
Washington, DC 20001
(202) 637-3000

Jaime A. Santos
Benjamin Hayes
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
*jsantos@goodwinlaw.com*

*Counsel for Amici Curiae*

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), the

National Association of Manufacturers and the Product Liability Advisory Council,

Inc. state that they have no parent corporation and have issued no stock.


Dated:  February 21, 2023

*s/ Jaime A. Santos*
Jaime A. Santos

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

ARGUMENT ....................................................................................4

    I.     Bankruptcy provides an important and legitimate mechanism for a financially distressed manufacturer or other business to efficiently resolve its liabilities and obtain a fresh start........................4

    II.    The Panel's ad hoc approach for determining financial distresss creates enormous uncertainty for manufacturers and other businesses and undermines the goals of bankruptcy protection. ........10

CONCLUSION ...................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*In re Asbestos Prods. Liab. Litig. (No. VI)*,
  771 F. Supp. 415 (J.P.M.L. 1991) ........................................................9

*In re Deer Park, Inc.*,
  10 F.3d 1478 (9th Cir. 1993) ...............................................................9

*In re Dow Corning Corp.*,
  187 B.R. 919 (E.D. Mich. 1995), *supplemented* (Sept. 14, 1995),
  *rev'd on other grounds*, 103 F.3d 129 (6th Cir. 1996) ....................8, 9

*In re Fed.-Mogul Glob. Inc.*,
  684 F.3d 355 (3d Cir. 2012) .............................................................7, 8

*In re Grossman's Inc.*,
  607 F.3d 114 (3d Cir. 2010) ................................................................7

*In re Neff*,
  824 F.3d 1181 (9th Cir. 2016) .............................................................4

*Schwab v. Reilly*,
  560 U.S. 770 (2010).........................................................................3, 5

*In re SGL Carbon Corp.*,
  200 F.3d 154 (3d Cir. 1999) ...........................................................11, 13

**Statutes:**

11 U.S.C. § 101(5) ...................................................................................7

11 U.S.C. § 362(d)(2)...............................................................................5

11 U.S.C. § 524(g)(2)(B)(i)(I) ................................................................7

**Journal Articles:**

John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class
  Action*, 95 Colum. L. Rev. 1343 (1995) ..............................................9

Brook E. Gotberg, *Small Business Disaster Relief and Restructuring*, 131 Yale L.J. Forum 388 (2021) .......................................................6

Troy A. McKenzie, *Toward A Bankruptcy Model for Nonclass Aggregate Litigation*, 87 N.Y.U. L. Rev. 960 (2012) ...................................5, 6

Samir D. Parikh, *The New Mass Torts Bargain*, 91 Fordham L. Rev. 447 (2022).................................................................................9

David A. Skeel, Jr., *When Should Bankruptcy Be an Option (for People, Places, or Things)?*, 55 Wm. & Mary L. Rev. 2217 (2014) ..................6

Douglas G. Smith, *Resolution of Mass Tort Claims in the Bankruptcy System*, 41 U.C. Davis L. Rev. 1613 (2008).................................5, 7, 9

**Other Authorities:**

Dun & Bradstreet, *Bankruptcy Statistics by Industry*, https://www.dnb.com/resources/business-bankruptcies.html#statistics ..................................................................8

James Nani & Alex Wolf, *J&J Bankruptcy Ruling Knocks Money Deal in 'Texas Two-Step'*, Bloomberg Law (Jan. 31, 2023), https://news.bloomberglaw.com/bankruptcy-law/j-j-bankruptcy-ruling-undercuts-central-move-in-texas-two-step ............................12

U.S. J.P.M.L., *MDL Statistics Report – Distribution of Pending MDL Dockets by Actions Pending* (Aug. 15, 2022), https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Doc kets_By_Actions_Pending-August-15-2022.pdf.............................6, 7

U.S. Judiciary, *U.S. Bankruptcy Courts – Business and Nonbusiness Cases Commenced, by Chapter of the Bankruptcy Code, During the 12-Month Period Ending March 31, 2018*, https://www.uscourts.gov/statistics/table/f-2/bankruptcy-filings/2018/03/31 .................................................................8

U.S. Judiciary, *U.S. Bankruptcy Courts – Business and Nonbusiness Cases Commenced, by Chapter of the Bankruptcy Code, During the 12-Month Period Ending March 31, 2020*, https://www.uscourts.gov/statistics/table/f-2/bankruptcy-filings/2020/03/31 .................................................................8

# INTEREST OF *AMICI CURIAE*[1]

The National Association of Manufacturers ("NAM") is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs nearly 13 million men and women, contributes over $2.8 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for over half of all private-sector research and development in the Nation. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

The Product Liability Advisory Council, Inc. ("PLAC") is a non-profit professional association of corporate members representing a broad cross-section of American and international product manufacturers. These companies seek to contribute to improving and reforming the law in the United States and elsewhere, particularly the law governing the liability of product manufacturers and others in the supply chain. PLAC's perspective derives from the experiences of a corporate membership spanning a diverse group of industries throughout the manufacturing sector. In addition, several hundred leading product liability defense attorneys are

---

[1] No counsel for a party authored this brief in whole or in part, and no party, party's counsel, or person or entity other than *amici* or their counsel contributed money that was intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

sustaining (non-voting) members of PLAC.  Since 1983, PLAC has filed more than 1,200 amicus briefs in both state and federal courts, presenting the broad perspective of product manufacturers seeking fairness and balance in the application and development of the law affecting product risk management.

The NAM and PLAC are interested in this case because their membership includes companies that may find themselves as defendants in mass-tort suits. Members of the NAM and PLAC believe that bankruptcy is an important tool for manufacturers in financial distress, including those that face mass-tort liability, to resolve their liabilities in an efficient manner that is both fair to their creditors and claimants, and have an opportunity to reemerge as productive market participants.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

At the time Appellee LTL Management, LLC ("LTL") filed for bankruptcy, it faced more than 38,000 lawsuits alleging that Johnson's Baby Powder caused ovarian cancer, as well as an additional 400 lawsuits alleging that Johnson's Baby Powder caused mesothelioma.  Panel Opinion ("Op.") 19-20.  And, as the Panel in this appeal acknowledged, the "[e]xpectation[]" was that there would be "thousands more in decades to come."  Op. 20.  Although Johnson & Johnson Consumer Inc. ("Old JJCI") had prevailed in numerous trials, it also suffered significant losses, including a $2.24 billion adverse verdict.  Op. 20.  All told, Old JJCI had paid some $3.5 billion in verdicts and settlements and $1 billion in

defense costs before filing for bankruptcy.  Op. 21.  Faced with the prospect of unending lawsuits and enormous potential liability, LTL sought to resolve these claims through bankruptcy—just as numerous manufacturers and other businesses have done before.

Bankruptcy is well equipped to efficiently resolve mass-tort lawsuits so that financially distressed businesses can obtain the "fresh start" that lies at the core of bankruptcy law.  *Schwab v. Reilly*, 560 U.S. 770, 791 (2010).  The bankruptcy code allows judges to channel efforts to recover against a debtor into a single forum so that the debtor's liabilities can be efficiently resolved in a coordinated manner.  This channeling function preserves the financially distressed company's value against a rush-to-the-courthouse frenzy that would deplete the company's remaining assets to the detriment of its employees, shareholders, and other creditors.  At the same time, bankruptcy promotes global resolution of a company's liabilities by sweeping in future claims based on injuries that have not yet manifested.  And by providing businesses in financial hardship with this fresh start, bankruptcy benefits the business's employees, shareholders, and other stakeholders who are invested in its continued existence.  For these reasons, numerous manufacturers and other businesses have filed for bankruptcy protection, including those facing significant mass-tort liability.

The Panel in this appeal did not dispute that bankruptcy is an important tool

for efficiently and fairly resolving mass-tort claims, like those leveled against LTL. *See, e.g.*, Op. 37. Nonetheless, the Panel held that LTL's bankruptcy petition must be dismissed on the theory that LTL was not in sufficient "financial distress," Op. 45-54—despite the billions of dollars of past and projected future liability arising from the talc lawsuits. In so doing, the Panel disclaimed any need to lay out a "specific test" for "evaluating financial distress," Op. 37, and instead employed a good-for-this-day-only analysis that offers no guidance for businesses facing enormous potential liability to determine beforehand whether they qualify for bankruptcy. If not corrected, the Panel's decision will sow lasting confusion over the availability of bankruptcy protection, and lead understandably cost-conscious debtors—wary of expending significant sums litigating the severity of their own financial distress only to have their bankruptcy petition dismissed—to forgo seeking bankruptcy until it is too late.

The Court should grant the petition for rehearing.

## ARGUMENT

### I. Bankruptcy provides an important and legitimate mechanism for a financially distressed manufacturer or other business to efficiently resolve its liabilities and obtain a fresh start.

Bankruptcy is an important mechanism for troubled companies to resolve their liabilities while "ensuring an equitable distribution" to creditors and affording the debtor a chance at a "fresh start"—a chance to reorder its affairs and return as a productive market participant. *In re Neff*, 824 F.3d 1181, 1187 (9th Cir. 2016)

(citation omitted).  This "fresh start" goal lies "[a]t the core of the Bankruptcy Code," *id*. (citation omitted), and is one of its "fundamental" objectives, *Schwab*, 560 U.S. at 791.

The bankruptcy code contains a number of important features that enable financially distressed businesses to obtain this fresh start.  These features are particularly beneficial for businesses facing mega mass-tort lawsuits and for their stakeholders—employees, shareholders, and business partners—who have an interest in the company's continued existence.

A.     Bankruptcy benefits manufacturers and other businesses by providing an efficient mechanism for channeling "all claims against [the company] in a single forum for collective resolution."  Troy A. McKenzie, *Toward A Bankruptcy Model for Nonclass Aggregate Litigation*, 87 N.Y.U. L. Rev. 960, 999 (2012).  The "automatic stay" that is triggered by the filing of a bankruptcy petition enjoins all ongoing or future efforts by creditors to collect against the debtor, including efforts to collect in state court.  *See* 11 U.S.C. § 362(d)(2); Douglas G. Smith, *Resolution of Mass Tort Claims in the Bankruptcy System*, 41 U.C. Davis L. Rev. 1613, 1639 (2008).  By closing the door to all other avenues of recovery against the debtor, bankruptcy brings all creditors into one "centralized" location to "resolve competing economic interests in an orderly and effective way."  Smith, *Resolution of Mass Tort Claims*, *supra*, at 1639-40 (citation omitted).  This centralization of

claims benefits the bankrupt entity, claimants, and the judicial system—protecting the debtor from having to litigate claims across the country while promoting the efficient resolution of the debtor's liabilities in a single forum.  *See* McKenzie, *Toward A Bankruptcy Model*, *supra*, at 1004-05.

This channeling mechanism is also vitally important for preserving the troubled company's value against creditors "rush[ing] to get paid before the money runs out."  David A. Skeel, Jr., *When Should Bankruptcy Be an Option (for People, Places, or Things)?*, 55 Wm. & Mary L. Rev. 2217, 2227 (2014).  "By halting creditors' individual efforts to collect … and providing a collective proceeding for resolving the debtor's financial distress," bankruptcy preserves the business's ongoing value against a "disorderly liquidation," *id*. at 2227, 2235, and allows the business to "look ahead to a future of productivity," Brook E. Gotberg, *Small Business Disaster Relief and Restructuring*, 131 Yale L.J. Forum 388, 404 (2021).

**B.**    Bankruptcy is particularly important for businesses, including manufacturers, that are threatened with mass-tort liability because of the sheer number of claims that can be filed over incredibly long time periods.  Here, for example, LTL faced nearly 40,000 lawsuits at the time of filing for bankruptcy protection, "with thousands more" expected "in decades to come."  Op. 20; *see also* U.S. J.P.M.L., *MDL Statistics Report – Distribution of Pending MDL Dockets by Actions Pending*, at 1, 2 (Aug. 15, 2022) (identifying multi-district litigation

proceedings with 312,789, and 192,130 claims).[2]  Bankruptcy's ability to centralize claims in a single forum makes it "uniquely equipped to efficiently address the large numbers of claims that are characteristic of mass tort litigation."   Smith, *Resolution of Mass Tort Claims*, *supra*, at 1649.  That advantage is enhanced by the scope of the bankruptcy court's jurisdiction, which allows it to sweep in *future* claimants whose injuries may not manifest for years (or even decades).  *See* 11 U.S.C. § 101(5) (defining "claim[s]" subject to a bankruptcy court's jurisdiction expansively to include "unmatured," "contingent," and "unliquidated" obligations); *In re Grossman's Inc.*, 607 F.3d 114, 125 (3d Cir. 2010).  In this way, a bankruptcy court can effectuate "a global resolution and discharge of current and future liability."  *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 359 (3d Cir. 2012).

Not only is bankruptcy well-suited to addressing mega mass-torts generally, but it has specific provisions designed for resolving asbestos-related mass-tort litigation, empowering the bankruptcy court in an asbestos case—like this one—to "issue an injunction channeling all current and future claims" into a "personal injury trust" for payment.  *Fed.-Mogul Glob. Inc.*, 684 F.3d at 357; *see* 11 U.S.C. § 524(g)(2)(B)(i)(I).  This mechanism seeks to ensure that future asbestos claimants will "be compensated comparably to present claims," while also "enabling corporations saddled with asbestos liability to obtain the 'fresh start'

---

[2] https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-August-15-2022.pdf.

promised by bankruptcy." *Fed.-Mogul Glob. Inc.*, 684 F.3d at 357, 359 (citation omitted).

    **C.**    Bankruptcy thus provides an important mechanism for manufacturers and other businesses to obtain efficient and widespread resolution of liabilities, particularly those arising from mass-tort litigation where the company faces tens of thousands of high-dollar claims in the present, and the prospect of thousands more accruing for the foreseeable future. It is thus unsurprising that thousands of businesses utilize bankruptcy every year to obtain a fresh start,[3] including over 6,000 manufacturers that have sought bankruptcy since 2014.[4]

    Manufacturers have also historically sought bankruptcy protection when faced with "mass tort liability" that has "push[ed] [the] debtor to the brink." Op. 42. For example, Dow Corning Corp. sought bankruptcy protection in May 1995 after thousands of individual and class-action lawsuits were filed alleging injuries from its silicone gel breast implants. *See In re Dow Corning Corp.*, 187 B.R. 919,

---

[3] *See, e.g.*, U.S. Judiciary, *U.S. Bankruptcy Courts – Business and Nonbusiness Cases Commenced, by Chapter of the Bankruptcy Code, During the 12-Month Period Ending March 31, 2018* (recording 6,628 Chapter 11 filings by businesses), https://www.uscourts.gov/statistics/table/f-2/bankruptcy-filings/2018/03/31; U.S. Judiciary, *U.S. Bankruptcy Courts – Business and Nonbusiness Cases Commenced, by Chapter of the Bankruptcy Code, During the 12-Month Period Ending March 31, 2020* (recording 6,274 Chapter 11 filings by businesses), https://www.uscourts.gov/statistics/table/f-2/bankruptcy-filings/2020/03/31.

[4] Dun & Bradstreet, *Bankruptcy Statistics by Industry*, https://www.dnb.com/resources/business-bankruptcies.html#statistics.

922 (E.D. Mich. 1995), *supplemented* (Sept. 14, 1995), *rev'd on other grounds*, 103 F.3d 129 (6th Cir. 1996); *see also* John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343, 1408-09 (1995). Numerous asbestos manufacturers took the same route when faced with hundreds of thousands of lawsuits in state and federal courts scattered across the country. *See In re Asbestos Prods. Liab. Litig. (No. VI)*, 771 F. Supp. 415, 419-20 (J.P.M.L. 1991); Smith, *Resolution of Mass Tort Claims*, *supra*, at 1618. "[B]y 2007, 'nearly all of the major [asbestos] manufacturers ha[d] declared bankruptcy.'" Samir D. Parikh, *The New Mass Torts Bargain*, 91 Fordham L. Rev. 447, 464 (2022) (alteration in original) (citation omitted).

Bankruptcy's benefits are not limited to the distressed business, but also inure to the business's stakeholders, including its employees and shareholders. By preserving the company's value against a rush-to-the-courthouse frenzy of creditor claims, bankruptcy maximizes the potential that the company will reemerge as a productive market participant, continue to employ workers, and preserve value for its shareholders. These protections are central to bankruptcy's goal: the "purpose of a business reorganization is to 'restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders.'" *In re Deer Park, Inc.*, 10 F.3d 1478, 1485 (9th Cir. 1993) (quoting H.R. Rep. No. 595, 95th Cong., 2nd Sess. 220, *reprinted in* 1978

U.S.C.C.A.N. 5787, 5963, 6179).

In short, bankruptcy offers an important tool for manufacturers and other businesses in financial hardship to produce comprehensive, equitable, and timely resolution of their current and future liabilities for the benefit of the company and its stakeholders—benefits that are all the more relevant in the context of mega mass-tort litigation.

## II.    The Panel's ad hoc approach for determining financial distresss creates enormous uncertainty for manufacturers and other businesses and undermines the goals of bankruptcy protection.

The Panel's decision undermines the important features of the bankruptcy code that enable defendants facing mass-tort liability to efficiently resolve claims while leaving open the chance of a "fresh start."  The Panel imposed a categorical rule that a debtor must be in "financial distress" to obtain bankruptcy protection, *see, e.g.*, Op. 36, but it then offered no meaningful guidance for debtors seeking to determine whether their financial predicament will qualify.  Left undisturbed, the Panel's opinion will cause businesses to expend enormous sums litigating their own financial distress, leading many to forgo bankruptcy until it is too late.

The Panel acknowledged that businesses facing mass tort liability are prime candidates for bankruptcy protection because mass-tort liability can "push [the] debtor to the brink." Op. 38, 42.  It also recognized that the bankruptcy code does not require a debtor to wait until it is insolvent to seek bankruptcy protection; to

the contrary, the code "contemplates 'the need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation.'"  Op. 38, 40 (quoting *In re SGL Carbon Corp.*, 200 F.3d 154, 163 (3d Cir. 1999)).    But even as the Panel acknowledged the "fine line" between insolvency and its theory of "financial distress," it offered manufacturers and other debtors no guidance on how to discern where that line falls.  Op. 38, 40.  Instead, the Panel refused to adopt any "specific test" for "evaluating financial distress," and opted for an I-know-it-when-I-see-it jurisprudence.  *See, e.g.*, Op. 37-38 (concluding that financial distress requires a "case-by-case" assessment that "consider[s] all relevant facts in light of the purposes of the [Bankruptcy] Code"); *see also* Op. 53.

The Panel's reasoning illustrates the confusion that its mode of analysis will sow if left in place.  The Panel based its holding that LTL was not in sufficient financial distress largely on the Funding Agreement that gave LTL access to assets from Johnson & Johnson and Johnson & Johnson Consumer Inc. to pay talc liabilities.  Op. 46-48.  But while denying LTL's bankruptcy petition on that basis, the Panel opined that other entities operating under the *same form* of funding agreement *could* qualify for bankruptcy.  Op. 52-53 n.17 (stating that the Panel was "not suggest[ing that] the presence of these characteristics would preclude a finding of financial distress in every case").  And yet, the Panel gave no guidance

as to what future companies might do to make their own funding arrangements acceptable, offering only its "confiden[ce]" that the "special circumstances" of LTL's financial situation made it "fall outside" the bounds of financial distress. Op. 52 n.17, 53. This provides no help *at all* to struggling manufacturers and other debtors trying to discern whether their financial circumstances are sufficiently dire to qualify. And the risk of miscalculation is substantial: if the funding arrangement provides *too much* support then the petition will be denied for lack of financial distress, but if it provides *too little*, then the business risks being accused of a fraudulent transfer.

The uncertainty caused by the Panel's decision will have broader harmful effects. By imposing a categorical requirement of financial distress and then offering no guidance on how to discern it, the Panel's decision will force cash-strapped debtors to expend significant sums trying to determine and then litigating whether their own financial situation is sufficiently severe—a waste of resources by entities already enmeshed in litigation across the country that could otherwise be used to pay creditors' claims. *See, e.g.*, James Nani & Alex Wolf, *J&J Bankruptcy Ruling Knocks Money Deal in 'Texas Two-Step'*, Bloomberg Law (Jan. 31, 2023) (noting that the Panel's decision will produce "increased litigation costs

as courts attempt to determine 'financial distress' for each individual case").[5] These increased costs will also likely lead manufacturers and other businesses seeking to avoid spending their resources on a bankruptcy petition that may ultimately be rejected to delay pursuing bankruptcy protection until "faced with a hopeless situation." *SGL Carbon*, 200 F.3d at 163. The Panel's decision thus converts the "financial distress" requirement into a *de facto* insolvency requirement and thereby undermines bankruptcy's preference for "early access to bankruptcy relief to allow a debtor to rehabilitate its business." *Id.*

In the end, the Panel's decision serves only to sow confusion and create additional hurdles to struggling manufacturers and businesses. Without review by the full Court to consider and correct the Panel's errors, businesses facing mega mass-tort liability will have little meaningful access to the features of bankruptcy that have proven enormously beneficial in resolving mass-tort litigation in a fair and equitable manner.

## CONCLUSION

This Court should grant the petition for rehearing.

---

[5] https://news.bloomberglaw.com/bankruptcy-law/j-j-bankruptcy-ruling-undercuts-central-move-in-texas-two-step.

Dated:  February 21, 2023

Respectfully submitted,

*s/ Jaime A. Santos*

Erica Klenicki
Michael A. Tilghman II
NAM LEGAL CENTER
733 10th Street, N.W., Suite 700
Washington, DC 20001
(202) 637-3000

Jaime A. Santos
Benjamin Hayes
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
*jsantos@goodwinlaw.com*

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Fed. R. App. P. 29(b)(4) and 32(a)(7)(B) because it contains 2,571 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Third Circuit Rule 29.1(b). This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: February 21, 2023

*s/ Jaime A. Santos*
Jaime A. Santos
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
*jsantos@goodwinlaw.com*

*Counsel for Amici Curiae*

# CERTIFICATE OF SERVICE AND COMPLIANCE WITH L.A.R. 31.1(C)

I certify that I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on February 21, 2023.  The text of the electronic brief is identical to the text of the paper copies delivered to the Court.

I certify that all participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

I certify that a virus-detection program, Metadact version 5.7.0, has been run on the electronic brief, and no virus was detected.

Dated:  February 21, 2023

*s/ Jaime A. Santos*
Jaime A. Santos
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
*jsantos@goodwinlaw.com*

*Counsel for Amici Curiae*

# CERTIFICATE OF ADMISSION TO BAR

Pursuant to L.A.R. 46.1(e), the undersigned certifies that she is a member of the bar of the United States Court of Appeals for the Third Circuit.

Dated: February 21, 2023

*s/ Jaime A. Santos*

Jaime A. Santos
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
*jsantos@goodwinlaw.com*

*Counsel for Amici Curiae*